Slip Op. 07-150

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| FORMER EMPLOYEES OF BMC SOFTWARE, INC., | : |
| Plaintiffs, | : |
| v. | : |
| UNITED STATES SECRETARY OF LABOR, | : |
| Defendant. | : |

Court No. 04-00229

[Granting in part Plaintiffs' application for attorneys' fees and expenses under the Equal Access to Justice Act.]

Dated: October 15, 2007

Miller & Chevalier Chartered (Alexander D. Chinoy, Hal S. Shapiro, Kevin P. DiBartolo, and James B. Altman), for Plaintiffs.

Peter D. Keisler, Assistant Attorney General; Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera); Stephen R. Jones, Office of the Solicitor, U.S. Department of Labor, Of Counsel; for Defendant.

## OPINION

RIDGWAY, Judge:

In this action, former employees of Houston, Texas-based BMC Software, Inc. ("the Workers") successfully challenged the determination of the U.S. Department of Labor denying their petition for certification of eligibility for trade adjustment assistance ("TAA") benefits. *See generally* Former Employees of BMC Software, Inc., 30 CIT ____, 454 F. Supp. 2d 1306 (2006) (BMC); Notice of Revised Determination on Remand, 69 Fed. Reg. 76,783, 76,784 (Dec. 22, 2004).

Now pending before the Court is Plaintiffs' Application For Fees and Other Expenses Pursuant to the Equal Access to Justice Act, which the Government opposes. *See generally* Application For Fees and Other Expenses Pursuant to the Equal Access to Justice Act; Memorandum in Support of Application for Attorneys' Fees; and Accompanying Exhibits ("Pls.' Application"); Defendant's Response to Plaintiffs' Application for Attorney Fees and Expenses ("Def.'s Response"); Memorandum in Reply to Defendant's Response to Plaintiffs' Application for Attorney Fees and Expenses ("Pls.' Reply").

For the reasons discussed more fully below, Plaintiffs' Application For Fees and Other Expenses  is granted in part.

## I. **Background**

The Workers' former employer, BMC, is a "Fortune 1000" company, and one of the largest software vendors in the world.  Among other things, BMC designs, develops, produces and sells business systems management software, which is distributed both in "object code" form and on a "shrink-wrap" basis.  BMC's competitors include industry giants and household names such as IBM, Computer Associates, Microsoft, Sun Microsystems, and Hewlett Packard.  *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1313.

The four former employees who filed the TAA petition at issue here were involved in the production and distribution of BMC software products.  Those products were mass-replicated at the Houston facility where they worked (as well as at several other BMC facilities), and were often shipped on physical media including CD-ROMs, packaged with user manuals.  *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1313.

The Workers' employment at BMC was terminated in early August 2003, as part of a round

of lay-offs reported in an article published in the *Houston Chronicle*. The news article explained:

> The company will spend $60 million this year to restructure. Jobs in sales, research
> and development, information technology, and administration will be shed.
>
> *The company will offset some of the cuts by adding research and development jobs
> and positions in information technology to offshore facilities in India and Israel*,
> making the net reduction more like 8 percent when all is done.

BMC, 30 CIT at ____, 454 F. Supp. 2d at 1313-14 (quotation omitted) (emphases added).

A copy of the *Houston Chronicle* article was enclosed with the petition for TAA benefits that

the Workers filed with the Labor Department in late December 2003. The petition alleged, *inter*

*alia*, that the company was shifting jobs "offshore to India and Israel." Appended to the Workers'

petition were some 25 pages of announcements of job vacancies – primarily at BMC facilities in

India and Israel – printed out from the company's website. *See* BMC, 30 CIT at ____, 454 F. Supp.

2d at 1314.

In mid-January 2004, the Labor Department contacted BMC management concerning the

Workers' TAA petition. Asked to "[b]riefly describe the business activities of BMC Software, Inc.,"

the company's Senior Manager for Human Resources responded by parroting – *verbatim* – a

marketing pitch on BMC's website:

> BMC Software, Inc. (NYSE: BMC), is a leading provider of enterprise management
> software solutions that empower companies to manage their IT infrastructure from
> a business perspective. Delivering Business Service Management, BMC Software
> solutions span enterprise systems, applications, databases and service management.

*See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1314-15 (citation and footnotes omitted).

The Labor Department also asked BMC to advise whether the company's Houston

employees "produce an article of any kind or . . . were engaged in employment related to the

production of an article."  There too the Senior Manager for Human Resources failed to respond

directly to the Labor Department's inquiry, and instead proffered a "soundbite" plucked from the

company's promotional materials (available on the company website):

> BMC Software develops software solutions to proactively manage and monitor the
> most complex IT environments, enabling around-the-clock availability of business-
> critical applications.  BMC also provides services to support its software products,
> including support and implementation services.

*See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1315 (citation omitted).

With no further inquiry, the Labor Department denied the Workers' TAA petition on January

20, 2004.  The Labor Department ruled that the Workers "develop[ed] software solutions," and thus

"[did] not produce an article" within the meaning of the TAA statute.  *See* BMC, 30 CIT at ____,

454 F. Supp. 2d at 1315-16 (citations and footnotes omitted); *see also* 69 Fed. Reg. 11,887, 11,888

(March 12, 2004) (notice of denial of TAA petition) (ruling that "[t]he workers firm does not

produce an article as required for certification [under the TAA statute]").[1]

According to an undated internal agency memorandum documenting the "Findings of the

---

[1]The Negative Determination similarly concluded that the Workers were ineligible for
certification as service workers.  According to that ruling:

> Workers . . . may be certified [as service workers] only if their separation was caused
> importantly by a reduced demand for their services from a parent firm, a firm
> otherwise related to their firm by ownership, or a firm related by control.
> Additionally, the reduction in demand for services must originate at a production
> facility whose workers independently meet the statutory criteria for certification, and
> the reduction must directly relate to the product impacted by imports.  These
> conditions have not been met for workers at this firm.

*See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1315-16 n.15 (citation omitted).

Investigation," the Labor Department concluded – solely on the strength of the information supplied by BMC's Senior Manager for Human Resources – that the Workers were "engaged in the development of" software, and thus "provide[d] development services." To support the agency's conclusion that "[BMC] [w]orkers do not produce an article," the agency memorandum attributed a statement to that effect to BMC's Senior Manager for Human Resources. In fact, however, the BMC official *had not* stated that the company does not produce a product. Indeed, the BMC official's statement expressly referred both to the company's "products" and to its provision of "services," implicitly distinguishing between the two. The memorandum also stated that BMC's "Standard Industrial Classification" ("SIC") code is 7371 (the code for "Computer Programming Services"). As BMC noted, however, the source of that information was not specified, and the relevance and accuracy of the information are dubious at best. *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1316 (citations omitted).[2]

The Labor Department sent the Workers copies of its Negative Determination under cover of a standard form letter, which advised the Workers of their right to seek administrative reconsideration of the denial. Incredibly, that letter said nothing about the Workers' right to challenge the Negative Determination in this court. *See* BMC, 30 CIT at ____, 454 F. Supp. at 1316-17 (citations omitted).

The Workers timely sought reconsideration of the Labor Department's denial of their TAA petition. In their request for reconsideration, the Workers disputed the agency's determination that

---

[2]The Labor Department and other federal agencies historically have used the Standard Industrial Classification ("SIC") system to classify businesses by the industry in which they are engaged, for statistical and other purposes. *See generally* BMC, 30 CIT at ____ n.18, 454 F. Supp. 2d at 1316 n.18.

BMC did not produce an article.  The Workers referred the agency to three specific URL locations

on BMC's website, including "an online store for purchasing BMC *products* and *product lines*."

The Workers also quoted the BMC website:

> Now you're ready to shop online with BMC Software.  Browse through the store by
> category or by the A-Z list below.  If you know the name of your *product*, use the
> *Product* Name Search field to locate your product quickly.

(Emphases added.)  The Workers explained that "[t]he use of the term 'solutions' is misleading.

Usage of the term 'solutions' within the BMC Software, Inc. web page and other places is

synonymous with 'product lines.'"  And the Workers again stated that BMC was shifting work "to

overseas companies as well as newly created BMC locations overseas."  The Workers added that

software was also being "imported to make up the products and product lines that BMC Software,

Inc. produces."  *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1317 (citations omitted).

In response to the Workers' request for reconsideration, a Labor Department staffer called

BMC's Senior Manager for Human Resources (the same company official who had responded to

the agency's initial request for information).  The BMC official reportedly stated unequivocally that

"no products are manufactured" by the company, and that the company's software is not "recorded

on media disks," nor is it "mass-produced" or "sold off-the-shelf."  She reportedly further stated that

"*most* [of BMC's] software is customized for individual users," and denied that jobs had been

transferred abroad.  *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1317 (emphasis added) (citation

omitted).

The Labor Department staffer failed to ask any follow-up questions concerning, for example,

the nature and volume of BMC software that is *not* "customized for individual users" – *i.e.*, software

that is mass-produced. Similarly, the staffer failed to explore with the BMC official the allegations of increased imports raised in the Workers' request for reconsideration. Indeed, the agency staffer did nothing to confront the BMC official with *any* of the information provided by the Workers. Nor did the staffer contact any of the Workers (to verify the information provided by BMC), or take any other measures to try to reconcile the apparent discrepancies and inconsistencies in the information before the agency. *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1317.

Based solely on its phone conversation with BMC's Senior Manager for Human Resources, the Labor Department denied the Workers' request for reconsideration. The Labor Department ruled once again that the Workers were "not considered to have been engaged in production."[3] *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1317-18 (*citing* 69 Fed. Reg. 20,642) (April 16, 2004) (notice of denial of request for reconsideration).[4]

---

[3]The Labor Department 's notice denying the Workers' request for reconsideration further stated: "The petitioner also alleges that imports impacted layoffs, asserting that because workers lost their jobs due to a transfer of job functions overseas, petitioning workers should be considered import impacted." *See* 69 Fed. Reg. at 20,642. As BMC noted, however, there are at least two problems with that statement. *See* BMC, 30 CIT at ____ & n.20, 454 F. Supp. 2d at 1317-18 & n.20 (citations omitted).

First, the Labor Department investigator reviewing the request for reconsideration failed to ask BMC about the Workers' claims of increased imports. There is therefore nothing in the record on the request for reconsideration to support an agency finding on the subject. And, second, the quoted statement improperly conflates two separate bases for TAA certification – increased imports *versus* a shift in production – and is simply illogical. *See* BMC, 30 CIT at ____ n.20, 454 F. Supp. 2d at 1317-18 n.20 (citations omitted).

[4]As BMC observed, the Labor Department notice denying the request for consideration also reiterated the agency's prior ruling that the Workers could not be certified as "service workers" – albeit based on a rather different rationale:

Only in very limited instances are service workers certified for TAA, namely the worker separations must be caused by a reduced demand for their services from a

The Labor Department's notice denying the Workers' request for reconsideration summarized the agency's rationale, emphasizing the concept of "tangibility":

> Software design and developing are not considered production of an article within the meaning of [the TAA statute]. Petitioning workers do not produce an "article" within the meaning of [that statute]. Formatted electronic software and codes are not *tangible* commodities, that is, marketable products, and they are not listed on the Harmonized Tariff Schedule of the United States (HTS), . . . which describes articles imported to the United States.
>
> To be listed in the HTS, an article would be subject to a duty on the tariff schedule and have a value that makes it marketable, fungible and interchangeable for commercial purposes. Although a wide variety of *tangible* products are described as articles and characterized as dutiable in the HTS, informational products that could historically be sent in letter form and that can currently be electronically transmitted . . . are not listed in the HTS. Such products are not the type of products that customs officials inspect and that the TAA program was generally designed to address.

BMC, 30 CIT at ____, 454 F. Supp. 2d at 1318-21 (emphases added) (citations omitted).

This action ensued, commenced by the Workers' letter to the court dated June 1, 2004 (deemed the Complaint in this matter, filed as of June 3, 2004). The attachments to the Workers' letter included copies of photos of BMC software on physical media (such as CD-ROMs). *See* Complaint.[5]

_____

> parent or controlling firm or subdivision whose workers produce an article and *who are currently under certification for TAA*. The investigation revealed no such affiliations.

(Emphasis added.) But, as BMC explained, the agency materially misstated the test for certification as "service workers." *See generally* BMC, 30 CIT at ____ n.21, 454 F. Supp. 2d at 1318 n.21 (citation omitted).

[5]The Workers' Application mistakenly states that the Workers submitted "photographic evidence of shrink-wrapped BMC software on CDs" with their request for reconsideration. *See* Pls.' Application at 4. As discussed above, the copies of photos instead were included with the Complaint filed with the court.

        In lieu of filing an Answer, the Government requested a 60-day voluntary remand to allow

the Labor Department to conduct a further investigation and to make a redetermination as to the

Workers' eligibility for TAA benefits.  As grounds for the voluntary remand, the Government cited

the Labor Department's "need[] to resolve an apparent conflict between information provided by

company officials and information provided by the petitioners" – specifically, whether BMC

produces "articles."  And, as counsel for the Government candidly conceded, the "conflict" between

information provided by the Workers and that provided by BMC was "apparent" during the course

of the Labor Department's investigation – long before the Workers filed their Complaint with the

Court.  *See* BMC, 30 CIT at ____ & n.24, 454 F. Supp. 2d at 1321 & n.24; Defendant's Second

Amended Motion for Voluntary Remand, at 3 (citing, as grounds for remand, not only the photos

of software attached to the Workers' Complaint, but also information that had been included in the

Workers' request for reconsideration).

        Counsel were appointed to represent the Workers, and played an integral role in structuring

the Court's Remand Order.  The Workers noted that the Labor Department had limited the scope of

both its initial investigation and its investigation following the Workers' request for reconsideration

to only a single TAA criterion – whether the Workers had been engaged in the production of an

"article" within the meaning of the TAA statute.  The Workers emphasized that they were concerned

about the impact of delayed certification by the Labor Department on the availability of full TAA

benefits, and that they wanted to guard against the need for multiple remands.  The Workers

therefore conditioned their consent to the Government's motion for a voluntary remand on the

agency's conduct of a comprehensive remand investigation – an investigation in which the agency

would reach determinations on all criteria for TAA certification.  The Workers conferred with the
Government, and drafted a detailed order to that effect for the consideration of the Court.  *See
generally* <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1344-45; Plaintiffs' Response to Government's
Second Amended Motion to Remand Case.  The Remand Order that the Court entered  reflected
only minor changes to the draft submitted by the Workers' counsel.  *See* Remand Order.

Three days before the Labor Department's remand results were due to be filed, the
Government requested a 60-day extension of the deadline.  When the Government contacted the
Workers' counsel to request their consent to the extension of time, the Workers reiterated their
previously-expressed concerns about the effect of delayed certification on the availability of TAA
benefits, and conditioned their consent upon an assurance from the Government that – should the
former employees of BMC be certified – the date of their certification would have no effect on the
benefits available to them.  Accordingly, the Government specifically warranted that, "in the event
[the petitioning workers] are certified in this case, [they] would be entitled to receive full [Trade
Readjustment Allowance, or 'TRA'] benefits regardless of the date they are certified."  *See*
Defendant's Consent Motion for an Extension of Time to File Remand Results, at 3-4.  In reliance
on the Government's assurances, the Workers consented to the requested extension of time, and the
Court granted it.  *See* <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1345-46  (*quoting* Defendant's
Consent Motion for an Extension of Time to File Remand Results, at 3-4).

On remand, the Labor Department reiterated – and elaborated on – its test for "production"
of an "article" in the context of the software industry, further emphasizing the characteristic of
"tangibility":

> The Department has consistently maintained that the design and development of software is a service. In order to be treated as an article, for TAA purposes, a software product must be *tangible*, fungible, and widely marketed. The Department considers software that is mass-replicated on physical media (such as CDs, tapes, or diskettes) and widely marketed and commercially available (*e.g.*, packaged "off-the-shelf" programs) and dutiable under the Harmonized Tariff Schedule of the United States to be an article. The workers designing and developing such products would be considered to be engaged in services supporting the production of an article.

69 Fed. Reg. at 76,783 (emphasis added). Applying that analysis in the course of its remand investigation here, the Labor Department "raised additional questions and obtained detailed supplemental responses from [BMC]." *Id.*

The information that BMC provided to the Labor Department in the course of the remand investigation conflicted with the information that the company had supplied earlier, and bore out the Workers' claims, casting an entirely new light on the merits of the Workers' TAA petition. Reiterating its position that "to be treated as an article . . . for TAA purposes, a software product must be *tangible*,"[6] the Labor Department explained:

> [T]he new information showed that, in addition to software design and development, the firm does, in fact, mass-replicate software at the subject facility. Further, software produced by the firm at the subject facility includes not only custom applications, but [also] packaged 'off-the-shelf' applications which are mass-replicated *on various media* (*CDs and tapes*) at the subject facility.

69 Fed. Reg. at 76,783 (emphases added). Noting that BMC employees "are not separately

---

[6]The Labor Department had advanced similar views – articulated in varying formulations – in a number of cases filed with the court in recent years involving software and similar "intangible" goods. Because BMC in fact sells its software "prepackaged" in "shrink wrap form" as well as electronically ("in object code form"), the Workers in this case qualified for TAA certification even under the criteria that the Labor Department was applying at the time. Accordingly, there was no need to reach the substantive merits of those criteria in this case, except to note that the Workers vigorously disputed them, and that the agency has since repudiated them in significant part. *See* BMC, 30 CIT at _____ n.22, 454 F. Supp. 2d at 1319-20 n.22 (collecting software and other similar cases).

identifiable by product line," the Labor Department concluded that the Workers here were, indeed, "engage[d] in activity related to the production of an article."  *Id*.

On remand, the Labor Department also re-evaluated the Workers' allegations that BMC had shifted production overseas, to India and Israel.  69 Fed. Reg. at 76,783.  The agency concluded that "there was no shift in production, for TAA purposes."  *Id*.  However, the agency did find that "employment and production of packaged, mass-replicated software at the subject facility had declined significantly from 2002 to 2003," that "company imports of mass-replicated software increased during the same period," and that "the increase in company imports represented a significant percentage of the decline in production at the subject facility during the relevant period." *Id*.  The Labor Department therefore determined on remand "that increases of imports of articles like or directly competitive with those produced at BMC Software, Inc., Houston, Texas, contributed importantly to the total or partial separation of a significant number of workers and to the decline in sales or production at that firm."  *Id*. at 76,783-84.

Accordingly, nearly one full year after the TAA petition was filed (and more than 16 months after the Workers here lost their jobs), the Labor Department certified as eligible to apply for benefits all Houston-based BMC employees "who became totally or partially separated from employment on or after December 23, 2002, through two years from the issuance of [the] revised determination."  69 Fed. Reg. at 76,783-84.

In their comments on the Labor Department's remand determination, the Workers advised that they were "generally satisfied" with the outcome of the remand investigation.  However, the Workers expressed concern that the remand determination did not reflect the unconditional

assurances that the Government had previously given them.  The Workers therefore requested that

the Court "expressly order[ ], in accordance with Defendant's representation, that Plaintiffs, having

been certified, are entitled to receive full TRA benefits, regardless of the date of their certification."

*See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1346 (*quoting* Plaintiffs' Comments on Defendant's

Determination on Remand, at 1-2).

     The Government responded flatly that the Court lacked jurisdiction to enforce the

representations that the Government's counsel had made to the Court and to the Workers.  *See* BMC,

30 CIT at ____, 454 F. Supp. 2d at 1346; Defendant's Response to Plaintiffs' Comments In

Response to Labor's Remand Determination, at 3 (arguing that "although  Labor confirms that the

delay from litigation will not affect the calculation of benefits . . . , the Court lacks the authority to

dictate whether the petitioners will, in fact, receive 'full' TRA benefits," and characterizing as

"inappropriate" the Court's inquiry into the effects, if any, of litigation delays on relief ultimately

available in a TAA case).

     The Government's insistence that the Court lacked any authority to hold counsel to the

Government (and the Government itself) to the representations that the Government had previously

made precipitated several rounds of post-certification submissions by the parties – all of which were

filed in direct response to orders of, or letters from, the Court.[7]

---

[7]*See* Remand Order (Aug. 11, 2004); Plaintiffs' Comments on Defendant's Determination on Remand; Defendant's Response to Plaintiffs' Comments in Response to Labor's Remand Determination; Letter to Defendant from the Court (Feb. 4, 2005); Defendant's Memorandum of Law in Response to the February 4, 2005 Order; Letter to Court from Plaintiffs (Feb. 11, 2005); Plaintiffs' Reply to Defendant's Response to Plaintiffs' Comments on Remand Results; Letter to Parties from Court (May 12, 2005); Defendant's Memorandum of Law in Response to the May 12, 2005 Order; Letter to Court from Plaintiffs (May 19, 2005).

In light of the Workers' objections to the language of the Labor Department's remand determination and the Government's intransigence, this action was maintained on the Court's docket following certification, to ensure that – in accordance with the assurances that the Government had previously given the Court and the Workers, and on which they had relied – the Workers' receipt of the various types of TAA benefits to which they were entitled was indeed unaffected by the Labor Department's protracted delays in certification.

Following some initial setbacks, and armed with clarification elicited in the course of the post-certification briefing, the Workers advised that they no longer foresaw any insurmountable obstacles to their receipt of the full measure of TAA benefits. The Workers further advised that if – contrary to their expectations – they did in fact continue to experience problems with their receipt of benefits, they would promptly notify the Court. *See generally* Letter to Court from Plaintiffs (May 19, 2005). "The Workers' silence in the intervening months [between their counsel's May 2005 letter and the issuance of BMC] suggests that any need for further proceedings to 'hold the Government to its words' ha[d] been obviated." BMC, 30 CIT at ____, 454 F. Supp. 2d at 1350.

The Labor Department has since revised its TAA certification criteria to recognize that – at least for purposes of cases such as this – "there are tangible and *intangible* articles," and that "the production of intangible articles can be distinguished from the provision of services." Accordingly, "[s]oftware and similar *intangible* goods that would have been considered articles for the purposes of the Trade Act if embodied in a physical medium will now be considered to be articles regardless of their method of transfer." *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1322-23 (*quoting* Computer Sciences Corporation: Notice of Revised Determination on Remand, 71 Fed. Reg. 18,355

(April 11, 2006) (emphasis added)).   In short, as the Labor Department apparently now concedes,

the Workers here would have been entitled to TAA certification even if BMC's software had not

been "replicated on various media (CDs and tapes)" – that is, even if it had not been in "tangible"

form.  *Id*. (footnote omitted).

## II.  <u>Analysis</u>

Under the Equal Access to Justice Act ("EAJA"):

> a court shall award to a prevailing party other than the United States fees and other
> expenses . . . incurred by that party in any civil action . . . , including proceedings for
> judicial review of agency action, brought by or against the United States . . . , unless
> the court finds that the position of the United States was substantially justified or that
> special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (2000).[8]  Thus, although the court retains a measure of discretion as to

the size of the award, under the EAJA "a trial court *must* award attorney's fees where: (i) the

claimant is a 'prevailing party'; (ii) the government's position was not substantially justified; (iii)

no 'special circumstances make an award unjust'; and (iv) the fee application is timely submitted

and supported by an itemized statement."  <u>Libas, Ltd. v. United States</u>, 314 F.3d 1362, 1365 (Fed.

Cir. 2003) (citations omitted) (emphasis added) (also noting "the imperative language" of EAJA

statute); *accord* <u>Hubbard v. United States</u>, 480 F.3d 1327, 1331 (Fed. Cir. 2007) (acknowledging

"mandatory" nature of EAJA award); <u>Brickwood Contractors, Inc. v. United States</u>, 288 F.3d 1371,

1379 (Fed. Cir. 2002) (same).

---

[8]Except as otherwise indicated, all statutory citations are to the 2000 edition of the United
States Code.  However, the text of the referenced provisions remained the same at all times relevant
herein.

Notably, the Government here does not dispute that the Workers were "prevailing parties."[9]

Nor does the Government contend either that there are "special circumstances" that would render

an award unjust,[10] or that the Workers' application for fees and expenses was untimely.  Instead,

the Government contends that an award is not warranted because the United States' position was

"substantially justified," both at the agency level and in litigation.  *See generally* Def.'s Response

at 1-2, 8-9, 10-23.  The Government further argues that – even if the Workers' application for fees

and expenses is granted – the sum claimed is excessive.  *See generally* Def.'s Response at 1-2, 9,

23-40.

        As discussed in greater detail below, the Government's position at the administrative level,

at a minimum, was not "substantially justified."  Moreover, contrary to the Government's assertions,

the fees claimed are generally well within the bounds of reason, with a few relatively minor

exceptions.

        A.  Whether the Government's Position Was "Substantially Justified"

        The Government bears the burden of proving that its position was "substantially justified."

---

        [9]*See* Pls.' Reply at 1 n.1 (noting that "the government has implicitly conceded that Plaintiffs
qualify as 'prevailing parties' for purposes of EAJA").

        [10]The EAJA's "special circumstances" exception to an award of fees and expenses serves as
a "'safety valve' [which] helps to insure that the Government is not deterred from advancing in good
faith the novel but credible extensions and interpretations of the law that often underlie vigorous
enforcement efforts.  It also gives the court discretion to deny awards where equitable considerations
dictate an award should not be made." Devine v. U.S. Customs Service, 733 F.2d 892, 895-96 (Fed.
Cir. 1984) (*quoting* H.R. Rep. No. 1418, 96th Cong., 2d Sess. 11, *reprinted in* 1980 U.S.C.C.A.N.
4984, 4990).  *See, e.g.*, Taylor v. United States, 815 F.2d 249, 252 (3d Cir. 1987) (explaining that
"special circumstances" provision permits consideration of traditional equitable principles in
determining whether fee award is warranted); Oguachuba v. Immigration & Naturalization Service,
706 F.2d 93, 98 (2d Cir. 1983) (same).

*See*, *e.g.*, Libas, 314 F.3d at 1365 (citations omitted); Doty v. United States, 71 F.3d 384, 385 (Fed.

Cir. 1995) (citations omitted).  The Government's position is substantially justified if it is "justified

in substance or in the main – that is, justified to a degree that could satisfy a reasonable person."

Pierce v. Underwood, 487 U.S. 552, 565 (1988).  That a party other than the Government prevailed

in an action does not establish that the Government's position was not substantially justified.

Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States, 837 F.2d 465, 467 (Fed.

Cir. 1988).

      In determining whether substantial justification exists, a court is to weigh not only "the

position taken by the United States in the civil action, [but also] the action or failure to act by the

agency upon which the civil action is based," taking into consideration the "totality of the

circumstances."  28 U.S.C. § 2412(d)(2)(D); Kelly v. Nicholson, 463 F.3d 1349, 1355 (Fed. Cir.

2006); Doty, 71 F.3d at 385-86 (citations omitted); Chiu v. United States, 948 F.2d 711, 715 (Fed.

Cir. 1991) ("trial courts are instructed to look at the entirety of the government's conduct and make

a judgment call" as to "the government's overall position"); Essex Electro Eng'rs, Inc. v. United

States, 757 F.2d 247, 253 (Fed. Cir. 1985) (articulating "totality of the circumstances" standard).

      Reaching a determination on substantial justification requires that a court reexamine the legal

and factual circumstances of a case through the EAJA "prism" – "a different perspective than that

used at any other stage of the proceeding."  Luciano Pisoni, 837 F.2d at 467; Libas, 314 F.3d at 1366

(*quoting* United States v. Hallmark Constr. Co., 200 F.3d 1076, 1080 (7th Cir. 2000)).  Nevertheless,

"the court's merits reasoning may be quite relevant to the resolution of the substantial justification

question."  F.J. Vollmer Co., Inc. v. Magaw, 102 F.3d 591, 595 (D.C. Cir. 1996).  And strong

language criticizing the Government's position in an opinion discussing the merits of a key issue

is evidence in support of an award of fees. *See* Marcus v. Shalala, 17 F.3d 1033, 1038 (7th Cir. 1994)

(*cited in* Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004)). "[A] string of losses can be

indicative" as well.  Pierce v. Underwood, 487 U.S. at 569.

        Moreover, in evaluating the existence of substantial justification, a trial court is entitled to

take into consideration "insights not conveyed by the record, into such matters as whether particular

evidence was worthy of being relied upon, or whether critical facts could easily have been verified

by the Government."  Pierce v. Underwood, 487 U.S. at 560; *see also* Hensley v. Eckerhart, 461

U.S. 424, 437 (1983) (noting propriety of deference to trial court's "superior understanding of the

litigation") (*quoted in* Comm'r, Immigration & Naturalization Service v. Jean, 496 U.S. 154, 161

(1990)); Libas, 314 F.3d at 1366 n.1 (in determining substantial justification, trial court may

consider "not only the actual record," but also "for example, any insights which [it] may have

gleaned from settlement conferences or other pretrial activities that are not conveyed by the actual

record") (*citing* Pierce v. Underwood, 487 U.S. at 560).[11]

---

[11]*Accord* Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1256, 1257 (10th Cir. 2005) (noting that trial court enjoys "the benefit of a degree of familiarity with trial court proceedings [the appellate court] cannot hope to match," and that trial court has an "inherent advantage in passing on a fee request given its familiarity with the proceedings below"); Interfaith Community Organization, 426 F.3d at 718 (deferring to trial court's "far greater understanding of the deadlines it imposed and the complexity of the underlying litigation"); Lyden v. Howerton, 731 F. Supp. at 1553 (noting, in analysis of "substantial justification," that "[o]ftentimes, as here, the published record of the case does not reveal the full aura and nuances of the litigation.  Although the court finds that the public record justifies finding the government without substantial justification in both law and fact, the history, procedure, and the historical context, specifically within this court's knowledge, buttresses this conclusion.").

### 1. The Role of the Labor Department in TAA Cases

The "substantial justification" analysis in this action cannot be conducted in a vacuum. The justification for the Government's position instead must be analyzed in the context of the trade adjustment assistance ("TAA") statute, and the special duties and obligations that the Labor Department owes to workers in its administration of that statute. *See generally* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1307-13 (summarizing policy underpinnings, legislative history, and practical implications of TAA).

The TAA laws are remedial legislation,[12] designed to assist workers who have lost their jobs as a result of increased import competition from – or shifts in production to – other countries, by helping those workers "learn the new skills necessary to find productive employment in a changing American economy." Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, 26 CIT 1272, 1273, 245 F. Supp. 2d 1312, 1317 (2002) ("Chevron I") (*quoting* S. Rep. No. 100-71, at 11 (1987)).

Today's TAA program entitles eligible workers to receive benefits which may include employment services (such as career counseling, resume-writing and interview skills workshops,

---

[12]*See*, *e.g.*, Former Employees of Sonoco Prods. Co. v. Chao, 372 F.3d 1291, 1301 (Fed. Cir. 2004) (Mayer, C.J., dissenting) (noting "remedial" nature of TAA statute); UAW v. Marshall, 584 F.2d 390, 396 (D.C. Cir. 1978) (noting the "general remedial purpose" of TAA statute, and that "remedial statutes are to be liberally construed" to effectuate their intended purpose); Fortin v. Marshall, 608 F.2d 525, 526, 529 (1st Cir. 1979) (same); Usery v. Whitin Machine Works, Inc., 554 F.2d 498, 500, 502 (1st Cir. 1977) (emphasizing "remedial" purpose of TAA statute); Former Employees of Merrill Corp. v. United States, 31 CIT ____, ____, 483 F. Supp. 2d 1256, 1266 (2007) (explaining that "courts liberally construe the TAA provisions of the Trade Act to effectuate legislative intent"); BMC, 30 CIT at ____ & n.9, 454 F. Supp. 2d at 1311 & n.9 (and authorities cited there).

and job referral programs), vocational training, job search and relocation allowances, income support

payments (known as "Trade Readjustment Allowance" or "TRA" payments), and a Health Insurance

Coverage Tax Credit.  *See generally* 19 U.S.C. § 2272 *et seq.* (2000 & Supp. II 2002).

TAA historically has been viewed as the *quid pro quo* for U.S. national policies of free trade.

*See generally* <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1307-08 (and authorities cited there).  As

<u>UAW v. Marshall</u> explains, "much as the doctrine of eminent domain requires compensation when

private property is taken for public use," the trade adjustment assistance laws similarly reflect the

country's recognition "that fairness demand[s] some mechanism whereby the national public, which

realizes an overall gain through trade readjustments, can compensate the particular . . . workers who

suffer a [job] loss."  <u>UAW v. Marshall</u>, 584 F.2d 390, 395 (D.C. Cir. 1978).

Absent TAA programs that are adequately funded and conscientiously administered,[13] "the

costs of a federal policy [of free trade] that confer[s] benefits on the nation as a whole would be

imposed on a minority of American workers" who lose their jobs due to increased imports and shifts

of production abroad.  *Id.*  Indeed, in introducing TAA in 1962, President Kennedy justified the

program in moral terms:

_____

[13]<u>BMC</u> quoted a *Wall Street Journal* article which emphasized the importance of
conscientious implementation of the TAA program:

> Calling attention to workers hurt by trade is uncomfortable for free traders.  They
> prefer to focus on benefits of low-cost imports and high-paying export jobs.  But the
> only way to persuade the public and politicians not to erect barriers to globalization
> and trade is to equip young workers to compete and protect older workers who are
> harmed.  Creating programs with a few votes in Congress, and then *botching the
> execution*, doesn't help.

David Wessel, "Aid to Workers Hurt by Trade Comes in Trickle," *Wall Street Journal*, Aug. 11,
2005, at A2 (emphasis added) (*quoted in* <u>BMC</u>, 30 CIT at ____ n.84, 454 F. Supp. 2d at 1355 n.84).

> Those injured by [trade] competition should not be required to bear the full brunt of the impact. Rather, the burden of economic adjustment should be borne in part by the federal government . . . [T]here is an obligation to render assistance to those who suffer as a result of national trade policy.

BMC, 30 CIT at ____, 454 F. Supp. 2d at 1309 (citation omitted).

The TAA laws also have been compared to veterans' benefits statutes:

> The purpose of the [TAA statute] is to distribute benefits to American workers whose jobs have been shipped overseas, while the purpose of the [veterans' benefit laws] . . . is to distribute benefits to veterans who have been injured during service. Both are remedial acts designed to provide much needed aid.

Former Employees of Sonoco Prods. Co. v. Chao, 372 F.3d 1291, 1301 (Fed. Cir. 2004) (Mayer, C.J., dissenting). The analogy is spot-on.

As BMC observed, "much as Congress has charged the U.S. Department of Veterans Affairs . . . ('VA') with caring for those who have risked life and limb for our freedom, so too Congress has entrusted to the Labor Department the responsibility for providing training and other re-employment assistance to those who have paid for our place in the global economy with their jobs." BMC, 30 CIT at ____, 454 F. Supp. 2d at 1355 (footnote omitted); compare, e.g., 38 U.S.C. § 5103A (captioned "Duty to assist claimants," obligating VA to "make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim" for veterans' benefits)[14] with 29 C.F.R. § 90.12 (2003)[15] (Labor Department is obligated to "marshal all relevant

---

[14]See generally Karnas v. Derwinski, 1 Vet. App. 308, 313 (1991) ("duty-to-assist" and "benefit-of-the-doubt" doctrines embodied in VA law "spring from a general desire to protect and do justice to the veteran who has, often at great personal cost, served our country"), overruled on other grounds, Kuzma v. Principi, 341 F.3d 1327, 1328-29 (Fed. Cir. 2003).

See also Littke v. Derwinski, 1 Vet. App. 90, 91-92 (1991) (characterizing "VA's duty to assist the veteran in developing the facts pertinent to his or her claim" as the "cornerstone of the veterans' claims process," and emphasizing that "[t]he 'duty to assist' is neither optional nor

facts" in making its TAA determinations).[16]

And just as veterans' benefits programs are designed to be extraordinarily "veteran-friendly"

---

discretionary"); Godwin v. Derwinski, 1 Vet. App. 419, 425 (1991) (once veteran presents plausible claim, burden shifts to VA to assist veteran in developing "*all* relevant facts, not just those for or against the claim"); Murincsak v. Derwinski, 2 Vet. App. 363, 370 (1992) (same); 38 C.F.R. § 3.103(a) (VA Statement of Policy, which acknowledges: "Proceedings before VA are *ex parte* in nature, and it is the obligation of VA to assist a claimant in developing the facts pertinent to the claim and to render a decision which grants every benefit that can be supported in law while protecting the interests of the Government.").

As Littke correctly observes:

By assisting the claimant in developing pertinent facts, from whatever source, . . . the VA will more adequately fulfill its statutory and regulatory duty to assist the veteran. A well developed record will ensure that a fair, equitable and procedurally correct decision on the veteran's claim for benefits can be made.

Littke, 1 Vet. App. at 92. The same can be said of the Labor Department in TAA cases.

[15]All citations to regulations are to the 2003 edition of the Code of Federal Regulations. However, the text of the referenced provisions remained the same at all times relevant herein.

[16]*See also*, *e.g.*, Woodrum v. Donovan, 4 CIT 46, 55, 544 F. Supp. 202, 208-09 (1982) ("the [TAA statute] requires the Secretary of Labor to conduct an investigation of each properly filed petition"); Former Employees of IBM Corp., Global Services Division v. U.S. Sec'y of Labor, 29 CIT ____, ____, 387 F. Supp. 2d 1346, 1351 (2005) (rejecting Labor Department's argument that because the workers did not allege certain facts, agency was not obligated to make further inquiry, and holding that – to the contrary – "*it is incumbent upon Labor to take the lead* in pursuing the relevant facts") (emphasis added); Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 129, 814 F. Supp. 1111, 1114 (1993) (Labor Department "has an *affirmative duty* to investigate" whether petitioning workers are eligible for TAA benefits) (citations omitted) (emphasis added); Former Employees of Sun Apparel of Texas v. U.S. Sec'y of Labor, 28 CIT 1389, 1399 (2004) ("Labor is under a *mandatory duty* to 'conduct an investigation into each properly filed petition'") (citation omitted) (emphasis added); Former Employees of Ameriphone, Inc. v. United States, 27 CIT 1161, 1167, 288 F. Supp. 2d 1353, 1359 (2003) (Labor Department "has an *affirmative obligation* to conduct its own independent 'factual inquiry into the nature of the work performed by the petitioners'"); Chevron I, 26 CIT at 1284-85, 245 F. Supp. 2d at 1327-28 (same).

and "pro-claimant,"[17] so too Congress designed TAA as a *remedial* program, recognizing that

petitioning workers would be (by definition) traumatized by the loss of their livelihood; that some

might not be highly-educated; that virtually all would be *pro se*; that none would have any mastery

of the complex statutory and regulatory scheme; and that the agency's process would be largely *ex*

*parte*.  Congress certainly did not intend the TAA petition process to be adversarial.  Nor did

Congress intend to cast the Labor Department as a "defender of the fund,"[18] sitting passively in

judgment, ruling "thumbs up" or "thumbs down" on whatever evidence the *pro se* petitioning

workers might manage to present.  *Cf.* Former Employees of IBM Corp., Global Services Division

v. U.S. Sec'y of Labor, 29 CIT ____, ____, 387 F. Supp. 2d 1346, 1351 (2005) (emphasizing that

petitioning workers cannot reasonably be expected to have knowledge of the "sometimes esoteric

criteria" for TAA certification).[19]

---

[17]*See* Hodge v. West, 155 F.3d 1356, 1362-63 (Fed. Cir. 1998) (emphasizing that the courts "have long recognized that the character of the veterans' benefit statutes is strongly and uniquely pro-claimant"; noting that "Congress itself has recognized and preserved the unique character and structure of the veterans' benefits system," and highlighting legislative history reflecting Congressional intent to maintain "historically non-adversarial system of awarding benefits to veterans"); Kelly v. Nicholson, 463 F.3d at 1353 (referring to veterans' benefits system as "uniquely pro-claimant").

[18]*Compare* 38 C.F.R. § 3.103(a) ("it is the obligation of VA . . . to render a decision *which grants every benefit that can be supported in law while protecting the interests of the Government*") (emphasis added); Barrett v. Nicholson, 466 F.3d 1038, 1044 (Fed. Cir. 2006) (emphasizing that "[t]he government's interest in veterans cases is not that it shall win, but rather that justice shall be done, that all veterans so entitled receive the benefits due to them") (citation omitted).

[19]*See also* Lady Kelly, Inc. v. U.S. Sec'y of Agriculture, 30 CIT ____, ____, 427 F. Supp. 2d 1171, 1175 (2006) (noting that, in authorizing TAA programs, "Congress has erected an administrative regime to disburse benefits to a class of sympathetic plaintiffs with relatively little sophistication in matters of federal litigation"); Lady Kelly, Inc. v. U.S. Sec'y of Agriculture, 30 CIT ____, ____, 414 F. Supp. 2d 1298, 1300 (2006) (observing "the lack of legal sophistication of many TAA plaintiffs").

Quite to the contrary, the Labor Department is charged with an *affirmative* obligation to *proactively* and thoroughly investigate all TAA claims filed with the agency – and, in the words of the agency's own regulations, to "marshal all relevant facts" before making its determinations. *See* 29 C.F.R. § 90.12. Moreover, both "[b]ecause of the *ex parte* nature of the certification process, and the remedial purpose of the [TAA] program," the agency is obligated to "conduct [its] investigation with *the utmost regard* for the interest of the petitioning workers." Internat'l Molders and Allied Workers' Union v. Marshall, 643 F.2d 26, 31 (D.C. Cir. 1981) (emphasis added); *see also* Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987) (*citing* Abbott v. Donovan, 7 CIT 323, 327-28, 588 F. Supp. 1438, 1442 (1984) (quotations omitted)); Former Employees of Internat'l Business Machines Corp. v. U.S. Sec'y of Labor, 29 CIT ____, ____, 403 F. Supp. 2d 1311, 1314 (2005) (*quoting* Stidham); Former Employees of Computer Sciences Corp. v. U.S. Sec'y of Labor, 29 CIT ____, ____, 366 F. Supp. 2d 1365, 1371 (2005).

Thus, while the Labor Department is vested with considerable discretion in the conduct of its investigation of trade adjustment assistance claims, "there exists a threshold requirement of reasonable inquiry." Hawkins Oil & Gas, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993); Former Employees of Electronic Data Sys. Corp. v. U.S. Sec'y of Labor, 29 CIT ____, ____, 408 F. Supp. 2d 1338, 1342-43 (2005); Former Employees of Merrill Corp. v. United States, 31 CIT ____, ____, 483 F. Supp. 2d 1256, 1264 (2007).

---

*Compare* Akles v. Derwinski, 1 Vet. App. 118, 121 (1991) (rejecting as absurd and inconsistent with agency's "duty to assist" the VA's argument that a claimant should be obligated to "specify with precision the statutory provisions or the corresponding regulations under which he is seeking benefits"; contrary to agency's contention, *claimants should not be required "to develop expertise in laws and regulations on veterans benefits* before receiving any compensation") (emphasis added).

To be sure, the statute does not entitle every petitioning worker to be certified as eligible to apply for TAA benefits.[20]  But every worker *is* entitled to a *thorough* agency investigation of his or her claim – an investigation in which the agency "marshal[s] all relevant facts," and an investigation which the agency conducts with "the utmost regard" for the petitioning workers' interests.  *See*, *e.g.*, Former Employees of Ameriphone, Inc. v. United States, 27 CIT 1611, 1618, 288 F. Supp. 2d 1353, 1359-60 (2003); 29 C.F.R. § 90.12.[21]  The courts therefore have not hesitated to set aside agency determinations that were the product of perfunctory investigations.  *See generally* BMC, 30 CIT at ____ & n.10, ____, 454 F. Supp. 2d at 1312-13 & n.10 (cataloguing sampling of opinions criticizing Labor Department's handling of TAA cases); *see also id.*, 30 CIT at ____, 454 F. Supp. 2d at 1352-54 (summarizing statistics concerning TAA actions filed with Court of International Trade in recent years, and noting that – at least during the four year period analyzed – Labor Department never successfully defended a denial of a TAA petition without at least one remand).

### 2.  The Government's Position at the Administrative Level

The Government argues that the Labor Department's position at the administrative level was substantially justified because the agency "gathered information from petitioners as well as

---

[20]*See generally* United Glass & Ceramic Workers v. Marshall, 584 F.2d 398, 400 (D.C. Cir. 1978) (quoting legislative history explaining that job losses are not covered by TAA if they "would have occurred regardless of the level of imports, *e.g.*, those resulting from domestic competition, seasonal, cyclical, or technological factors").

[21]*Cf.* UAW v. Marshall, 584 F.2d at 397-98 (remanding case to Labor Department, emphasizing that "[e]ven if a more detailed inquiry does not change the result in this case, the class of those seeking or considering adjustment assistance will be afforded (1) a description of the circumstances that the [agency] believes mandate the choice of the plant as the appropriate subdivision and (2) an explanation why [the agency] holds that opinion.").

statements by company officials." Def.'s Response at 15. According to the Government, the agency "examined the evidence before it and chose between two conflicting interpretations." Def.'s Response at 15. The Government therefore concludes that the Labor Department properly "examined the evidence before it, applied what it considered to be the appropriate legal standard, and provided an analysis based on the facts and the law as it understood them." Def.'s Response at 15; *see also id*. at 8 (same). *But see* Pls.' Application at 19-21 (highlighting flaws in agency's investigation, and noting that legal action would have been avoided "if [the Workers'] claims were adequately investigated at the outset"); Pls.' Reply at 1-7 (responding to Government's arguments, and rebutting Government's attempt to distinguish "substantial justification" cases cited in Workers' Application).

The Government's portrayal of the Labor Department's actions in this case bears little semblance to reality. The Government's assertion that the Labor Department "*gathered* information from petitioners" shades the truth, to say the least. *See* Def.'s Response at 15 (emphasis added). Although the agency *received* information from the Workers (both with the initial submission of their TAA petition, and with their request for reconsideration), the agency failed to contact the Workers for any purpose – except to notify them, by letter, of the denial of their TAA petition and their request for reconsideration – until after this matter had been remanded to the agency by the Court.

Similarly baseless is the Government's claim that "[i]n its initial investigation, Labor received information from BMC *unequivocally indicating that the workers . . . provided a service . . . and did not produce an article." See* Def.'s Response at 15 (emphasis added); *see also id*. at 8

(noting that agency's denial of Worker's TAA application was "based . . . upon the representations of . . . BMC officials").  To the contrary, there was nothing whatsoever about BMC's response to the agency's initial inquiry that could be characterized as "unequivocal."

As <u>BMC</u> explained, the information that BMC supplied in the course of the Labor Department's initial investigation could most charitably be described as vague or noncommital:

> The Labor Department . . . asked BMC to advise whether the company's Houston employees "produce an article of any kind or . . . were engaged in employment related to the production of an article." . . . [BMC's] Senior Manager for Human Resources *failed to respond directly* to the Labor Department's inquiry, and instead proffered a "soundbite" plucked from the company's promotional materials:

>> BMC Software develops software solutions to proactively manage and monitor the most complex IT environments, enabling round-the-clock availability of business-critical applications.  BMC provides services to support its software products, including support and implementation services.

<u>BMC</u>, 30 CIT at \_\_\_\_, 454 F. Supp. 2d at 1315 (emphasis added).[22]

---

[22]Even if BMC had given an unequivocally affirmative response to the agency's  inquiry (stating that the Workers did not produce an article), and even if the record had contained no contrary evidence, the Labor Department nevertheless would not have been entitled to base a denial of the Workers' TAA petition on the information supplied by the company, because the agency's question was itself defective.

As <u>BMC</u> noted, "[i]n its initial investigation of the Workers' petition, the Labor Department asked BMC the 'ultimate question':  'Do the workers in BMC Software, Inc., Houston, TX . . . produce an article of any kind or were they engaged in employment related to the production of an article?  If workers do produce an article, please explain, and what is the product?'"  <u>BMC</u>, 30 CIT at \_\_\_\_, 454 F. Supp. 2d at 1328.  But, as <u>BMC</u> observed, a long line of precedent has consistently held that the Labor Department may not – in effect – delegate to employers the agency's authority to determine whether workers are entitled to TAA benefits.  Accordingly, the Labor Department cannot rely on employers' blanket assurances that petitioning workers were, or were not, engaged in "production" of an "article."  *See generally* <u>BMC</u>, 30 CIT at \_\_\_\_, 454 F. Supp. 2d at 1328-29 (and cases cited there).

In the case at bar, it was unreasonable for the Labor Department to leave it to a BMC official

As <u>BMC</u> emphasized, the company's response to the Labor Department's question "cannot fairly be read as a statement that BMC does not produce a product." <u>BMC</u>, 30 CIT at _____ & n.17, 454 F. Supp. 2d at 1316 & n.17; *see also id.*, 30 CIT at _____, 454 F. Supp. 2d at 1325-26 (same). <u>BMC</u> pointedly observed: "It would be, frankly, impossible for anyone – including the Labor Department – to discern from BMC's *non-responsive answers* [to the agency's questions] whether or not the company's software constitutes a 'product' within the Labor Department's interpretation of the TAA laws at that time." <u>BMC</u>, 30 CIT at _____, 454 F. Supp. 2d at 1325 (emphasis added).

In sum, as <u>BMC</u> noted, "[t]he entirety of the Labor Department's initial investigation here consisted of a mere five questions (all of which were either very basic, or conclusory, or both), posed to BMC's Senior Manager for Human Resources. . . . The record reveals that the agency made no effort whatsoever to follow up with company officials (via telephone or otherwise) – even though the company's responses to the Labor Department's few substantive questions were *non-responsive*, *ambiguous*, *and/or inconsistent with other information on the record*, and thus begged for

_____

to determine what constitutes "production" of an "article" for TAA purposes in the context of the software industry. Instead, the agency was obligated to frame specific questions in terms of the criteria that the agency was assertedly applying at the time in cases such as this – *i.e.*, whether the company's software was mass-replicated on physical media (such as CDs, tapes, or diskettes) and whether it was widely marketed and commercially available (*e.g.*, packaged for "off-the-shelf" sale) – to elicit from the company factual information which the agency could then use to determine whether the Workers were engaged in "production" of an "article." *See generally* <u>BMC</u>, 30 CIT at _____ n.30, _____ n.36, 454 F. Supp. 2d at 1324 n.30, 1328 n.36 (and authority cited there).

The Labor Department's criteria for certification in the software industry were not set forth in any statute, regulation, or agency policy statement. Only upon issuance of the agency's determination denying their request for reconsideration did the Workers learn that the agency's criteria for TAA certification required that an "article" be "tangible," and that the agency interpreted the TAA statute to exclude software that is "electronically transmitted." *See* <u>BMC</u>, 30 CIT at _____, 454 F. Supp. 2d at 1317-21 (citation omitted).

clarification." <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1324-25 (emphasis added). The Labor Department compounded its error by misrepresenting and distorting the BMC official's statements in the agency's determination denying the Workers' TAA petition. *See* <u>BMC</u>, 30 CIT at ____ & n.31, 454 F. Supp. 2d at 1325-26 & n.31.

As detailed above, then, there is simply no truth to the Government's assertion that the Labor Department's initial determination that the Workers were not engaged in the "production" of an "article" was based on an "unequivocal" statement by their former employer. That argument thus cannot support a finding that the agency's position at the administrative level was substantially justified. Also unavailing is the Government's assertion that the agency properly "examined the evidence before it and chose between two conflicting interpretations" in denying the Workers' TAA petition. *See* Def.'s Response at 15.

The Government emphasizes that, in their request for reconsideration, the Workers "provided additional information which called into question the representations by BMC officials," and that the Labor Department responded by requesting additional information from the company. *See* Def.'s Response at 15. The Government argues that, "[e]ven assuming the [Labor Department] could have resolved the discrepancy [between the information supplied by the Workers and that supplied by BMC] by investigating further within the statutory timeframe, Labor decided to make a credibility determination on the record evidence available. This was well within Labor's discretion." Def.'s Response at 19; *see also id.* at 8, 19 (arguing that "Labor has the discretion to determine the scope of its investigation").[23] The Government asserts flatly that "[t]here is no support

---

[23]The Government intimates that the Labor Department's investigatory efforts in this case were constrained by "the statutory timeframe," and seeks to make much of the fact that "[n]either

the statute nor the regulations provide for any extension of the timeframe for issuing a determination" on a TAA petition. *See* Def.'s Response at 19.

But the administrative record wholly undermines any suggestion that the Labor Department's investigation here was "a race against the clock." As BMC pointed out, "[t]he entirety of the Labor Department's initial investigation . . . consisted of a mere five questions (all of which were either very basic, or conclusory, or both), posed to BMC's Senior Manager for Human Resources. . . . The record reveals that the agency made no effort whatsoever to follow up with company officials (via telephone or otherwise) – even though the company's responses to the Labor Department's few substantive questions were non-responsive, ambiguous, and/or inconsistent with other information on the record, and thus begged for clarification." BMC, 30 CIT at ____, 454 F. Supp. 2d at 1324-25 (citation omitted); *see also* BMC, 30 CIT at ____ n.30, 454 F. Supp. 2d at 1324 n.30 (*quoting*, *verbatim*, the five questions that the agency posed to BMC in its initial investigation).

The Government simply cannot credibly claim that the Labor Department's "shockingly cursory process" in this case consumed any significant part of the 40-day period that the statute provides for the investigation of a TAA petition. *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1324; 19 U.S.C. § 2273 (Supp. II 2002) (establishing 40-day time limit for initial TAA determination). Indeed, it is a misnomer even to refer to the agency's process here as an "investigation." As BMC observed, "[a]n 'investigation' is defined as a 'detailed examination' or 'a searching inquiry,' 'an official probe.'" BMC, 30 CIT at ____ n.29, 454 F. Supp. 2d at 1324 n.29 (*quoting* Webster's Third New International Dictionary (Unabridged) 1189 (2002)). To put it bluntly, to characterize the Labor Department's five-question inquiry in this case as an "investigation" is to pervert the meaning of that term. *See generally* BMC, 30 CIT at ____ nn.29-30, 454 F. Supp. 2d at 1324 nn.29-30 (explaining, *inter alia*, that "[t]he Labor Department's track record in TAA cases in this court belies any suggestion that the agency's typical initial review of a TAA petition can fairly be described as an 'investigation.'").

Moreover, although the Labor Department is required by statute to reach an initial determination on a TAA petition within 40 days, there is no statutory time limit for agency determinations on requests for reconsideration. Nevertheless, as BMC noted, "the [Labor Department's] investigation conducted in response to the Workers' request for reconsideration was little more than a rubber stamp of its initial denial. The Labor Department's reconsideration consisted – in toto – of a single phone conversation with BMC's Senior Manager for Human Resources (the same company official who had responded to the agency's initial questions). That conversation was in turn documented by the agency investigator in a memorandum that consisted of a total of five sentences, in a mere five lines of text." *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1327.

It is true that, as the Government notes, the Labor Department's own regulations require that the agency make an initial determination on a request for reconsideration within 15 days of receipt

for the proposition that a decision not to issue follow-up questionnaires to resolve a discrepancy may constitute a 'failure to investigate' that renders an agency's position substantially unjustified." *See* Def.'s Response at 16.

Contrary to the Government's claim, however, the Labor Department was not entitled to "make a credibility determination" under the circumstances of the case at bar, and further inquiry was indeed required. To be sure, the agency may base a TAA determination on statements of company officials – "*if* the Secretary *reasonably* concludes that those statements are creditworthy" and *if* the company's statements "*are not contradicted by other evidence*." <u>Former Employees of Marathon Ashland Pipe Line, LLC v. Chao</u>, 370 F.3d 1375, 1385 (Fed. Cir. 2004) (emphases added). But where – as in this case – there is a conflict in the evidence, the Labor Department is "precluded . . . from relying on the representations by the employer" and is obligated to "take further investigative steps before making [its] certification decision." *Id.*; *see generally* <u>BMC</u>, 30 CIT at

---

of the request. *See* Def.'s Response at 38 (*citing* 29 C.F.R. § 90.18(c)). However, if that is too little time to conduct a proper investigation, it is within the agency's power to amend its regulations. The agency has taken no action to do so. The agency also could have asked the Workers here to agree to an extension of time, if necessary. But the agency did not do so. Further, having wasted virtually all of the initial 40-day statutory period provided for the initial investigation of a TAA petition, the Labor Department should not now be heard to complain that it lacked sufficient time to properly investigate the Workers' request for reconsideration. That is classic "boot-strapping." Squandering the time allotted for the initial investigation effectively increased the agency's scope of work at the stage of the request for reconsideration – but the agency has no one but itself to blame for that.

In any event, the bottom line is that it is absurd to suggest (as the Government does) that the Labor Department's investigation of the Workers' request for reconsideration – which consisted of a brief phone call from the agency to BMC, as discussed above – consumed any significant portion of the 15 days allowed by regulation for the conduct of that investigation.

In short, contrary to the Government's claims, the Labor Department cannot hide behind statutory and regulatory time limits to excuse its failure to adequately investigate the Workers' TAA petition in this case.

____, 454 F. Supp. 2d at 1329-30 (and cases cited there).[24]

As evidence of substantial justification, the Government also points to the voluntary remand that it sought to permit the Labor Department to reconsider its denial of the Workers' TAA petition. *See* Def.'s Response at 1, 8-9, 16, 19-20. The Government underscores that it requested the voluntary remand "within 24 days" after the filing of the Complaint (*see* Def.'s Response at 8-9, 20), and argues that the Labor Department "cannot be held to lack substantial justification for failing to evaluate information that was unavailable to the agency during the administrative proceedings." *See* Def.'s Response at 16.

But the Government's defense rests on a false premise. There is no truth to the

_____

[24]As discussed above, the Government is not entitled to make credibility judgments without further inquiry under the circumstances of this case in any event. But it is also worth noting that the administrative record here is devoid of any explanation of the agency's rationale for crediting information supplied by BMC over that provided by the Workers. *Cf.* Inter-Neighborhood Hous. Corp. v. NLRB, 124 F.3d 115, 122 (2d Cir. 1997) (finding lack of substantial justification where, in declining to investigate further, agency investigator must have concluded that a witness was lying and falsifying documents, but where administrative record contained "no basis for such conclusions").

Moreover, as the Supreme Court has observed, the trial courts have unique insight into whether "particular evidence was worthy of being relied upon." *See* Pierce v. Underwood, 487 U.S. at 560. In the case at bar, as in TAA cases generally, the Labor Department's blind, reflexive reliance on information provided by employers is problematic. *See* BMC, 30 CIT at _____, 454 F. Supp. 2d at 1331-37 (criticizing Labor Department's longstanding standard practice of "view[ing] employers as presumptively reliable sources, and treat[ing] any information that they provide as though it 'trumps' information provided by petitioning workers," even though "there is no apparent rational basis for treating information supplied by employers as inherently and necessarily more reliable and authoritative than that provided by petitioning workers – particularly where the employer's information is unsworn, unverified, and uncorroborated, or where it conflicts with information submitted by the petitioning workers"); *id.*, 30 CIT at ____ n.52, 454 F. Supp. 2d at 1337 n.52 (noting that 1992 GAO study identified as a "major" problem the Labor Department's practice of relying on "incomplete, inaccurate, or unsubstantiated" information provided by employers).

Government's apparent claim that the Workers' photos of packaged software – as well as other

evidence that BMC mass-replicated its software on physical media including CDs and tapes – were

"unavailable to the agency" prior to the commencement of this action.

The fact is that – throughout both the initial investigation and the reconsideration – the Labor

Department investigators never once contacted the Workers to request or confirm information, much

less to disclose to them the criteria that the agency was then applying to determine whether, as

workers in the software industry, they had been engaged in the "production" of an "article." *See*

*generally* <u>BMC</u>, 30 CIT at \_\_\_\_, 454 F. Supp. 2d at 1330 (noting that "the agency never once

contacted the Workers to attempt to reconcile the discrepancies [between the information provided

by BMC and that provided by the Workers], or to solicit information from them . . . – not as part of

the agency's initial investigation, and not even in response to the request for reconsideration"); n.22,

*supra* (noting lack of transparency as to criteria applied by agency); n.60, *infra* (same).

The Workers can hardly be faulted for failing to come forward with evidence to prove that

they satisfied criteria of which they had no knowledge.[25] "There can be no doubt that – if the Labor

---

[25]It is – in a word – unseemly for the Government to essentially "blame the victim" for failing to adduce evidence to meet criteria of which the victim had no knowledge. It is particularly egregious for the Government to attempt to do so here for the sole purpose of trying to shift the blame from the Labor Department for the two patently inadequate investigations that it conducted in this case.

It is all the more troubling that the Government would stoop to criticizing petitioning workers in a situation such as this for not coming forward with evidence, when the Labor Department has routinely failed even to criticize – much less take any legal action against – company officials who affirmatively provide demonstrably false or misleading information to the agency in the course of TAA investigations. *See generally* <u>BMC</u>, 30 CIT at \_\_\_\_ & n.39, 454 F. Supp. 2d at 1330 & n.39 (noting that BMC's Senior Manager for Human Resources stated to Labor Department that, *inter alia*, BMC software was not "recorded on media disks," nor was it "mass-produced" or "sold off-the-shelf" – statements which were all "patently and demonstrably false");

Department [investigators] had bothered to ask the Workers whether BMC's software is mass-

replicated on physical media and is widely marketed and commercially available (*e.g.*, packaged for

'off-the-shelf' sale) – the Workers would have provided to the agency the same photos of shrink-

wrap software that they appended to their Complaint filed with the court." *See* BMC, 30 CIT at

____ & n.40, 454 F. Supp. 2d at 1330 & n.40.[26] *See generally* Pierce v. Underwood, 487 U.S. at 560

(emphasizing that, in evaluating existence of "substantial justification," trial courts have special

insight into whether "critical facts could easily have been verified by the Government").

Moreover, from the moment that the agency began its initial investigation, the Labor

Department had readily available to it other proof that BMC mass-replicated its software on physical

---

*id.*, 30 CIT at ____ & nn.51-52, 454 F. Supp. 2d at 1334-37 nn.51-52 (surveying various potential means of ensuring reliability of information provided to agency in course of TAA investigations, and noting that "a referral to the U.S. Attorney for potential prosecution . . . of a corporate executive for material false statements . . . would get the attention of other employers elsewhere across the country, and send a strong message to company officials everywhere about the importance of responding to the agency's inquiries accurately and completely").

[26] The Government's argument also wrongly assumes that the photos attached to the Workers' Complaint were the Labor Department's first clue that BMC produced a tangible "product." To the contrary, as discussed elsewhere herein, there was earlier evidence supportive of that fact in the administrative record. But the agency either overlooked or affirmatively chose not to pursue that information. *See, e.g.*, BMC, 30 CIT at ____, ____, 454 F. Supp. 2d at 1314, 1326 (noting that BMC job vacancy announcements attached to Workers' TAA petition included listings not only for positions such as "Systems Programmers" and "Programmer Analysts," but also for positions such as "*Product* Developers" and "Sr. *Product* Developers") (emphases added); *id.*, 30 CIT at ____, ____ & n.17, ____, 454 F. Supp. 2d at 1315, 1316 & n.17, 1325 (noting that, "in responding to the Labor Department's query whether the company's workers 'produce an article,' BMC's Senior Manager for Human Resources herself actually used the term 'products' – *i.e.*, 'software *products*' – in describing BMC's business," and, indeed, referred, in contrast, to the company's provision of "services" as well) (emphasis added); *id.*, 30 CIT at ____, ____, 454 F. Supp. 2d at 1317, 1327 (noting that "the Workers' request for reconsideration insisted that BMC 'does produce an article or articles in the form of products,'" "quoted language from the BMC website referring to 'products,'" and "provided the agency with cites to locations on the BMC website where company products are sold").

media, including CDs and tapes.  As <u>BMC</u> observed:

> [T]he Labor Department's standard form Petition for Trade Adjustment Assistance asks that petitioning workers supply the web address for their former employer.  The Workers here complied with that request. . . .
>
> Agency investigators apparently never consulted the company's website, however.  Had they done so, they would have discovered that the website states that BMC's "SIC" code – "Standard Industrial Classification" code – is 7372, which is the classification code for *"Prepackaged* Software." . . . The agency investigators also would have been able to access BMC's Form 10-K for the Fiscal Year Ended March 31, 2003 . . . – the most recent report as of the date of the Workers' termination.  That report describes the work of BMC's Houston facility as "manufacturing," and explains that the company sells its software both "in object code form" and "on a shrink wrap basis."

<u>BMC</u>, 30 CIT at ____ & nn.54-55, 454 F. Supp. 2d at 1338-39 & nn.54-55 (emphasis added).

Indeed, in requesting a voluntary remand in this matter, the Government conceded that the Labor

Department had erred in failing to follow up on the URL cites to BMC's website that the Workers

provided in their request for reconsideration.  *See* Defendant's Second Amended Motion for

Voluntary Remand, at 3 (citing, as grounds for remand, not only the photos of software attached to

the Workers' Complaint, but also the reference in the Workers' request for reconsideration to three

URL locations on BMC website).

        In short, there is no merit whatsoever to the Government's claim that the Labor Department

lacked access to evidence that BMC mass-replicated software on physical media until the Workers

commenced this action.  Had the Labor Department conducted a proper investigation, it would have

had conclusive proof of that fact in its possession early in its proceeding.  And, as the Workers

correctly note, an agency position that is predicated on a fundamentally inadequate investigation is

not supported by substantial justification.  *See* Pls.' Application at 20 (*citing* <u>Hess Mech. Corp. v.</u>

<u>NLRB</u>, 112 F.3d 146, 150 (4th Cir. 1997); <u>Inter-Neighborhood Hous. Corp. v. NLRB</u>, 124 F.3d 115,

122 (2d Cir. 1997)).

What is perhaps most telling, however, is the failure of the Government's Response even to acknowledge the Labor Department's obligation in TAA cases to "marshal all relevant facts" and to conduct its investigation with "the utmost regard" for the interests of the petitioning workers. *See generally* section II.A.1, *supra*.

As outlined above, the entirety of the Labor Department's initial investigation consisted of five generic questions posed to BMC. Even worse, the questions – in effect – impermissibly delegated to the company the agency's determination as to whether the Workers were engaged in the production of an "article." Moreover, the agency made no effort to follow up on the company's non-responsive, "corporate double-talk" answers. And the agency's determination denying the Workers' TAA petition impermissibly distorted what little information the company did provide.

Similarly, the entirety of the Labor Department's investigation following the Workers' request for reconsideration consisted of a single, brief phone conversation with the same BMC official who had responded to the agency's original five-item questionnaire. The agency then denied the Workers' request for reconsideration based solely on that phone conversation. The agency did not require the BMC official to make a formal statement by reducing her assertions to written form, much less require their submission under oath. And at no time during either the initial investigation or the investigation following the Workers' request for reconsideration did the Labor Department contact the Workers to confirm the accuracy of the information provided by BMC (to verify, for example, whether the company produces software on physical media), or to solicit additional evidence to support their petition. *See generally* Pierce v. Underwood, 487 U.S. at 560 (recognizing that trial courts have special insight into whether "critical facts could easily have been verified by

the Government").

The Labor Department further failed to consult BMC's website, either in the course of its initial investigation or its investigation following the Workers' request for reconsideration – even though the agency's petition form specifically requests the address of the website of the petitioning workers' former employer, and even though the Workers' request for reconsideration expressly directed the agency to three URL locations on BMC's website.  Had the agency consulted BMC's website, it would have learned that the company does indeed sell software on physical media, and it would have noted that BMC's SIC code was listed as 7372 – "Prepackaged Software."  In other words, as BMC observed, "a few quick clicks of a computer mouse by a Labor Department investigator would have sufficed to expose the falsity of the information provided to the agency" by the BMC official on which the agency relied.  *See generally* BMC, 30 CIT at ____ & nn.54-55, 57, 454 F. Supp. 2d at 1337-39 & nn.54-55, 57; Pierce v. Underwood, 487 U.S. at 560 (noting trial court's special insight into whether "critical facts could easily have been verified by the Government").

The Labor Department also took no steps to conduct any independent investigation to confirm the accuracy of the information provided by BMC.  For example, the agency did not review the company's most recent Form 10-K, which would have disclosed that BMC in fact does sell software on physical media, and that its SIC code was listed as 7372 (*i.e.*, "Prepackaged Software").  *See generally* Pierce v. Underwood, 487 U.S. at 560 (acknowledging trial court's special insight into whether "critical facts could easily have been verified by the Government").  Nor did the agency otherwise seek to corroborate the information supplied by BMC in any way.

While "[t]he EAJA does not tell an agency how to handle a case," the agency "cannot decline

to conduct further inquiry and then plead [its] own failure to investigate as  reason to conclude that

[its] position was substantially justified." <u>Hess Mech. Corp.</u>, 112 F.3d at 150.  That is – in effect

– precisely what the Government and the Labor Department have sought to do here.[27]

     The Labor Department's first two investigations in this case – the initial investigation, and

the investigation conducted in response to the request for reconsideration – would not provide

"substantial justification" for the Government's position, even if the agency owed no special

obligation to petitioning workers.  The unique nature of the Labor Department's responsibilities in

its administration of the TAA program simply strengthens the Workers' hand.

---

[27]The Workers drive this point home in their Reply:

> [The Workers'] arguments and the Court's criticisms of Labor's actions primarily concern [the Labor Department's] omissions and inactions, as a matter of practice and in this case in particular, in formulating its meager administrative record, and not the subsequent legal position formed from interpreting or understanding that meager administrative record. . . . [I]t is precisely Labor's *failure to investigate* and form a sufficient record that is without substantial justification. . . .

> . . . If Labor could argue that its legal positions were substantially justified whenever it evaluates what is in the record, no matter how limited or inadequate that record, it would create a dangerous incentive for administrative agencies to engage in even more perfunctory investigations than is already the case. . . .

> This absurd result is no straw man. [The Government's] Response admits that Labor essentially chose to stay ignorant of facts that were clearly discoverable through a modicum of investigation. . . .

> In essence, [the Government] suggests that Labor's legal positions were substantially justified even though they relied on an administrative record that lacked essential, readily-available information, because the jobless TAA petitioners were responsible for spoon-feeding Labor . . . all relevant information.  The Court has clearly disagreed with this characterization of Labor's TAA obligations as so limited.

Pls.' Reply at 2-4 (footnote omitted).

A recitation of the facts of this case alone suffices to refute any suggestion that the agency here properly discharged its duties to "marshal all relevant facts" and to conduct its investigation with "the utmost regard" for the interests of the Workers, and – further – definitively establishes that there was no "substantial justification" for the Government's position at the administrative level. See Gavette v. Office of Personnel Management, 808 F.2d 1456, 1467 (Fed. Cir. 1986) (holding that "'substantial justification' requires that the Government show that it was *clearly* reasonable in asserting its position, including its position at the agency level, in view of the law and the facts") (footnote omitted).[28]

### 3.  The Government's Position in Litigation

The Government also argues that its position in litigation was substantially justified.  *See generally* Def.'s Response at 19-23.  According to the Government, in evaluating "substantial justification," "the relevant question is whether the Government notified the Court [of the need for a voluntary remand] within a reasonable amount of time after reviewing the record and determining that the agencies needed to address the discrepancies in the record."  *See* Def.'s Response at 20.

_____

[28]The conclusion that the Government's position at the administrative level was not substantially justified is buttressed by the Labor Department's "track record" in other TAA cases filed with the Court of International Trade in recent years.  See Pierce v. Underwood, 487 U.S. at 569 (noting that "a string of losses can be indicative" on the issue of "substantial justification"); BMC, 30 CIT at ____, 454 F. Supp. 2d at 1352-54 (summarizing statistics concerning TAA actions filed with Court of International Trade in recent years, and noting that – at least during four year period analyzed – agency never successfully defended a denial of a TAA petition without at least one remand).

Strong language criticizing the Government's position in an opinion on the "merits" of a case has also been held to be evidence in support of an award of fees.  See Marcus v. Shalala, 17 F.3d at 1038.  On this point, the language of BMC speaks for itself.  See generally BMC, 30 CIT ____, 454 F. Supp. 2d 1306, *passim*.

However, the Government cannot cure a lack of substantial justification at the administrative level by prompt action in litigation. *Cf.* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1339-40 & nn.59-60 (noting that "the Labor Department's *modus operandi* increasingly is to seek a voluntary remand in TAA cases that are appealed to the court" and that "[r]equests for voluntary remands have become all but routine").[29]

On the facts of this case, even assuming that the Government's position in litigation was substantially justified, the overall position of the United States was not. *See generally* Chiu v. United States, 948 F.2d at 715 (noting, with approval, that – in making EAJA award – trial court "assumed the government's position in litigation . . . to be reasonable, but found that the lack of substantial justification [for the agency's action at the administrative level] outweighed any reasonable positions taken thereafter").

"As exemplified in the EAJA and Fed. R. Civ. P. 11, . . . the processes of litigation presuppose some reasonable investigation . . . " Hess Mech. Corp., 112 F.3d at 150; *cf. id.* at 147 (criticizing "flimsiness" of administrative record of investigation). In the case at bar, much like Chiu, the Labor Department's perfunctory, *pro forma* treatment of the Workers' TAA petition at the administrative level had the substantial effect of depriving the Workers of the critical trade adjustment benefits to which they were entitled for months, while the litigation phase was relatively

---

[29]*See also* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1340 (observing that "a voluntary remand affords the Labor Department an opportunity to 'doctor' the record of its initial investigation, by eliciting information that the agency should have obtained previously, and then using that information to 'beef up' the administrative record before the agency's determination is subjected to judicial review," allowing the Labor Department to "avoid[] much of the harsh criticism it would have drawn had a court reviewed the agency's determination based solely on the record developed in the initial investigation").

abbreviated and involved little consideration of the merits of the case.  As such, here – as in Chiu

– "any justification for the litigation phase cannot outweigh the lack of substantial justification for

the original agency action."  Chiu v. United States, 948 F.2d at 715 (*quoting* Chiu v. United States,

17 Cl. Ct. 334, 340 (1989)).

　　　　Accordingly, there is no need to parse the Government's conduct of this litigation before

concluding that, for purposes of an EAJA award, the Government's position was not substantially

justified.  *See*, *e.g.*, Kelly v. Nicholson, 463 F.3d at 1355 (concluding that government's position

was not substantially justified based solely on lack of justification for  agency's actions at

administrative level); Scarborough v. Nicholson, 19 Vet. App. 253, 260 (2005) (noting that, where

agency conceded that its position at the administrative level was not substantially justified, fee

applicant had "cleared the substantial-justification hurdle" for EAJA award eligibility, obviating

need to consider agency's position in litigation); Role Models America, Inc. v. Brownlee, 353 F.3d

962, 967-68 (D.C. Cir. 2004) (noting that, even assuming that government's litigation position was

"substantially justified," plaintiff was eligible for EAJA award based on lack of substantial

justification for agency's actions);  *cf.* Former Employees of Tyco Electronics v. U.S. Dep't of

Labor, 28 CIT 1571, 1586 n.2, 350 F. Supp. 2d 1075, 1089 n.2 (2004) (finding a lack of substantial

justification in TAA case without considering Labor Department's position at the administrative

level, where "the Government's position during . . . litigation was not substantially justified").

　　　　Because the Government's position in this matter was not substantially justified, the Workers

are entitled to an award of attorneys' fees and expenses under the EAJA.  What remains to be

determined is the amount of that award.

## B.  Calculation of the EAJA Award

To determine the size of a reasonable award of attorneys' fees under EAJA, the court calculates a "lodestar" figure, arrived at by multiplying "the number of hours reasonably expended" by "a reasonable hourly rate."  Hensley v. Eckerhart, 461 U.S. at 433.  "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."  Id. at 437.

The EAJA requires that an applicant submit "an itemized statement . . . stating the actual time expended and the rate at which fees and other expenses were computed."  28 U.S.C. § 2412(d)(1)(B); see generally Naporano Iron and Metal Co. v. United States, 825 F.2d 403, 404 (Fed. Cir. 1987).  Thus, "[t]he party seeking an award of fees should submit evidence supporting the hours worked and rates claimed."  Hensley v. Eckerhart, 461 U.S. at 433.  "The court needs contemporaneous records of exact time spent on the case, by whom, their status and usual billing rates."  Naporano Iron and Metal Co., 825 F.2d at 404 (citation omitted); accord Owen v. United States, 861 F.2d 1273, 1275 (Fed. Cir. 1988) (explaining that "[c]ontemporaneous records of the exact time spent by attorneys on a case [as well as] their status and usual billing rates" are "essential to support [an EAJA] claim").

While the fee applicant "bears the burden of documenting the appropriate hours expended, 'the party opposing the fee application has a burden of rebuttal that requires submission of evidence . . . challenging the accuracy and reasonableness of the hours charged.'"  Sneede v. Coye, 856 F. Supp. 526, 535 (N.D. Cal. 1994) (quoting Gates v. Deukmejian, 987 F.2d 1392, 1397-98 (9th Cir. 1993)).  Further, the Government must assert its challenges to the fee application with a relatively

high degree of specificity – both for the benefit of the fee applicant, and for the benefit of the court.[30]

"In a statutory fee case, the party opposing the fee award . . . has the burden to challenge, by affidavit or brief *with sufficient specificity to give fee applicants notice*, the reasonableness of the requested fee." Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990) (emphasis added) (*citing* Bell v. United Princeton Properties, Inc., 884 F.2d 713 (3d Cir. 1989)). "Only with proper notice can the [fee] claimant know which [billing entries] . . . to defend as reasonable." United States v. Eleven Vehicles, 200 F.3d 203, 212 (3d Cir. 2000); *see also* Rode v. Dellarciprete, 892 F.2d at 1188 (explaining that objections must be sufficiently specific to "serve the . . . function of putting the applicant on notice that it must defend its fee position") (*quoting* Bell v. United Princeton Properties, 884 F.2d at 720).

Thus, for example, "the adverse party's submissions cannot merely allege in general terms that the time spent was excessive. In order to be sufficient, the briefs or answers challenging the fee request must be clear in two respects. First, they must generally identify the type of work being challenged, and second, they must specifically state the adverse party's grounds for contending that the hours claimed in that area are unreasonable. The briefs must be specific and clear enough that the fee applicants have a fair chance to respond and defend their request." Bell v. United Princeton Properties, 884 F.2d at 720 (footnote omitted) (*quoted in* Interfaith Community Organization v.

---

[30]The Government notes in its Response that "[i]f the opposing party objects to the number of hours proffered, that party must, through affidavit or brief, provide notice with sufficient specificity to the fee applicant the portion of the fee petition which must be defended." *See* Def.'s Response at 31 (*citing* Walton v. Massanari, 177 F. Supp. 2d 359, 361 (E.D. Pa. 2001)). The Government thus seems to recognize – at least in principle – its obligation to frame its objections with sufficient specificity to give the Workers and the Court effective notice of the billing entries that it challenges. As discussed below, however, the Government generally falls short in its observance of that obligation.

Honeywell Int'l, Inc., 426 F.3d 694, 713-14 (3d Cir. 2005)).[31]

"Where an opposing party lodges a sufficiently specific objection to an aspect of a fee award, the burden is on the party requesting the fees to justify the size of its award." Interfaith Community Organization, 426 F.3d at 713 (emphasis added). "The more specific the objections to a fee application are, the more specific the [court's] findings and reasons for rejecting those objections can be." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1196-97 (11th Cir. 2002) (quoting American Civil Liberties Union of Georgia v. Barnes, 168 F.3d 423, 428-29 (11th Cir. 1999)); see also Interfaith Community Organization, 426 F.3d at 713 (observing that a court reviewing objections to a proposed fee award "is entitled to help from the fee objector"). And "a boilerplate objection merits no more . . . [than] a boilerplate response." Oxford Asset Mgmt., 297 F.3d at 1197.

### 1.   The Number of Hours Reasonably Expended by Counsel

"[T]he number of hours reasonably expended on the litigation" is one of two key components in calculating a reasonable fee under the EAJA. Hensley v. Eckerhart, 461 U.S. at 433. The fee applicant must submit "evidence supporting the hours worked." Hensley v. Eckerhart, 461 U.S. at 433. Counsel are "not required to record in great detail how each minute of [their] time was expended. But at least counsel should identify the general subject matter of [their] time expenditures." Hensley v. Eckerhart, 461 U.S. at 437 n.12 (citing Nadeau v. Helgemoe, 581 F.2d

---

[31]See, e.g., Bell v. United Princeton Properties, 884 F.2d at 722 (reversing trial court's reduction of time claimed by fee applicant, where opposing party's categorical objection failed to give fee applicant adequate notice of specific billing entries subject to challenge); Walton v. Massanari, 177 F. Supp. 2d at 363 (rejecting objections to fee award as insufficiently specific; party opposing award "failed to meet its burden of challenging the fee petition with sufficient specificity to provide notice to counsel of that portion of the fee petition which must be defended").

275, 279 (1ˢᵗ Cir. 1978)); *see also* <u>Naporano Iron and Metal Co.</u>, 825 F.2d at 404 ("itemized

statement" submitted by fee applicant must be sufficiently detailed to show "specific task[s]

performed").

Moreover, a fee applicant "should make a good-faith effort to exclude from a fee request

hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice

ethically is obligated to exclude such hours from his fee submission." <u>Hensley v. Eckerhart</u>, 461

U.S. at 434.

> "In the private sector, 'billing judgment' is an important component in fee setting.
> It is no less important here. Hours that are not properly billed to one's *client* also are
> not properly billed to one's *adversary* pursuant to statutory authority."

<u>Hensley v. Eckerhart</u>, 461 U.S. at 434 (*quoting* <u>Copeland v. Marshall</u>, 641 F.2d 880, 891 (1980) (*en

banc*)).

Of course, the mere fact that a fee applicant seeks compensation for all time spent on a case

does not mean, *ipso facto*, that the party failed to exercise the "billing judgment" required by

<u>Hensley</u>. *See* <u>City of Riverside v. Rivera</u>, 477 U.S. 560, 569 n.4 (1986). "<u>Hensley</u> requires a fee

applicant to exercise 'billing judgment' not because he should necessarily be compensated for less

than the actual number of hours spent litigating a case, but because the hours he does seek

compensation for must be *reasonable*." *Id.*[32]

---

[32]As a practical matter, billing judgment may be exercised either when an attorney's time is
recorded (*i.e.*, when the attorney decides whether to record time spent on an activity, or whether to
essentially "write it off"), or when a billing statement is prepared (*i.e.*, when the billing attorney
reviews all records of time recorded as chargeable to a particular client account, and decides whether
to "write off" any of that time).

Review of the Itemized Billing Statement included with the Workers' Application reveals
the exercise of billing judgment by counsel in this case. As one example, in a number of instances,

Thus, "[t]he touchstone in determining whether hours have been properly claimed is reasonableness." Davis v. City and County of San Francisco, 976 F.2d 1536, 1543 (9th Cir. 1992), *reh'g denied*, *vacated in part*, *and remanded*, 984 F.2d 345 (9th Cir. 1993). And "[t]he assessment of reasonableness is made by reference to standards established in dealings between paying clients and the private bar." *Id.*

As outlined in section II.B above, while the fee applicant bears the burden of establishing the reasonableness of the fees claimed, the Government must raise any objections with appropriate specificity, both for the benefit of the fee applicant, and for the benefit of the court. *See*, *e.g.*, United States v. Eleven Vehicles, 200 F.3d at 212 (explaining that "[o]nly with proper notice can the [fee] claimant know which [billing entries] . . . to defend as reasonable"); Interfaith Community Organization, 426 F.3d at 713 (noting that a court reviewing objections to a proposed fee award "is entitled to help from the fee objector").

As a general rule, objecting parties must "point to all the [billing] entries that they believe to be unreasonable." Bell v. United Princeton Properties, 884 F.2d at 720; *see also* Oxford Asset Mgmt., 297 F.3d 1182 (dismissing general, "boilerplate objection"). However, when such a requirement would be impractical – such as when the objecting party contends "that the time spent by a fee applicant was excessive in light of counsel's expertise, or in light of the simplicity of the case" – the objecting party "need only specify with particularity the reason for its challenge and the

---

an attorney recorded time spent meeting with another attorney; but there is no parallel billing entry for the second attorney, because the second attorney's time was "written off" (either by the second attorney, or – subsequently – by the billing attorney). *But see* Role Models America, 353 F.3d at 972 (criticizing billing documentation for inconsistency where "one attorney's records indicate that he or she spent time meeting with another attorney, while the second attorney's records report no such meeting").

category (or categories) of work being challenged; it need not point to each individual excessive

entry." Bell v. United Princeton Properties, 884 F.2d at 720-21.

Once the Government raises a sufficiently specific objection to a proposed fee award, the

burden is on the fee applicant to defend the size of the proposed award. *See*, *e.g.*, Interfaith

Community Organization, 426 F.3d at 713. "It is true that '[s]worn testimony that, in fact, it took

the time claimed is evidence of considerable weight on the issue of the time required in the usual

case and therefore [to justify a reduction of the hourly rate], it must appear that the time claimed is

obviously and convincingly excessive under the circumstances.'" Oxford Asset Mgmt., 297 F.3d

at 1196 (*quoting* Perkins v. Mobile Housing Board, 847 F.2d 735, 738 (11th Cir. 1988)). However,

"giving weight to sworn statements of fee applicants does not mean accepting those statements as

gospel." American Civil Liberties Union of Georgia, 168 F.3d at 430 (*quoted in* Oxford Asset

Mgmt., 297 F.3d at 1196).

Accordingly, hours may be reduced or disallowed where, for example, "the documentation

. . . is inadequate," or where the hours expended were "excessive, redundant, or otherwise

unnecessary," such as where a case was "overstaffed." *See* Hensley v. Eckerhart, 461 U.S. at 433-34

(citation omitted). "Hours are not reasonably expended if an attorney duplicates work done earlier

by another attorney, if an attorney takes extra time due to inexperience, or if an attorney performs

tasks that are normally performed by paralegals, clerical personnel or other non-attorneys." Action

on Smoking & Health v. Civil Aeronautics Board, 724 F.2d 211, 220-21 (D.C. Cir. 1984).

As the Supreme Court has emphasized, the trial court generally is "in the best position to

determine whether the time expended by [fee applicant's] counsel was reasonable." *See* City of

Riverside v. Rivera, 477 U.S. at 573 n.6; *accord* Case v. Unified School Dist., 157 F.3d 1243, 1249

(10th Cir. 1998) (observing that deference to trial court is appropriate, because trial court "'saw "the

attorneys' work firsthand,"'" and because appellate court "is not well suited to assess the course of

litigation and the quality of counsel") (*quoting* <u>Poolaw v. City of Anadarko</u>, 738 F.2d 364, 368 (10th

Cir. 1984) (quotation omitted)); <u>Spegon v. Catholic Bishop of Chicago</u>, 175 F.3d 544, 551 (7th Cir.

1999) (noting that trial court's judgment on reasonableness of hours expended on litigation is

entitled to "great deference"; "By virtue of its familiarity with the litigation, the [trial] court certainly

is in a much better position than [the court of appeals] to determine the number of hours reasonably

expended.") (quotation omitted).

       In support of their Application, the Workers here have submitted a computer-generated

Itemized Billing Statement of the time expended in this action, accompanied by an affidavit of

counsel. *See* Pls.' Exhs. 5-6, 8. The affiant attests, *inter alia*, that the rates reflected in the Itemized

Billing Statement are the standard hourly rates that counsel's law firm charges for each of the

individual "timekeepers" listed. *See* Pls.' Application at Exh. 8 ¶ 2. The Itemized Billing Statement

lists entries in chronological order, and – for each entry – provides the date the work was done, the

name of the timekeeper who did the work, the number of hours billed (in quarter hours), the total

fee for the time billed in the entry, and a summary description of the tasks as provided by the

timekeeper. *See* Pls.' Application at Exhs. 5-6.[33]  The Application also specifies the total fees

_____

       [33]The Itemized Billing Statement submitted as Plaintiffs' Exhibit 5 reflects time charged at
the EAJA rate of $125 per hour, while the Itemized Billing Statement submitted as Plaintiffs'
Exhibit 6 reflects time charged at the standard billing rates that the law firm charges to paying
clients.

       As is common practice, a billing entry cumulates the time for all tasks billed by an individual
to the client account on a given day. *But see* <u>Role Models America</u>, 353 F.3d at 971 (reducing
proposed fee award where, *inter alia*, "many time records lump together multiple tasks, making it

calculated both at counsel's standard hourly rates, and at the EAJA rate of $125 per hour.  *See* Pls.'

Application at 26-27; *Id*. at Exhs. 5-6, 8.

The Government mounts a scattershot attack, taking issue with virtually every aspect of the

Workers' Application.  But much of the Government's Response is basic "boilerplate," devoid of

case-specific analysis.[34]  Further, the Government fails to clearly distinguish between its various

theories for disallowance of the Workers' fee claims.  For example, caselaw on the disallowance of

claims for insufficient documentation is intertwined with caselaw on the disallowance of claims for

tasks that are – by their nature – non-compensable, as well as caselaw on the disallowance of

duplicative or otherwise excessive claims.  *See generally* Def.'s Response at 24-32.

In addition, much of the Government's Response consists of one-line summaries of, or

quotes from, decisions in fee litigation where claims were disallowed.  But that survey of caselaw

is of limited utility at best, because the Government gives little indication as to the relevance or

application of that caselaw to the fee claims at issue here, or the Government's objections thereto.

*Compare* Def.'s Response at 23-27, 29-32 (generally surveying caselaw) *and* Def.'s Response at 27-

29, 32-33 (addressing fee claims in this case).  Most critically – to the extent that it *does* address the

case at bar – the Government largely contents itself with broadbrush statements.[35]

---

impossible to evaluate their reasonableness") (citation omitted).

[34]Apart from its discussion of the Workers' claims for enhanced fees for "special factors" and a cost of living adjustment, the Government devotes a mere three-and-one-quarter pages to case-specific analysis and argument concerning the appropriate size of the Workers' award.  *See* Def.'s Response at 27-29, 32-33.

[35]The Reply filed by the Workers here left something to be desired as well.  *See generally* Interfaith Community Organization, 426 F.3d at 713 (noting that, once the Government raises a sufficiently specific objection to a proposed fee award, the burden is on the fee applicant to defend

According to the Government, the award sought must be reduced to eliminate hours billed early in the case, as well as hours billed after the Workers filed their comments on the Labor Department's certification determination (other than time spent preparing the fee application itself). *See* Def.'s Response at 29. The Government also claims that the billing documentation supplied by the Workers' counsel is insufficient, and that any award therefore must be further pruned. *See* Def.'s Response at 32. In addition, the Government contends that the case was overstaffed, that the research conducted by the Workers' counsel was excessive, that some tasks billed "bear no direct relation to the litigation of [the Workers'] claims," and that other tasks were largely administrative or clerical in nature and are therefore non-compensable. *See* Def.'s Response at 32-33.

However, the Government specifically targets only a handful of billing entries, labeling them as "examples" – apparently leaving it to the Court to scour the billing statement line-by-line to identify other similar entries to flesh out the Government's challenge. *See generally* Def.'s Response at 32-33 (quoting various billing entries as "examples" of objectionable charges); *but see* Interfaith Community Organization, 426 F.3d at 713 (noting that a court reviewing objections to a proposed fee award "is entitled to help from the fee objector").[36] And even as to the "examples" that it provides, the Government fails to supply the requisite citations to the Workers' Application, much less the specific dates of the quoted billing entries. *See generally* Def.'s Response at 32-33 (quoting

---

the size of the proposed award). Rather than addressing the numerous objections raised by the Government (albeit in "drive-by" form), the Workers limited their Reply to just two issues – the threshold issue of "substantial justification," and the Workers' claim to a "special factors" enhancement of their fee award. *See generally* Pls.' Reply.

[36]*See also* Portland Audubon Society v. Lujan, 865 F. Supp. 1464, 1477 (D. Or. 1994) (noting that a court "should not be asked to engage in an 'hour-by-hour analysis of the fee request'") (*quoting* Gates v. Deukmejian, 987 F.2d at 1399).

various billing entries, but providing no supporting citations to the Workers' Application).

In any event, as discussed in greater detail below, the Government's various objections to the Workers' Application are generally wide of the mark.

a.  Fees for Services Rendered Prior to Filing of Complaint/Notice of Appearance

The Government asserts, among other things, that fees for services rendered "before the complaint was filed and before [counsel's] notice of appearance was filed" should be disallowed. *See* Def.'s Response at 33; *see also id*. at 29 (arguing that award should be limited to fees incurred "from the date counsel for petitioners filed a notice of appearance").  But the Government's argument finds no support in either the facts or the law.

Contrary to the Government's claims, none of the services at issue here were rendered before the Complaint in this action was filed. As discussed above, the Workers' June 1, 2004 letter to the Court seeking review of the Labor Department's denial of their TAA petition was deemed the Complaint, filed as of June 3, 2004.  In contrast, the first billing entry is for services rendered on June 4, 2004 – the day after the filing of the Complaint.  *See* Pls.' Application.  The Government's argument thus cannot be reconciled with the facts of this case.

Moreover, the Government points to no legal authority to support its position.  Curiously, the Government cites Levernier for the proposition that "pre-complaint fees while administrative proceedings are still pending are not allowable."  Def.'s Response at 26 (*citing* Levernier Constr., Inc. v. United States, 947 F.2d 497, 502 (Fed. Cir. 1991)).  As discussed above, however, that principle has no relevance in light of the facts here, where no fees are sought for the period prior to the filing of the Complaint.

What the Government fails to acknowledge is that <u>Levernier</u> squarely rejected the claim that "the only pre-complaint efforts for which EAJA would permit compensation are those related to drafting the complaint." <u>Levernier</u>, 947 F.2d at 501 n.2 (holding that "fees for legal and factual research preparatory to . . . litigation" are compensable under EAJA); *see also* <u>Cox Constr. Co. v. United States</u>, 17 Cl. Ct. 29, 34 n.2 (1989) (same).

The law elsewhere in the country is to the same effect. As a general principle, "reasonable work at all stages of the litigation is compensable, including prefiling work." A. Hirsch & D. Sheehey, <u>Awarding Attorneys' Fees and Managing Fee Litigation</u> 28 (Federal Judicial Center 2d ed. 2005) (citation omitted); *see also*, *e.g.*, <u>Dowdell v. City of Apopka, Fla.</u>, 698 F.2d 1181, 1188 (11th Cir. 1983) (rejecting claim that fee award should exclude hours "prior to the lawyer-client relationship"). Accordingly, contrary to the Government's assertions, timing alone provides no basis for disallowing fees for services rendered prior to July 23, 2004, when the Workers' *pro bono* counsel filed their Notice of Appearance in this matter.

### b. Fees for Services Rendered After Filing of Workers' Comments on TAA Certification

Just as the Government contests the Workers' claim for fees for services rendered *early* in this litigation, the Government similarly disputes the compensability of services rendered *late* in the case. The Government asserts that – other than compensation for the preparation of the fee application itself – fees should be denied for services rendered after "the date [the Workers] filed comments indicating that they accepted Labor's certification determination"[37] – that is, after January

---

[37]The Government begins its argument inauspiciously, by fundamentally mischaracterizing the position taken by the Workers in their Comments on Defendant's Determination on Remand. Contrary to the Government's assertion, the Workers did not "indicat[e] that they accepted Labor's

18, 2005. *See* Def.'s Response at 29. This argument, too, is without merit.

In particular, the Government challenges the time that the Workers' counsel spent on "briefing regarding the calculation of benefits [which] occurred *after* the agency certified petitioners." *See* Def.'s Response at 28. The Government accuses the Workers' counsel of "engag[ing] the Court and the Government in a needless colloquy regarding the hypothetical circumstance of a miscalculation of benefits," which (according to the Government) "[the] Court lacks jurisdiction to determine in any event." *Id.* at 28-29. The Government asserts that the efforts of the Workers' counsel "only protracted the litigation after certification." *Id.* at 28-29.[38] However, the Government has no one but itself to blame for the post-certification briefing to which it objects.

---

certification determination." *See* Def.'s Response at 29. Instead, the Workers advised that, while they were "generally satisfied" with the remand outcome itself, they were dissatisfied with the language of the Notice of Revised Determination on Remand, because it did not reflect certain assurances that the Government had previously given. The Workers therefore asked that the Court "expressly order, in accordance with Defendant's [previous] representation, that Plaintiffs, having been certified, are entitled to receive full TRA benefits, regardless of the date of their certification." *See* Plaintiffs' Comments on Defendant's Determination on Remand. As detailed below, the Government's response to that request for relief by the Workers is what triggered the post-certification briefing to which the Government here objects.

[38]The Government intimates that the post-certification briefing prevented the Workers from applying to state authorities for, and receiving, their individual TAA benefits. *See* Def.'s Response at 29 (asserting that "[i]t can hardly be reasonable to conclude that [the Workers] would prefer to wait an additional year for extended briefing over an issue that was irrelevant to certification than to have Labor's certification determination sustained so that they may present the certification to the relevant state agencies for issuance of benefits"). The Government is simply wrong.

As documents filed in this action demonstrate, the Workers were proceeding with the application process at the state level, in parallel with the post-certification briefing. *See, e.g.*, Letter to Court from Plaintiffs (May 19, 2005) (detailing the numerous challenges the Workers were encountering in obtaining their TAA benefits through the Texas Workforce Commission, but noting that some of the Workers had already been permitted to enroll in training programs).

*See generally* Pls.' Application at 9-12, 14, 21-22, 27-28.[39]

As discussed in section I above, the Government sought an additional 60 days to file the results of the voluntary remand, above and beyond the 60-day period initially granted for the remand investigation. Counsel for the Government induced the Workers' consent to the requested extension of time – and the Court's entry of an order granting that extension – with express, unequivocal assurances that "in the event petitioners are certified in this case, the petitioners would be entitled to receive full TRA benefits regardless of the date they are certified." *See* <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1345-46 (*quoting* Defendant's Consent Motion for an Extension of Time to File Remand Results, at 3-4).[40]

When the Labor Department's remand results eventually issued, however, there was no language reflecting the unconditional assurances that the Government had previously given. Concerned, the Workers urged the Court to "expressly order[ ], in accordance with Defendant's representation, that Plaintiffs, having been certified, are entitled to receive full TRA benefits, regardless of the date of their certification." *See* <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1346

---

[39]At various points, the Government charges the Workers' counsel with "unexplained and continuing efforts to prolong senselessly the litigation," and asserts that they "senselessly delayed litigation," when they "could have resolved the litigation expeditiously." *See* Def.'s Response at 22, 28, 38-39. However, as detailed herein, the work by the Workers' counsel that the Government targets was entirely justified. There is, therefore, no cause here to "reduce the amount to be awarded . . . , or deny an award" because the prevailing party "engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy." *See* 28 U.S.C. § 2412(d)(1)(C); *see also* 28 U.S.C. § 2412(d)(2)(D) (providing that "fees and expenses may not be awarded to a party for any portion of the litigation in which the party has unreasonably protracted the proceedings").

[40]*See also* Letter to Court from Plaintiffs (Feb. 11, 2005) ("Given the Government's representation, Plaintiffs consented to an extension of time, expressly predicated on their belief that, should they prevail, they would not be prejudiced as a result of [that extension]").

(*quoting* Plaintiffs' Comments on Defendant's Determination on Remand, at 1-2).  The Government

responded flatly that the Court lacked jurisdiction to enforce the representations that the

Government's counsel had made to the Court and to the Workers.  *See id.* (citation omitted).[41]

The Government's position precipitated the several rounds of post-certification submissions

by the parties – all of which were filed in direct response to orders of, or letters from, the Court.

Those directives were generally intended to ensure that the Workers' receipt of the various types of

TAA benefits would be unaffected by the Labor Department's protracted delays in certifying the

Workers as eligible to apply for TAA benefits, in accordance with the assurances that the

Government had previously given the Court and the Workers.[42]

The Workers' concerns were by no means trumped up.[43]  The Workers had more than ample

_____

[41]*See generally* Defendant's Response to Plaintiffs' Comments In Response to Labor's Remand Determination, at 3 (arguing that "although Labor confirms that the delay from litigation will not affect the calculation of benefits . . ., the Court lacks the authority to dictate whether the petitioners will, in fact, receive 'full' TRA benefits," and characterizing as "inappropriate" the Court's inquiry into the effects, if any, of litigation delays on relief ultimately available in a TAA case).

[42]*See* Remand Order (Aug. 11, 2004); Plaintiffs' Comments on Defendant's Determination on Remand; Defendant's Response to Plaintiffs' Comments in Response to Labor's Remand Determination; Letter to Defendant from the Court (Feb. 4, 2005); Defendant's Memorandum of Law in Response to the February 4, 2005 Order; Letter to Court from Plaintiffs (Feb. 11, 2005); Plaintiffs' Reply to Defendant's Response to Plaintiffs' Comments on Remand Results; Letter to Parties from Court (May 12, 2005); Defendant's Memorandum of Law in Response to the May 12, 2005 Order; Letter to Court from Plaintiffs (May 19, 2005).

[43]The Government's suggestions to the contrary are at odds with reality and with the record in this action as well as those in other TAA cases filed with the Court of International Trade in recent years.  The Government states, for example, that "there was no evidence whatsoever . . . that the state agency administering benefits would deviate from [the] position [that delays in certification would have no effect on the Workers' benefits]."  *See* Def.'s Response at 22.  But the Government ignores the fact that workers in other cases in fact *had* experienced serious problems as a result of delayed certification.  *See generally* <u>BMC</u>, 30 CIT at ____ n.63, 454 F. Supp. 2d at 1341 n.63

reason to be concerned about the real-life effects of delayed certification on their benefits.  As BMC

explained, "[w]orkers who are belatedly awarded TAA benefits receive no interest or other

compensation for the delay that they suffer.  At best, such workers receive – months (or even years)

after the fact – the same funds and training that they were entitled by statute to receive much earlier.

*Worse yet*, *all too often*, *delay effectively operates to reduce* (*and conceivably even eliminate*)

*benefits to which workers are otherwise entitled by law*."  BMC, 30 CIT at _____ & n.63, 454 F.

Supp. 2d at 1341-42 & n.63 (emphasis added) (detailing the numerous ways in which delayed

certification may negatively affect workers' ability to receive TAA benefits including training funds,

as well as both "Basic" and "Additional" TAA income support payments (known as "Trade

Readjustment Allowance" or "TRA" payments)).[44]

For example, in at least three cases (*i.e.*, Tyco, Oxford Automotive, and Ericsson), displaced

---

(discussing, *inter alia*, problems faced by workers in Tyco, Oxford Automotive, and Ericsson).  And
the record reflects that the Workers here experienced problems as well.  *See* Letter to Court from
Plaintiffs (May 19, 2005) (documenting problems that the Workers experienced with Texas state
authorities).

[44]It is thus disingenuous for the Government to dismiss the Workers' fears as worries about
the potential for "*miscalculation* of benefits" by state authorities.  *See* Def.'s Response at 28-29
(emphasis added).  The Workers were worried – and quite properly so – not that Texas Workforce
Commission personnel would "miscalculat[e]" their benefits, but rather that the delays in the Labor
Department's certification would effectively operate to deprive the Workers of some of the benefits
to which they were otherwise entitled.

The Government's assertion that the Workers' concerns were "irrelevant to certification" is
even more absurd.  *See* Def.'s Response at 22, 29; *see also id.* at 39 (characterizing Workers'
concerns as "irrelevant to the substance of Labor's determination").  The Government cannot argue
with a straight face that a diminution in benefits directly caused by delays in certification attributable
to the Labor Department and to counsel for the Government is "irrelevant to certification."  The
Workers have no interest in certification as an end in itself; certification is simply the means to an
end – specifically, the receipt of TAA benefits.  If delays in certification operated to effectively
deprive the Workers of benefits, certification would be a pyrrhic victory indeed.

workers suffered through repeated remands of their NAFTA-TAA claims and were eventually

certified by the Labor Department, only to learn that the extended delays resulting from the agency's

incompetence and intransigence had effectively rendered them ineligible for basic benefits.  In all

three cases, the workers ultimately succeeded in receiving at least some of those benefits – but only

after extensive post-certification efforts by their attorneys, who basically "browbeat" the agency into

submission.  *See generally* BMC, 30 CIT at _____ n.63, 454 F. Supp. 2d at 1341 n.63 (and authorities

cited there).

The Workers here note that the Government made the exact same argument in Tyco that it

makes in this action – that is, the Government asserted that time expended by the workers' counsel

after TAA certification was not compensable under the EAJA.  *See* Pls.' Application at 27 (citation

omitted).[45]  But the Tyco court rejected that argument, awarding fees for post-certification work by

counsel, relying on Jenkins v. Missouri, 127 F.3d 709 (8th Cir. 1997).  *See* Tyco, 28 CIT at 1597-98,

350 F. Supp. 2d at 1098-99.

In Jenkins v. Missouri, the court surveyed the range of post-judgment activities that may be

covered by fee-shifting statutes, emphasizing that "monitoring the defendant's compliance with

court orders and enforcing the remedy are generally compensable as part of the underlying case."

Jenkins v. Missouri, 127 F.3d at 716-17 (citation omitted).[46]  The court similarly "stressed the

_____

[45]*See generally* Tyco, 28 CIT at 1583-84, 350 F. Supp. 2d at 1087 (summarizing Government's arguments objecting to fees for post-certification work).

[46]Of course, the work at issue here is not *post-judgment* work, but – rather – *post-certification* work.  That fact only strengthens the Workers' claim.  And, notwithstanding the distinction, cases analyzing post-judgment work are instructive on the merits of the Government's challenge in this action.

importance of allowing the plaintiff . . . fees for *successfully* defending the remedy against attacks."

*Id*. at 717.          To the same effect is <u>Norman v. Housing Authority of City of Montgomery</u>, 836 F.2d

1292 (11th Cir. 1988), where the court of appeals reversed the district court's disallowance of fees

for time expended by counsel in a class action after a consent decree had been entered.  As the court

of appeals observed:

> The law seeks to compensate attorneys for work reasonably done actually to secure
> for clients the benefits to which they are entitled. . . . [T]he order of the court does
> not always secure the actual benefit and additional legal work may be required.  *To
> paraphrase the acute observation of baseball great Yogi Berra, a case ain't over till
> it's over. This means that . . . counsel are entitled to compensation until all benefits
> obtained by the litigation are in hand.*

<u>Norman</u>, 836 F.2d at 1305 (emphasis added); *see generally* <u>Pennsylvania v. Delaware Valley</u>

<u>Citizens' Council for Clean Air</u>, 478 U.S. 546, 558-61 (1986) (discussing compensability of various

monitoring and enforcement activities that could have adversely affected rights under consent

decree).[47]

The same result obtains here.  Indeed, the case for compensability of the challenged hours

in this action is even stronger than in many cases involving post-judgment work, because the time

at issue here was largely expended in direct response to the orders and instructions of the Court.

*See*, *e.g.*, <u>Powers v. Comm'r of Internal Revenue Service</u>, 43 F.3d 172, 181-82 (5th Cir. 1995)

(concluding that it was abuse of discretion for trial court to deny fees for work that trial court itself

---

[47]*See also* <u>Northcross v. Bd. of Ed. of Memphis City Schools</u>, 611 F.2d 624, 637 (6th Cir.
1979) (in desegregation case, noting that "[s]ervices devoted to reasonable monitoring of the court's
decrees, both to insure full compliance and to ensure that the plan is indeed working to desegregate
the school system, are compensable services.  They are essential to the long-term success of the
plaintiff's suit."); Hirsch & Sheehey, *supra*, at 28 (noting that "reasonable work at all stages of
litigation is compensable," including "work in connection with post-judgment or post-decree
administration" and "monitoring") (citations omitted).

had ordered counsel to do); <u>Miller v. Hotel & Restaurant Employees & Bartenders Union</u>, 107

F.R.D. 231, 243 (N.D. Cal. 1985), *rev'd on other grounds*, 806 F.2d 1371 (9th Cir. 1986) (awarding

fees for challenged hours, based in part on fact that challenged work was in response to court's

request).[48]

Moreover, the Government's contention that disputes concerning the benefits awarded to

individual workers are reserved for the state courts gives no cause for pause – at least under the

specific circumstances of this case. *See* Def.'s Response at 28-29, 38-39. As <u>BMC</u> observed:

> Even assuming *arguendo* that the court – in a run-of-the-mill TAA case – lacks the
> authority to 'expressly order[ ], . . . that Plaintiffs, having been certified, are entitled
> to receive full TRA benefits, regardless of the date of their certification,' it is clear
> beyond cavil that 'a court always retains jurisdiction to supervise and administer its
> own docket.'

<u>BMC</u>, 30 CIT at _____, 454 F. Supp. 2d at 1348 (*quoting* Government's brief first, then <u>Arvinmeritor,</u>

<u>Inc. v. United States</u>, 29 CIT _____, _____, 2005 WL 1958804 at * 1 (2005); other citations omitted).

<u>BMC</u> thus explained that, "to the extent that the time consumed by litigation may operate in any

fashion to limit the effectiveness of any relief that may ultimately be awarded in a TAA case, the

court is duty-bound – particularly in light of the remedial nature of the TAA statute – to expedite

its proceedings, limiting the number and the duration of remands." <u>BMC</u>, 30 CIT at _____, 454 F.

---

[48]Specifically, Plaintiffs' Comments on Defendant's Determination on Remand – like
Defendant's Response to Plaintiffs' Comments in Response to Labor's Remand Determination –
were filed in accordance with the Court's Remand Order, as well as the Order of October 13, 2004
(which granted the Government's motion for an extension of time for the filing of the Labor
Department's remand results, and amended the deadlines for the parties' related submissions). The
Workers' letter to the Court dated February 11, 2005 was in response to (and was invited by) the
Court's letter of a week earlier. Plaintiffs' Reply to Defendant's Response to Plaintiffs' Comments
on Remand Results was filed pursuant to the Order dated February 3, 2005. And, finally, the
Workers' letter memorandum dated May 19, 2005 was in response to (and was invited by) the
Court's letter to the parties of May 12, 2005.

Supp. 2d at 1348-49 (footnote omitted).

As <u>BMC</u> observed, whatever the Court's authority in a run-of-the-mill TAA case may be,[49] this was no run-of-the-mill case. To obtain the lengthy extension of time that it sought for the filing of the Labor Department's remand results, the Government here expressly warranted to the Workers and to the Court that, "in the event petitioners are certified in this case, *the petitioners would be entitled to receive full TRA benefits* regardless of the date they are certified." (Emphasis added.) Thus, as the Workers correctly noted, the issue presented in this case was "whether [the] Court should exercise its inherent authority to give effect to a representation made by the Government in a pleading before this Court." *See* <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1349 (quotation omitted).

The Workers emphasized:

Plaintiffs . . . have a reasonable expectation as litigants to have a measure of reliability in their dealings with the government in this case [– as does the Court – ]. . . . The Government should not have assured Plaintiffs of their entitlement to full

---

[49]Although there is no need to decide the issue here, it is far from clear that the extent of the benefits available to a *group* of petitioning workers pursuant to a Labor Department TAA certification is a matter for the state courts (rather than the Court of International Trade), as the Government has argued here and in other cases.

The statutory scheme generally contemplates that state courts will resolve disputes concerning a state's administration and implementation of a Labor Department group certification – such as disputes concerning the coverage of a particular individual worker under a Labor Department group certification, as well as disputes concerning a particular individual worker's compliance with preconditions to eligibility for specific types of benefits available under the group certification. *See generally* 19 U.S.C. § 2311(d). But issues concerning the overall scope and effect of the Labor Department's certification of a *group* of petitioning workers are a very different matter. In other words, the issue is not what benefits a particular individual worker will or will not receive (the administration and implementation of a group certification). Rather, the issue is the scope, meaning and effectiveness of the group certification itself – for *all* of the workers potentially covered by that group certification.

benefits if the Government knew it would ultimately take the position that its representation (designed to induce an extension [of time]) could not be enforced. *In such a scenario, the Court must have the authority to hold the Government to its words*.

BMC, 454 F. Supp. 2d at 1349 (*quoting* Plaintiffs' Reply to Defendant's Response to Plaintiffs' Comments on Remand Results, at 2) (emphasis added in BMC).

Under circumstances such as those presented here, the Government cannot possibly contend that the Court is powerless to hold the Government to its word, or that petitioning workers are relegated to the state courts to enforce express representations made by the Government to petitioning workers and to the Court of International Trade, and on which the workers and the Court have relied in granting the Government relief that it has requested.[50]  Given the facts of this case, counsel to the Workers were entirely justified in undertaking efforts to ensure that the Government kept its word and that the Workers were not deprived of benefits due to the Labor Department's delayed certification.  The relatively modest amount of time that counsel devoted to those ends is thus compensable.

---

[50]Fortunately, there was ultimately no need here to test the limits of the Court's jurisdiction *vis-a-vis* that of the state courts.  *See generally* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1347 (acknowledging that "the statutory scheme generally vests the state courts with jurisdiction over disputes concerning the specific TAA benefits to which individual members of a certified group of former employees are entitled") (citations omitted).  Nor was it ultimately necessary to consider the need for sanctions, contempt proceedings, or other action against the Government or its counsel.  As noted above, the Workers advised the Court that – armed with the post-certification memoranda filed by the Government in this action interpreting the complex provisions of the TAA statute and regulations and confirming that the delay in the Workers' certification would have no effect on the benefits to which they were entitled – they no longer foresaw any insurmountable obstacles to their receipt of the full measure of TAA benefits.  *See id*., 30 CIT at ____, 454 F. Supp. 2d at 1349-50 (citation and footnote omitted).

### c. The Sufficiency of Billing Documentation

The Government criticizes certain billing entries in the Workers' Application as "vague," and asserts generally that the hours reflected in those entries should be disallowed. *See* Def.'s Response at 32-33. As "example[s],"[51] the Government points to entries for time spent on "telephone calls, e-mails and meetings regarding TAA issues," "discussions . . . regarding case management," and "discussions . . . regarding getting visibility for TAA software cases." *See id.* at 32.[52]

The Government cites a number of cases in which courts reduced fee awards because billing records were not sufficiently detailed. *See generally* Def.'s Response at 29-31.[53] But specificity in

---

[51]It is, in general, inappropriate for the Government to merely cite "examples," and effectively delegate to the Court the work of analyzing all billing entries line-by-line in an effort to identify other entries that the Government might find similarly objectionable. *See generally* sections II.B & II.B.1, *supra*. It is particularly inappropriate here, because – quite apart from the trespass on the Court's time – the Court cannot know what the Government considers to be unduly "vague." Federal judges are not required to be telepathic.

[52]As noted in section II.B.1 above, the Government consistently and inexplicably fails to identify the dates of the billing entries that it quotes, or to cite to the pages of the Workers' Application where those entries appear.

In any event, review of the Workers' Application discloses that entries dated July 22, 2004 and July 28, 2004 include time devoted to "telephone calls, e-mails and meetings regarding TAA issues." An entry dated July 28, 2004 reports time spent in "discussions . . . regarding case management." And an entry dated December 16, 2004 reports time spent on "discussions . . . regarding getting visibility for TAA software cases."

[53]Contrary to the Government's intimations, however, inadequate documentation only rarely results in wholesale denial of a fee application. *See* Def.'s Response at 29 (arguing that "[a]n application for EAJA fees may be denied . . . where an applicant provides only vague descriptions of activities").

"[T]he recordkeeping requirement should not be imposed in a draconian manner." <u>Action on Smoking & Health</u>, 724 F.2d at 220. As a general rule, "deficiencies in documentation [of hours

time-keeping is not an end in itself.  Significantly, the Government fails to allege that it was harmed

in any particular way by the alleged lack of detail in the billing records in this case.

It is true that fee applicants are obligated to "maintain billing time records in a manner that

will enable a reviewing court to identify distinct claims," so that the court may discount a potential

award to adjust for work on claims as to which the fee applicant did not prevail.  Hensley v.

Eckerhart, 461 U.S. at 437 (footnote omitted);  *see also* City of Riverside v. Rivera, 477 U.S. at 569

n.4 (discussing Hensley requirement to maintain billing records in manner that permits identification

of distinct claims, to permit court to differentiate between time spent on successful claims *versus*

unsuccessful claims); Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 180 (4th Cir. 1994)

(emphasizing that specificity in billing records "is especially necessary when [a court] review[s] an

award in a case where the plaintiff has not prevailed on all the claims") (citation omitted).

But the Government does not allege that, in reviewing the Workers' Application, it was

unable to distinguish between the time that the Workers' counsel spent on tasks related to successful

claims and that spent on tasks related to unsuccessful claims.  Nor could the Government do so –

because the Workers prevailed on the entirety of their case.  Accordingly, there is no need here for

detailed billing records to identify and disallow time spent on unsuccessful claims.  *See* City of

Riverside v. Rivera, 477 U.S. at 569 n.4 (rejecting argument that fee applicant's time records were

insufficient, emphasizing that "while it is true that some of the disputed time records do not identify

---

worked] are cause for reduction rather than outright denial of fees." *Id*. (*citing* Hensley v. Eckerhart,
461 U.S. at 436); *see also* Jordan v. Dep't of Justice, 691 F.2d 514, 518 (D.C. Cir. 1982) (stating that
"[o]utright denial [of an award of fees] may be justified when the party seeking fees declines to
proffer any substantiation in the form of affidavits, timesheets or the like, or when the application
is grossly or intolerably exaggerated, or manifestly filed in bad faith.") (citations omitted).

the precise claims worked on at the time, . . . [the] lapse [is] unimportant" since the trial court found

all claims to be interrelated and thus compensable).

Just as some detail in billing records is necessary in cases where – unlike this one – the court

must distinguish between time spent on successful claims and time spent on unsuccessful claims,

so too a certain level of specificity may be needed to allow opposing counsel and the court to

evaluate whether the amount of time that counsel devoted to specific tasks was appropriate.  *See*,

*e.g.*, Naporano Iron and Metal Co., 825 F.2d at 404-05 (emphasizing need under EAJA for

"contemporaneous records of attorney's time . . . in order to determine the reasonableness of the

charges"; "Only by knowing the specific task performed can the reasonableness of the number of

hours required for any individual item be judged."); Rode v. Dellarciprete, 892 F.2d at 1190

(holding that "[a] fee petition is required to be specific enough to allow the district court 'to

determine if the hours claimed are unreasonable for the work performed.'") (*quoting* Pawlak v.

Greenawalt, 713 F.2d 972, 978 (3d Cir. 1983)).

But, again, nowhere has the Government claimed that the alleged lack of detail in the billing

records at issue precluded it from assessing the reasonableness of the time that the Workers' counsel

expended on various tasks.[54]  Indeed, quite to the contrary, the Government specifically argues that

the Workers' counsel devoted too much time to at least one task.  *See generally* Def.'s Response at

32 (arguing that "[t]he research engaged in by counsel is . . . excessive"); section II.B.1.e, *infra*

---

[54]The Government's Response does state generally that vague descriptions in billing records
"provide no guidance . . . in determining whether attorney time was reasonable and necessary."  *See*
Def.'s Response at 30.  However, that statement appears only as part of a "boilerplate" summary of
certain general principles of law in cases under fee-shifting statutes, which precedes the section of
its brief in which the Government argues this case.  *See* Def.'s Response at 32 (analyzing case at bar,
starting with paragraph beginning "In this case . . . ").

(addressing Government's argument that hours spent on legal research should be disallowed).  In short, absent any claim that it suffered some resulting harm, it is unclear that the Government is in a position to complain about the level of detail in the billing records in this case.

Counsel are "not required to record in great detail how each minute of [their] time was expended.  But at least counsel should identify the general subject matter of [their] time expenditures." Hensley v. Eckerhart, 461 U.S. at 437 n.12 (citation omitted).  As another court has put it, "a fee petition should include 'some fairly definite information as to the hours devoted to various general activities, *e.g.*, pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, *e.g.*, senior partners, junior partners, associates." Rode v. Dellarciprete, 892 F.2d at 1190 (*quoting* Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973)).  "However, 'it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.'"  Rode v. Dellarciprete, 892 F.2d at 1190 (*quoting* Lindy Bros., 487 F.2d at 167; *citing* Pawlak v. Greenawalt, 713 F.2d at 978).[55]

To be sure, many of the billing entries in the records submitted by the Workers' counsel are

_____

[55]*See generally* Davis v. City and County of San Francisco, 976 F.2d at 1542 (rejecting argument that billing records were insufficiently specific, emphasizing that Supreme Court's decision in Hensley requires only that counsel "identify the general subject matter of his time expenditures") (*quoting* Hensley v. Eckerhart, 461 U.S. at 437 n.12); Rode v. Dellarciprete, 892 F.2d at 1191 & n.13 (rejecting argument that billing entries such as "settlement" and "miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses" were insufficiently specific).

*See also* In re Synthroid Marketing Litigation, 264 F.3d 712, 722 (7th Cir. 2001) (holding that level of billing itemization and detail required to support award of costs "is a question for the market"; "If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more.") (citation omitted).

"hardly paragons of revelation."  *See* Earth Island Institute v. Christopher, 20 CIT 1221, 1241, 942

F. Supp. 597, 613 (1996), *vacated on jurisdictional grounds and remanded sub nom*. Earth Island

Institute v. Albright, 147 F.3d 1352 (Fed. Cir. 1998) (characterizing "printout of . . . lawyers' billing

notes" in that case).  However, when read together with both the Administrative Record and the

court docket sheet in this matter, the billing entries at issue provide sufficient information to

conclude that the time that the Workers' counsel devoted to various tasks was not excessive or

otherwise unreasonable.  *See generally* Dennis v. Chang, 611 F.2d 1302, 1308 (9th Cir. 1980)

(rejecting challenge to adequacy of billing entries, where trial court found information provided to

be sufficient "in light of the court's intimate knowledge of the proceedings in the case"); Portland

Audubon Society v. Lujan, 865 F. Supp. 1464, 1477 (D. Or. 1994) (rejecting challenge to adequacy

of billing entries, where trial court "reviewed the submissions of the plaintiffs and the record of [the]

case, and . . . [was] familiar with the entire history of [the] litigation").[56]

Counsel are cautioned, however, that the Court of Appeals has "reject[ed] unequivocally any

suggestion that [a trial court] ha[s] *an obligation* to reconstruct . . . bills" for a fee petitioner based

on "the documentation in [the] fee application together with the . . . [court's] docket sheet," as the

Court has done here.  *See* Naporano Iron and Metal Co., 825 F.2d at 405 (emphasis added).

Accordingly, those who fail to keep detailed records of their time – describing their work with a

relatively high degree of specificity – do so at their peril.  *See* PPG Indus. v. Celanese Polymer

---

[56]*See also* Powers v. Comm'r of Internal Revenue Service, 43 F.3d at 181-82 (concluding that nature of work could be inferred from dates on which hours were expended relative to various events in litigation, where billing summary failed to provide requisite "description of the work done"); Tyco, 28 CIT at 1593, 350 F. Supp. 2d at 1095 (disallowing certain hours where, even when reading billing entries in conjunction with administrative record and court's docket sheet, court was nevertheless still unable to determine nature of work claimed).

Specialties Co., 840 F.2d 1565, 1570 (Fed. Cir. 1988) (citation omitted) ("call[ing] attention to the well-established rule that insufficient documentation may warrant a reduction in the fees").

### d.  Fees for Representation by Multiple Attorneys

The Government also challenges the Workers' claim for fees for "multiple 'status meetings' and conversations among three or more attorneys," charging broadly that "this case was not of the level of complexity to warrant representation by several attorneys."  *See* Def.'s Response at 32.

The Government's reference to "status meetings," in quotation marks, does little to add specificity to its argument.  The Government fails to identify the dates of any of the billing entries to which it is referring.  Nor does the Government cite to the Worker's Application – either as to the "status meetings" or as to the "conversations among three or more attorneys" to which it objects.

As discussed above, where a defendant raises only "a generalized objection" to a category of fees, the prevailing party typically need not present an entry-by-entry defense of the challenged claims.  Nor in such cases is the court generally obligated to scrutinize the fee claimant's billing statement to identify entries potentially at issue, other than those which can be "eliminated through a cursory examination of the bill."[57]  *See*, *e.g.*, Wooldridge v. Marlene Indus. Corp., 898 F.2d 1169,

---

[57]Although not required to do so, the Court analyzed the Workers' Application and identified a total of nine meetings convened to discuss "the status of the case" (or some similar phrasing).  By any measure, that is not an unreasonable number of "status meetings" in a case that was actively litigated for more than eight months, and in which litigation spanned more than two years.

Scrutiny of the Workers' Application reveals another seven or so "conversations among three or more attorneys" (including phone calls, as well as meetings), without regard to the phrasing of the entries or the subject of the communication.  Again, by any measure, that does not reflect excessive consultation among the members of the Workers' litigation team.

As an aside, it is worth noting that the Government's objection to "conversations among

1176 (6th Cir. 1990); Jean v. Nelson, 863 F.2d 759, 772-73 (11th Cir. 1988), *aff'd on other grounds*

*sub nom.* Comm'r, Immigration & Naturalization Service v. Jean, 496 U.S. 154 (1990) (declining

to reduce hours where, *inter alia*, "the government has pointed to no specific instances in which

counsels' work was unreasonably duplicative").

      In any event, the gravamen of the Government's argument seems to be that the Workers'

case was overstaffed. The Government cites no specific facts or authority to support its claim,

however. Nor does the Government elaborate on its assertion that "this case was not of the level of

---

three or more attorneys" is, in certain respects, unusual. In fee-shifting cases involving three or
more attorneys representing a single client, the more common argument is the claim that the fee
applicant's attorneys were inefficient because they were *not* parties to a single conversation and
instead communicated by "relay" – that is, where (rather than having a single conversation including
Lawyers A, B, and C) Lawyer A instead conferred only with Lawyer B, and then Lawyer B
conferred with Lawyer C. *See, e.g.*, Bell v. United Princeton Properties, 884 F.2d at 721 (noting
defendants' contention that such a means of communication "was, quite obviously, inordinately
cumbersome and resulted in unnecessary time spent on the matter"); Connecticut State Dep't of
Social Services v. Thompson, 289 F. Supp. 2d 198, 207-08 (D. Conn. 2003), *rev'd on grounds that
plaintiff not "prevailing party" sub nom.* Santiago v. Leavitt, 153 Fed. Appx. 18 (2d Cir. 2005)
(rejecting challenge to "reimbursement for hours expended by multiple attorneys on routine
litigation tasks, like telephone conferences with one another"; "Participation by several attorneys
on conference calls is often the most efficient means of communicating and of keeping each attorney
apprised of developments in the case. Alternative means of updating co-counsel, including
preparation and circulation of memoranda or e-mails summarizing matters handled by a single
attorney is often more time consuming and less effective than including additional counsel at
important events (*e.g.*, court arguments, depositions) or conducting conference calls so that
communications are not mixed up as information passes from one lawyer to the next.").

      As discussed immediately above, the bottom line is that the Government's allegations of
overstaffing in this case are without foundation. And review of the Workers' Application
demonstrates that the Workers' claims for meetings and conversations among counsel are well
within the bounds of reason, and are justified by the size, complexity, and scheduling of the remand
investigation (and, to a lesser extent, the litigation), and particularly by the proactive role that the
Workers' counsel played early in the remand proceeding.

complexity to warrant representation by several attorneys." *See* Def.'s Response at 32.[58]

Contrary to the Government's claim, the case has been a complex one, in a number of different respects. As a threshold matter, it appears that the application of the TAA laws to the software industry has presented perhaps the greatest challenge that the Labor Department has confronted in its more than 30-year history of administering the TAA program. As BMC suggested, the Labor Department has struggled over a period of years, grappling with issues such as the characterization of software as a "good" or a "service," the tariff treatment of software, the relevance of software's mode of transmission (electronically or on physical media), and the significance (or lack thereof) of the difference between custom-designed software and that which is mass-produced. *See generally* BMC, 30 CIT at ____ & nn.22, 25, 27, 454 F. Supp. 2d at 1314-23 & nn.22, 25, 27 (and cases cited there) (discussing numerous software and other cases illustrating agency's struggles,

---

[58]There is no small irony in the Government's claim here that this was not a complex case. That assertion is at least somewhat in tension with other positions that the Government has taken in this litigation.

Essentially the Government argues that "either this was a straightforward case, in which counsel's time and expertise was misspent" (the argument that it makes here, in an effort to prune counsel's hours), *or* the Government argues that this was a somewhat challenging, time-consuming case (the argument that the Government at least implicitly made in requesting an extension of time for the filing of the remand results, and – more recently, in its Response to the Workers' Application – in asserting that the Labor Department's position was "substantially justified," albeit incorrect). Logically, the Government cannot have it both ways. *Cf.* Edwards v. Griepentrog, 783 F. Supp. 522, 529-30 (D. Nev. 1991) ("Defendants do claim . . . that Plaintiffs are inaccurate when they characterize this case as one requiring the special expertise and skill possessed by Plaintiffs' counsel. Essentially Defendants argue that either this was a straightforward case, in which counsel's time and expertise was misspent, or this was an extremely complicated case, in which no one could fault Defendants in adopting . . . [the challenged] policy (thus it must have been substantially justified).").

and the evolving nature of the agency's criteria).[59]  Under the circumstances, the Workers and their

counsel were faced with a moving target, and were forced to try to make sense out of (still-)evolving

standards for TAA certification in the industry at issue – a challenge that was only exacerbated by

the Labor Department's lack of transparency.[60]

Moreover, as courts have recognized in the past, TAA cases are, by definition, fact-intensive.

*See*, *e.g.*, Marathon Ashland, 370 F.3d at 1384 (referring to Labor Department's "fact-intensive

determination" in TAA investigation).[61]  Even as the Workers' counsel were trying to identify the

precise criteria that the Labor Department was applying to decide the Workers' TAA petition, the

Workers' counsel also had to develop a working knowledge of the facts surrounding the software

industry in general, and BMC and this case in particular – including matters such as the precise

nature of the Workers' duties during their employment by BMC, the extent of the Workers'

integration into the operations of their former employer, the facts surrounding the Workers' lay-offs,

---

[59]*See also* Former Employees of Tesco Tech., LLC v. U.S. Sec'y of Labor, 30 CIT ____, ____, 2006 WL 3419786 at ** 4-5 (2006) (rejecting Labor Department's "mass-production" *versus* "custom-designed" distinction, in TAA case); Merrill Corp., 31 CIT at ____, 483 F. Supp. 2d at 1268 (same).

[60]The Labor Department has failed to make the standards that it is applying in the software industry generally accessible by publishing them in a regulation or in some sort of policy statement or other guidance document.  Thus, anyone attempting to ascertain the applicable standard – or to determine how a particular standard was being applied, or whether it was being *consistently* applied – has had no choice but to conduct fairly exhaustive research, identifying and then reviewing (and comparing) relevant agency determinations in the Federal Register, briefs submitted by the Government in relevant cases, and judicial opinions issued in those cases (quite a time-consuming endeavor).

[61]*See also* Former Employees of Internat'l Business Machines Corp. v. U.S. Sec'y of Labor, 31 CIT ____, ____ n.62, 483 F. Supp. 2d 1284, 1326 n.62 (2007) (discussing "fact intensive," "case-by-case" nature of analysis in TAA case) (citation omitted).

BMC's product lines and modes of distribution, trends in employment and production at the company's Houston facility, and trends in imports and the company's international operations. In essence, the Workers' counsel had to do the Labor Department's job for it. *See generally* Earth Island Institute, 20 CIT at 1232, 942 F. Supp. at 607 (crediting affiant's statement that environmental organization "stepped in and [did] the government's job . . . as it became apparent that the government lacked the initiative" to enforce statute protecting sea turtles).[62]

The press of time was also a factor.[63] By the time the Labor Department's remand investigation began, the Workers already had been unjustly deprived of TAA benefits for more than

---

[62]There is thus no truth to the Government's assertions that "[t]his case involved a simple matter of whether Labor adequately investigated the information provided by the petitioners and the subject facility to determine whether an article was produced," and that "no peculiar research or legal development was necessary." *See* Def.'s Response at 28. As detailed above, it was indeed a "simple matter" to determine whether the Labor Department had adequately investigated the Workers' TAA petition; the inadequacy of the investigation was immediately and abundantly apparent from even a cursory review of the Administrative Record. But the scope of counsel's obligation to the Workers was much greater than the Government suggests.

Counsel's charge was to do everything possible to ensure that the Labor Department certified the Workers for any TAA benefits to which they were entitled, as rapidly as possible. And, as outlined above, neither the legal research nor the development of the facts was a "simple matter" here – with the obvious exception of establishing that BMC did, indeed, produce "prepackaged" software on a "shrink wrap" basis (*i.e.*, software on physical media).

[63]For the reasons summarized above, speed is critical in the resolution of all TAA cases. But it is particularly important in cases where, as here, the Labor Department has failed *not once but twice* to conduct the thorough investigation that is mandated by both the TAA statute and the agency's own regulations.

The facts of this case are all the more compelling because – at the time the Labor Department issued its initial denial – the agency failed to notify the Workers of their right to challenge that determination in court, and instead advised them only of the process for seeking administrative reconsideration. *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1316-17. The Labor Department thus induced the Workers to spend additional valuable time pursuing a dead-end administrative process.

six months.  And they had been out of work for more than a year.

Quoting a decision in a prior TAA case, <u>BMC</u> emphasized that "as a general principle, the effectiveness of trade adjustment assistance depends upon its *timeliness*."  <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1342 (*quoting* <u>Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor</u>, 27 CIT 1930, 1942, 298 F. Supp. 2d 1338, 1349 (2003) ("<u>Chevron III</u>") (emphasis added)).  Indeed, as <u>BMC</u> noted, "the consequences of Labor Department delays in certification can be profound – sometimes, quite literally, life-or-death":

> There is a very human face on [TAA] cases.  Workers who are entitled to trade adjustment assistance benefits but fail to receive them may lose months, or even years, of their lives.  And the devastating personal toll of unemployment is well-documented.  Anxiety and depression may set in, with the loss of self-esteem, and the stress and strain of financial pressures.  Some may seek refuge in drugs or alcohol; and domestic violence is, unfortunately, all too common.  *The health of family members is compromised with the cancellation of health insurance; prescriptions go unfilled, and medical and dental tests and treatments must be deferred* (*sometimes with life-altering consequences*).  And college funds are drained, then homes are lost, as mortgages go unpaid.  Often, marriages founder.

<u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1343 (*quoting* <u>Chevron III</u>, 27 CIT at 1942-43, 298 F. Supp. 2d at 1349) (emphasis added in <u>BMC</u>).

Accordingly, delay was a major concern of the Workers and their counsel, from the very inception of this action.  *See generally* <u>BMC</u>, 30 CIT at ____, 454 F. Supp. 2d at 1344.  Especially given the urgency of securing long-delayed (and desperately-needed) TAA benefits for the Workers, ensuring that this matter was well-staffed was a logical and reasonable way for counsel to expedite the handling of the case.  *See generally* <u>Vaughns v. Bd. of Educ. of Prince George's Co.</u>, 598 F. Supp. 1262, 1278 (D. Md. 1984), *aff'd*, 770 F.2d 1244 (4th Cir. 1985) (noting that pace of case required counsel to address multiple legal and factual issues  "on a nearly simultaneous basis").

The magnitude of this action is a factor as well. This is not a matter involving a single plaintiff, or even the four representative named plaintiffs. Instead, TAA cases are, in significant respects, much like class actions. They directly affect not only the rights of the individual representative plaintiffs, but also those of an entire class of former employees. Counsel here thus not only had to communicate with, coordinate with, and represent the interests of the multiple named representative plaintiffs, but also had to ascertain and consider the facts as to other similarly-situated former employees of BMC. The challenges that counsel confronted were compounded by the distance that separates them from their clients.[64]

Finally, contrary to the Government's implication, there is nothing at all out of the ordinary about staffing significant, high-impact litigation with multiple attorneys. The courts have recognized that "the retention of multiple counsel in complex cases is 'understandable and not a ground for reducing the hours claimed' because 'the use in involved litigation of a team of attorneys who divide up the work is common for both plaintiff and defense work.'" Jean v. Nelson, 863 F.2d at 772-73 (quoting Johnson v. University College, 706 F.2d 1205, 1208 (11th Cir. 1983)). "An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." Johnson v. University College, 706 F.2d at 1208 (citations omitted) (acknowledging typical staffing practices

_____

[64]In some cases where prevailing litigants opt to be represented by counsel who are not local (even though appropriate representation is available locally), fees that are attributable to the distance between the litigants and their counsel may not be taxable under fee-shifting statutes. Cf. Ramos v. Lamm, 713 F.2d 546, 559 (10th Cir. 1983) (disallowing travel expenses incurred for travel between counsel's offices and city where litigation was conducted, absent showing of "need to employ counsel from outside the area"). In the case at bar, because the Court appointed counsel, neither the Workers nor their counsel bear any responsibility for the challenges of representation attributable to the distance between them.

in major litigation, and reversing trial court's exclusion of time based on retention of multiple attorneys and "unnecessary duplication of effort").[65]

In the interests of efficiency, "senior attorneys often delegate[] less complex tasks to junior staff attorneys; this arrangement is the normal partner/associate or senior associate/junior associate working relationship in most legal firms." Ross v. Saltmarsh, 521 F. Supp. 753, 760 (S.D.N.Y. 1981) (footnote omitted), *aff'd mem.*, 688 F.2d 816 (2d Cir. 1982).  Thus, "it is the rule rather than the exception to have a junior and senior attorney working together on a matter." *Id.*, 521 F. Supp. at 760 n.35.  That is exactly what happened in the case at bar:  "[The Workers] were represented in significant part by more junior attorneys (with oversight from senior attorneys) who were able to provide successful representation at a lower effective billable rate." *See* Pls.' Application at 26.

To be sure, a fee reduction is appropriate where, for example, a case is overstaffed such that hours spent by one lawyer are unnecessarily duplicative of those expended by another, or where excessive staffing leads to a "practice of engaging in long daily conferences." Spell v. McDaniel, 852 F.2d 762, 767 (4th Cir. 1988); *see also* Hirsch & Sheehey, *supra*, at 26-27 (noting that courts have reduced fee awards in instances of "duplication of services," "use of too many attorneys," and "too much conferencing") (citations omitted).

This is not such a case, however.  Scrutiny of the Workers' Application (together with the Administrative Record and the court's docket sheet) yields not even a hint of any inappropriate

---

[65]*See also* Norman v. Housing Authority of City of Montgomery, 836 F.2d at 1302 (emphasizing that "[t]here is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer.") (citation omitted); Davis v. City and County of San Francisco, 976 F.2d at 1544 (noting that "the time spent by all lawyers on a litigation can be billed so long as the hours claimed are not duplicative").

duplication of effort,[66] much less any attempt to "pad" the bill or "run up the meter" in this matter.[67]

The Government's unsubstantiated allegations of excess must therefore be rejected.  *See* Rueda-Menicucci v. Immigration & Naturalization Service, 132 F.3d 493, 496 n.4 (9th Cir. 1997) (refusing to disallow hours where agency failed to substantiate its claim of "redundant and excessive hours").[68]

---

[66]"While duplication of effort is a proper ground for reducing a fee award, 'a reduction is warranted only if the attorneys are *unreasonably* doing the *same* work.'" Jean v. Nelson, 863 F.2d at 772-73 (*quoting* Johnson v. University College, 706 F.2d at 1208); Rode v. Dellarciprete, 892 F.2d at 1187 (*quoting* Jean v. Nelson, 863 F.2d at 773 (emphasis in the original) (quotation omitted)) (same).  "Having experienced the case firsthand, the [trial] court is in the best position to decide whether the attorneys' time was reasonably spent."  Pirus v. Bowen, 869 F.2d 536, 541 n.7 (9th Cir. 1989).

[67]*See, e.g.*, Glover v. Johnson, 934 F.2d 703, 716-17 (6th Cir. 1991) (affirming trial court's determination that "plaintiffs' counsel did not spend excessive time, duplicate efforts, . . . or spend an inordinate amount of time conferring with each other or reviewing each others' work," and endorsing trial court's findings that counsel "generally worked on separate tasks; each made a separate contribution.  The hours they spent conferring are reasonably proportionate to their total hours.  Given the magnitude and the complexity of this case, such consultation is at least reasonable, and probably necessary.").

[68]*See generally* Lipsett v. Blanco, 975 F.2d 934, 939 (1st Cir. 1992) (noting that the reasonableness of staffing is best left to trial court, which has "intimate, first-hand knowledge of a particular case's nuances and idiosyncracies") (citation omitted); New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 & n.5 (2d Cir. 1983) (noting that trial court is to be accorded "ample discretion" in assessing extent of necessary staffing; "for the most part such decisions are best made by the [trial] court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation"); Davis v. City and County of San Francisco, 976 F.2d at 1544 (observing that trial court's familiarity with litigation "warrants considerable deference . . . on such matters as whether the hours claimed by prevailing counsel are redundant") (citations omitted); City of Riverside v. Rivera, 477 U.S. at 573 n.6 (noting that trial court is "in the best position" to determine reasonableness of time that counsel spent conferring with one another).

e. <u>Fees for Legal Research</u>

The Government contests the Workers' claim for fees for time devoted to legal research, characterizing the research generally as "excessive and presumptively unreasonable." *See* Def.'s Response at 32. The Government argues that it "requested a voluntary remand within 24 days of the filing of the complaint," and asserts that the Workers "never had to brief . . . the merits [of the case] at any stage because Labor certified them for trade adjustment assistance ('TAA') . . . upon remand." *See* Def.'s Brief at 1; *see also id.* at 8-9, 28. According to the Government, "the only briefs filed before the certification determination involved a six-page statement of consent to the voluntary remand, [and] a motion for an extension of time to do so, . . . [as well as] a two-page statement of agreement with the certification determination." Def.'s Response at 32; *see also id.* at 1, 9, 28. But the Government doesn't tell the whole story.

As the Supreme Court has observed, "[t]he government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." <u>City of Riverside v. Rivera</u>, 477 U.S. at 580 n.11 (quotation omitted). So too the Labor Department cannot wholly abdicate its responsibility to conduct the thorough investigation of the Workers' TAA petition that is mandated by law, and then be heard to object when the Workers expend the resources required to prove their case by themselves.[69] *See generally* section II.A.1, *supra* (detailing agency's

---

[69]*Accord* <u>Praseuth v. Rubbermaid</u>, 406 F.3d at 1260 (emphasizing that "[a]n aggressive litigation strategy carries with it certain risks, one of which is that a party pursuing an aggressive strategy may, if it loses, find itself required to bear a portion of the attorneys' fees incurred by the *other* party in responding to that aggressiveness"); <u>Lipsett v. Blanco</u>, 975 F.2d at 941 (approving lodestar in amount greater than damages awarded plaintiff, noting that "the discrepancy is explained largely by what we have referred to as the 'Stalingrad defense.' While this hard-nosed approach to litigation may be viewed as effective trench warfare, . . . such tactics have a significant downside. The defendants suffer the adverse effects of that downside here.").

obligation to "marshal all relevant facts," and to conduct its investigation with "the utmost regard" for the interests of petitioning workers).

As discussed above, under the circumstances, the Workers' counsel here had to research and analyze the statute, regulations, caselaw, and past agency practice concerning the impact of delayed certification on the availability of TAA benefits. *See* sections I & II.B.1.b, *supra*. In addition, the Workers' counsel had to familiarize themselves with the criteria for TAA certification, and research how the Labor Department was applying those criteria to the software industry. *See* section II.B.1.d, *supra*.[70]

---

Just as the Government runs certain risks if it engages in "scorched earth" litigation tactics, it runs similar risks if an agency shirks its duties at the administrative level. For example, where – as here – the Labor Department is guilty of gross dereliction of its duty to investigate a TAA petition, the Government assumes the risk of being required to bear the attorneys' fees incurred when counsel representing the petitioning workers undertake to (essentially) fulfill the obligations on which the agency defaulted.

[70]Particularly in light of the incompetence and/or indifference that the Labor Department displayed both in its initial investigation and in its reconsideration of the Workers' TAA petition, and in light of the importance of the timely receipt of TAA benefits, the Workers' counsel were not required to take a "wait and see" approach, deferring all work on the case until after the agency completed its remand investigation. The Workers' counsel could not afford to gamble the Workers' solvency and health on the assumption that – when it comes to TAA investigations – "the third time is a charm," and the Labor Department would finally conduct a proper investigation and reach a correct result. The Workers' counsel had to assume the worst. They had to assume that, like the agency's two previous investigations, the remand investigation would also be flawed, and that the agency would yet again deny the Workers' petition (presumably on some *new* ground).

In effect, the Government now seeks to judge, with the benefit of hindsight, the extent of the factual and legal research conducted by the Workers' counsel. But that is an inappropriate standard. Even if some of the research never saw the light of day, the fact that it never became necessary to memorialize the research in memoranda filed with the agency or briefs filed with the Court does not mean that it was unreasonable for the Workers' counsel to be prepared. *See*, *e.g.*, Wooldridge, 898 F.2d at 1177 (eschewing use of hindsight, and emphasizing that "the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when t work was performed").

Moreover, even as it emphasizes the relatively modest amount of briefing required in this litigation prior to the Labor Department's certification of the Workers, the Government ignores the critical role that the Workers' counsel played in the remand proceeding. The Workers' counsel took the lead in structuring the remand investigation, researching and drafting a comprehensive order to define the scope of the agency's work – a detailed order that was entered by the Court with only minor alterations. *See* section I, *supra*.

The Workers' counsel also assisted with the development of the administrative record on remand, filing submissions with the Labor Department which – although primarily factual – had legal underpinnings, and which were integral to the agency's work. Indeed, the agency incorporated excerpts from one of the Workers' submissions wholesale into its first questionnaire ("Confidential Data Request") for BMC in the course of the remand investigation. *See*, *e.g.*, Letter to Labor Department from Counsel for Plaintiffs (Aug. 31, 2004); Letter to BMC from Labor Department (enclosing Confidential Data Request) (Sept. 2, 2004), at Att. B; Letter to Labor Department from Counsel for Plaintiffs (transmitting Declaration of Arthur L. Blummer, one of the named representative plaintiff Workers) (Sept. 28, 2004).

For its part, the Government cites but a single billing entry as evidence of the Workers' "excessive and presumptively unreasonable" research – an entry for two hours on July 25, 2004,

---

In somewhat analogous circumstances, the Court of Appeals for the D.C. Circuit declined to reduce fees, noting that "[t]he fact that [counsel's] legal research bore no fruit is no reason to deny them fees for the time spent on this work. . . . [C]*ounsel correctly recognized that there was no guarantee that their motion would be granted merely because it was unopposed.* Therefore, it made good sense for them to research the issue." Wilkett v. Interstate Commerce Comm'n, 844 F.2d 867, 878 (D.C. Cir. 1988) (emphasis added). So too counsel for the Workers here could not assume that the Labor Department would do its duty; they had to do a reasonable amount of research so as to be prepared, come what may.

devoted to "research regarding past CIT practices in remands of TAA benefit certification cases." *See* Def.'s Response at 32.[71]  However, as noted above, research on that topic was obviously relevant to the Workers' case, and there can be no claim that those two hours were "excessive" or "unreasonable."[72]

---

[71]As with its other objections to the Workers' Application, the Government here fails to specify the date of the billing entry that it quotes.  Indeed, the Government fails even to provide a citation to the relevant page of the Workers' Application.  *See* section II.B.1, *supra*.

[72]In addition to the July 25, 2004 billing entry, the Government points to two other asserted examples of "excessive and presumptively unreasonable" research – "hours allegedly expended conducting 'meetings on TAA issues,'" and "multiple hours of 'reviewing' orders and decisions" issued in this case.  *See* Def.'s Response at 32.  However, contrary to the Government's assertion, neither of those types of work constitutes "research" – "excessive and presumptively unreasonable," or otherwise.

The Government cites no specific billing entries for either "meetings on TAA issues" or "review[]" of "orders and decisions" which it contends are unreasonable.  And, as discussed in greater detail above, it is not the duty of the Court to make the Government's case for it.  *See* section II.B.1, *supra*.

In any event, scrutiny of the Workers' Application identifies eight entries which include time spent "reviewing" orders or decisions issued by the Court:  (1-2) two entries dated August 10, 2004; (3) an entry dated August 11, 2004; (4) an entry dated February 3, 2005; (5) an entry dated February 4, 2005; (6) an entry dated February 9, 2005; (7) an entry dated May 12, 2005; and (8) an entry dated September 2, 2006.  Those eight entries account for a total of six hours of billed time; and – in most instances – the entries include time spent on tasks in addition to "'reviewing' orders and decisions," which means that the actual total time devoted to such review was substantially less than six hours. Consideration of each of the entries individually, as well as all eight entries as a whole, compels the conclusion that the Workers' counsel did not devote excessive time to the task.  Surely the Government does not contend that counsel should not have reviewed the rulings of the Court in this case.  And since law firms customarily bill their clients for such work, it is also compensable here. *See generally* Davis v. City and County of San Francisco, 976 F.2d at 1543 (holding that "[t]he touchstone in determining whether hours have been properly claimed is reasonableness.  The assessment of reasonableness is made by reference to standards established in dealings between paying clients and the private bar").

Similarly, other than the meetings analyzed in section II.B.1.d above (which discusses the Government's challenge to the Workers' representation by multiple attorneys), review of the

Further, where – as here – a defendant fails to "raise more than a generalized objection" to a category of fees, it is typically unnecessary for the prevailing party to mount an entry-by-entry defense of the challenged claims. Nor in such cases is the court generally required to review entries other than those which can be "eliminated through a cursory examination of the bill." *See*, *e.g.*, Wooldridge, 898 F.2d at 1176 n.14.

In any event, the record compiled before the Court, together with the administrative record compiled on remand, provide more than ample justification for the 15 entries comprising a total of fewer than 40 hours of research for which the Workers seek compensation,[73] and demonstrate that – contrary to the Government's assertions – that time was neither "excessive" nor "unreasonable." *See generally* Pirus v. Bowen, 869 F.2d 536, 541 n.7 (9th Cir. 1989) (observing that, "[h]aving experienced the case firsthand, the [trial] court is in the best position to decide whether the attorneys' time was reasonably spent").[74]

_____

Workers' Application identifies only three entries which reflect time spent in "meetings on TAA issues" (or some similar phrasing): (1) an entry dated July 22, 2004; (2) an entry dated July 28, 2004; and (3) an entry dated April 19, 2005. Because the first two of those three entries include time devoted to activities in addition to meetings, the actual time spent in meetings was significantly less than the total of six hours of work that the three entries reflect. Moreover, whether judged in isolation or in conjunction with the meetings convened to discuss the status of the case (*see* n.57, *supra*), that is not an unreasonable number of meetings in a case of this significance, magnitude, complexity, and duration.

[73]The Workers' Application includes a total of 15 billing entries which include legal research or review of caselaw, excluding the five entries for research and drafting of the fee application itself. Because virtually all of those 15 entries reflect time devoted to activities in addition to legal research, the total of 37.5 hours significantly overstates the actual time devoted to legal research.

[74]Although the Government raises no challenge to "background research" conducted in this case (*see* Def.'s Response at 32-33), it asserts generally that "time spent familiarizing oneself with the general area of law at issue would normally be absorbed into [a] firm's overhead. Attempting to charge an adversary with time spent conducting background research is presumptively

## f. Fees for Miscellaneous Legal Services

In addition to its numerous other objections, the Government also charges that the Workers'

Application seeks an award of fees for "items . . . [that] bear no direct relation to the litigation of

[their] claims."  *See* Def.'s Response at 33.  As "example[s],"[75] the Government points to billing

_____

unreasonable."  *See* Def.'s Response at 31 (*citing*, *inter alia*, Case v. Unified School Dist., 157 F.3d at 1253).

But, as the Government apparently concedes, the general principle to which it refers has no application in circumstances such as these.  In the absence of a client base – or at least a *potential* client base – with a need for counsel specializing in TAA law, no law firm can reasonably be said to have a vested self-interest in developing and maintaining expertise in the field.  And here, as in New York State Ass'n for Retarded Children, "[t]he background research performed . . . was not of the sort needed to raise these attorneys to a level of competence shared by many experienced practitioners within an established field of specialization, which may well not be compensable, but was warranted rather to assist in establishing a new branch of specialization, one in which only a handful of attorneys had preceded them."  *See* New York State Ass'n for Retarded Children, 711 F.2d at 1146 n.5 (affirming award of "fees for time spent on background research").

In case after case, courts have noted the relationship between counsel's level of expertise in the area of the law at issue and the number of hours billed.  "A fee applicant cannot demand a high hourly rate – which is based on his or her experience, reputation, and a presumed familiarity with the applicable law – and then run up an inordinate amount of time researching that same law."  Ursic v. Bethlehem Mines, 719 F.2d 670, 677 (3d Cir. 1983); *see also* Bell v. United Princeton Properties, 884 F.2d at 721 (same); Spell v. McDaniel, 852 F.2d at 768 (same).  *Cf.* Atlantic Fish Spotters Ass'n v. Daley, 205 F.3d 488, 493 (1st Cir. 2000) (noting that "a lawyer without [the subject attorney's] experience might have to spend far more hours to do the same work").

As discussed in greater detail below, the Workers' counsel here are not claiming any special expertise in TAA law.  *See* section II.B.2.a(1), *infra*.

Moreover, a trial court is generally entitled to "ample discretion" in "assessing the extent of . . . background research appropriate for a given case."  New York State Ass'n for Retarded Children, 711 F.2d at 1146 & n.5.  "[F]or the most part such decisions are best made by the [trial] court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation."  *Id*. at 1146.

[75]As discussed elsewhere above, it is generally insufficient for the Government to identify mere "examples" of the entries that it finds objectionable, and leave to the Court the painstaking

entries for "communications with an unnamed 'attorney representing claimants in other TAA

software case,'" "research regarding federal government policy on alternative dispute resolution,"

"publicizing the plight of software workers who have TAA claims," and "review and respond to e-

mails on prospect for seeking congressional assistance with client's TAA claim." *Id*.[76]  But the

Government cites no authority to support its assertion that those types of work are not compensable.

*Id*.

Contrary to the Government's claim, fees may properly be awarded for consultations with

counsel in other comparable cases.  *See*, *e.g.*, Davis v. City and County of San Francisco, 976 F.2d

at 1545 (sustaining award for time spent "conferring . . . with attorneys involved in similar

litigation").  Due to the Labor Department's lack of transparency concerning the applicable criteria,

it was particularly important for the Workers' counsel here to confer with counsel in other software

cases.  *Cf*. Pls.' Application at 12 (noting that Workers' counsel obtained a copy of an agency

"clarification of the . . . issues in a parallel case" involving delayed certification, which the Workers'

---

work of combing the Itemized Billing Statement submitted with the Workers' Application, line-by-
line, in an effort to ascertain whether there are other entries that the Government might also find
objectionable.   *See* sections II.B & II.B.1, *supra*.   Moreover, the Court cannot read the
Government's mind.  The Court therefore cannot know with any confidence what the Government
would deem to be "items . . . [that] bear no direct relation to the litigation of [the Workers'] claims."
*See* Def.'s Response at 33.

[76]Here again the Government fails to provide specific cites to the Workers' Application,
much less identify the dates of the billing entries that are quoted.  *See* section II.B.1, *supra*.

In any event, review of the Workers' Application indicates that the billing entries that the
Government quotes are dated October 20, 2004 ("Telephone conference with attorney representing
claimants in other TAA software case"), July 23, 2004 ("Research regarding federal government
policy on alternative dispute resolution"), December 13, 2004 ("Discussions . . . regarding
publicizing plight of software workers who have TAA claims"), and July 19, 2004 ("Review and
respond to e-mails on prospect for seeking congressional assistance with client's TAA claim").

counsel "used to alleviate confusion within the Texas Workforce Commission").[77]

Also unfounded is the Government's challenge to time spent on "research regarding federal government policy on alternative dispute resolution." The fact that the parties ultimately did not pursue alternative dispute resolution is of little moment. "The relevant issue . . . is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." Grant v. Martinez, 973 F.2d 96, 99 (2nd Cir. 1992) (citing Wooldridge, 898 F.2d at 1177).[78] Particularly under the circumstances here, because of the importance of securing TAA certification of the Workers as rapidly as possible, the Workers' counsel were justified in evaluating other possible avenues to expedite resolution of this matter. Indeed, in some cases, fee awards have actually been reduced based on counsel's *failure* to explore alternatives to litigation. *See*, *e.g.*, Spegon v. Catholic

---

[77]The same rationale applies with equal force to the four other billing entries which are similar to the October 20, 2004 entry quoted by the Government: (1) an October 16, 2004 entry ("Draft e-mail to counsel in other TAA software cases"); (2) an October 19, 2004 entry ("E-mail counsel in other TAA software cases regarding status"); (3) a November 9, 2004 entry ("E-mail counsel in other software TAA cases regarding CIT Judicial Conference developments related to TAA matters; e-mail others interested in same"); and (4) a January 24, 2005 entry ("Discussion with outside attorney regarding TAA software cases before the CIT").

[78]*Accord* Indep. Sch. Dist. v. Digre, 893 F.2d 987, 992 (8th Cir. 1990) (declining to second-guess "with the benefit of hindsight" "judgement calls" made in course of litigation; plaintiffs are required "to be prudent and not incur unnecessary attorneys' fees," but they are not required to be "prescient"); Wilkett v. Interstate Commerce Comm'n, 844 F.2d at 878 (noting that "[t]he fact that [counsel's] legal research bore no fruit is no reason to deny them fees for the time spent on this work. . . . [C]ounsel correctly recognized that there was no guarantee that their motion would be granted merely because it was unopposed. Therefore, it made good sense for them to research the issue."); Dennis v. Chang, 611 F.2d at 1308; *cf*. Jenkins v. Missouri, 127 F.3d at 718 (in evaluating compensability of post-judgment activities, courts have not ruled "that any unsuccessful efforts were perforce unnecessary, but rather have asked whether the plaintiff's attorneys would have been expected or obliged to take the position they took") (citation omitted); In re Synthroid Marketing Litigation, 264 F.3d at 718-19.

Bishop of Chicago, 175 F.3d at 551-52 (holding that fee-paying client would have expected counsel

to assess feasibility of quick settlement prior to filing suit).[79]

Media relations work and government relations work are similarly compensable in

appropriate cases.  As Justice Kennedy observed in Gentile v. State Bar of Nevada, a case reviewing

a state bar's disciplinary action based on a criminal defense attorney's statements at a news

conference: "An attorney's duties do not begin inside the courtroom door.  He or she cannot ignore

the practical implications of a legal proceeding for the client."  Gentile v. State Bar of Nevada, 501

U.S. 1030, 1043 (1991).  Nor can counsel afford to ignore collateral fora where they may be useful

in advancing a client's interests.  Thus, "[w]here the giving of press conferences and performance

of other lobbying and public relations work is directly and intimately related to the successful

representation of a client, private attorneys do such work and bill their clients."  Davis v. City and

County of San Francisco, 976 F.2d at 1545.[80]  Counsel to prevailing plaintiffs in TAA cases such

---

[79]In addition to the July 23, 2004 entry which the Government quotes, review of the Workers' Application reveals two other entries concerning the potential use of alternative dispute resolution to dispose of this matter – (1) a July 23, 2004 entry ("Meeting . . . to discuss potential for arbitration of TAA case"), and (2) a July 23, 2004 entry ("Meeting regarding use of ADR").  For the reasons set forth above, there is similarly no reason to disallow the time reflected in either of those entries.

[80]See also Glover v. Johnson, 934 F.2d at 717 (sustaining award of fees for lobbying efforts); DeMier v. Gondles, 676 F.2d 92, 93-94 (4th Cir. 1982) (affirming award of fees for lobbying work); United States v. Aisenberg, 247 F. Supp. 2d 1272, 1314-17 (M.D. Fla. 2003), rev'd and remanded on other grounds, 358 F.3d 1327 (11th Cir. 2004) (awarding fees for media relations work).

But see, e.g., Role Models America, 353 F.3d at 973 (explaining that D.C. Circuit does not allow government to be charged for "time spent in discussions with the press"); Rum Creek Coal Sales, 31 F.3d at 176 (sustaining denial of fees where media relations work was "aimed, not at achieving litigation goals, but at minimizing the inevitable public relations damage to the company" associated with labor strike); Greater Los Angeles Council on Deafness v. Community Television of Southern California, 813 F.2d 217, 221 (9th Cir. 1987) (sustaining as "reasonabl[e]," without

as this generally may do the same.[81]

However, the time reflected in one public relations-related billing entry and in one government relations-related entry must be disallowed, because the work cannot be said to have been "related to the successful representation of [the] client." Specifically, an entry dated March 2, 2005 documents time devoted to drafting text concerning counsel's handling of the Workers' case for inclusion in a law firm brochure or similar publication – "Draft description of BMC representation for pro bono publication." Although the Government did not object to that billing entry, the time obviously was not expended for the benefit of the Workers and therefore must be disallowed.

---

explanation, denial of fees for time spent on publicity and lobbying); Portland Audubon Society, 865 F. Supp. at 1475 (declining to award fees "for actions taken . . . in the political or legislative arena"); cf. Forest Conservation Council v. Devlin. 994 F.2d 709, 712-13 (9th Cir. 1993) (declining to extend definition of "prevailing party" to allow EAJA fee award "where a party's pre-litigation activities were solely responsible for bringing about the desired result"; "The EAJA does not serve to compensate public interest groups for their lobbying efforts, no matter how successful those efforts may be. That the dialogue between concerned citizens and the government . . . may have led the Forest Service to reevaluate the validity of the timber sale means that democracy works; it does not justify an award for attorneys' fees expended on a lawsuit that, according to [the public interest group's] own concession, did not precipitate the outcome.").

[81]In addition to the December 13, 2004 entry which the Government quotes, review of the Workers' Application reveals one other entry reporting time devoted to media relations work – a November 16, 2004 entry reporting a "[d]iscussion . . . regarding getting visibility for TAA software cases." For the reasons set forth above, the nature of the work provides no basis for disallowing the time recorded in that entry.

Again, it is not determinative whether the government relations work or media relations work actually contributed to the Workers' ultimate success. Hindsight is 20/20. But "[t]he question is not . . . whether in hindsight the time expenditure was strictly necessary to obtain the relief achieved. Rather, the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." Wooldridge, 898 F.2d at 1177. Given the nature of the case at bar, counsel were justified in their efforts (except as specifically noted).

The time reflected in a March 7, 2005 billing entry – "Prepare proposed draft of revised TAA statute . . . ; research regarding same" – must be disallowed as well. Although the Government also did not object to that billing entry, and although the task that the entry reflects might well have been compensable under other circumstances, the legislative drafting work at issue *postdated* the Workers' certification of eligibility for TAA benefits in this case. Accordingly, that time too was not expended for the benefit of the Workers. *See generally* Davis v. City and County of San Francisco, 976 F.2d at 1545 (indicating that, although other media relations and government relations activities were generally compensable as valid means of achieving client's objective, television appearances by counsel *after* signing of consent agreement were probably not for benefit of client and thus were probably not compensable).

Review of the Workers' Application discloses yet another category of work that merits attention. Although the Government raised no objection, time devoted to internal law firm administrative matters related to client billing (such as establishing a client account and drafting a retainer agreement) must be disallowed – at least where, as here, there is no showing that it is standard practice to charge paying clients for such work. *See*, *e.g.*, Role Models America, 353 F.3d at 973 (explaining that time devoted to "administrative matters relating to the formal relationship between [the fee applicant] and its attorneys" is not compensable); Reed v. Rhodes, 934 F. Supp. 1459, 1482 (N.D. Ohio 1996) (publishing 1995 Order) (expressing doubt whether it is "standard billing practice[]" to charge client for "time devoted to the preparation and posting of time charges and the preparation of client invoices"); Griffin & Dickson v. United States, 21 Cl. Ct. 1, 11 & n.18 (1990) (Rader, J.) (disallowing fees for "collection issues strictly of interest to plaintiff and its legal representative").

The specific billing entries at issue are: (1) a July 21, 2004 entry ("TAA research; meeting to discuss case status and strategy; telephone discussions with client regarding same; telephone discussion with government attorney regarding extension and basis for remand; *complete new matter form*; draft motion for extension; draft proposed order in support; draft protective order agreement; circulate drafts of proceeding") (emphasis added); (2) an August 1, 2004 entry ("*Draft retainer letter*; review CIT rules regarding response submissions; draft submission regarding response to Government's motion for remand; review remand order; e-mail Government regarding same") (emphasis added); (3) an August 4, 2004 entry ("Discussion . . . regarding issue of recovery of legal fees language for retainer letter; revise letter to reflect same"); (4) an October 27, 2004 entry ("Investigate whether retainer letters have been received from all clients; e-mail . . . regarding missing letter"); and (5) an October 28, 2004 entry ("E-mail client regarding mailing of follow-up retainer letter").

Because the July 21, 2004 entry and the August 1, 2004 entry include time devoted to compensable tasks in addition to non-compensable client billing-related work, those entries will be docked 15 minutes and 45 minutes, respectively. The three remaining billing entries must be disallowed in their entirety.

Finally, an entry dated July 20, 2005 memorializes time spent to "[l]ocate case-related materials . . . . " Whatever may have precipitated the need for those materials, the task of locating them postdated the completion of all post-certification briefing. Under the circumstances, it cannot be said that the time was expended for the benefit of the Workers. That time too therefore must be disallowed.

g.  Fees for Litigation Support Work

As the Government correctly notes, the Workers' Application seeks an award of fees for a range of litigation support activities.  The Government spotlights billing entries for services to "organize materials and coordinate creation of case file in Records Department," and for "routing and distribution of service copies of letter and proposed order to government and clients."  *See* Def.'s Response at 33.[82]  According to the Government, such activities are "[n]on-compensable" under the EAJA.  *Id.*

Nothing in the record indicates that the tasks identified in the billing entries that the Government cites required the skills of a lawyer.  However, contrary to the Government's assertion, it does not necessarily follow that the work is, by definition, "[n]on-compensable."  *See*, *e.g.*, Lipsett v. Blanco, 975 F.2d 934, 940 (1st Cir. 1992) (holding that, where work could have been performed by non-attorney, "[t]he hours should not be completely eliminated but should be compensated at a less extravagant rate") (citation omitted).

As the Supreme Court has observed, "paralegals are capable of carrying out many tasks . .

---

[82]Here, as elsewhere, the Government has made no effort to identify those billing entries to which it objects, but – instead – proffers mere "examples."  *See* Def.'s Response at 33.  As discussed above, however, there is no obligation on the part of the Court to do the work of the Government for it.  *See generally* sections II.B & II.B.1, *supra*.

The Government has similarly failed to specify the dates of the billing entries that it quotes as examples of objectionable charges.  Indeed, it has not even provided citations to the pages of the Workers' Application where the quoted entries appear.  *See generally* section II.B.1, *supra*.

The Government appears to be referring to a July 27, 2004 entry ("Routing and distribution of service copies of letter and proposed order to government and clients; researching and printing court rules re: time computation and service procedures"), and to an August 5, 2004 entry ("Organize materials and coordinate creation of case file in Records Department").

. that might otherwise be performed by a lawyer and billed at a higher rate." Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989). Where – as here – tasks implicate some level of specialized training or experience, but do not necessarily require a law degree,[83] the work may be performed by a paralegal or legal assistant, and is compensable under the EAJA *at a lower rate. See*, *e.g.*, Lipsett v. Blanco, 975 F.2d at 940.[84]

As discussed above, where the party opposing the award of fees contents itself with merely identifying "examples" of the entries to which it objects, a court generally is under no obligation to conduct a line-by-line review of the fee application to identify other similar entries. *See* section II.B.1, *supra*. However, such a review in this case identifies a number of other entries which – like the two examples cited by the Government – are best characterized as paralegal work.[85] Like the

---

[83]The Government makes no attempt to argue that the tasks at issue are purely clerical or secretarial (and thus presumed to be absorbed within a law firm's overhead). And a careful review of the two billing entries specified by the Government – as well as all others discussed in this section – discloses that the tasks listed therein may fairly be characterized as paralegal work. *See generally* Lipsett v. Blanco, 975 F.2d at 939-40 (noting that trial court's judgment is accorded "greatest weight" where tasks "[fall] into the gray area between purely clerical tasks and those properly entrusted to a paralegal"); *cf*. Missouri v. Jenkins, 491 U.S. at 288 n.10 (listing types of work that "lie[] in a gray area of tasks that might appropriately be performed either by an attorney or a paralegal").

[84]Even if the work is actually done by an attorney, it is nevertheless compensable only at a non-attorney rate. "It simply is not reasonable . . . to bill, at [a lawyer's] regular hourly rate, for tasks that a non-attorney . . . could perform at a much lower cost." Davis v. City and County of San Francisco, 976 F.2d at 1543. "[The] dollar value [of such non-legal work] is not enhanced just because a lawyer does it.'" Missouri v. Jenkins, 491 U.S. at 288 n.10 (*quoting* Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717 (5th Cir. 1974)). "A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." Ursic v. Bethlehem Mines, 719 F.2d at 670.

[85]The additional billing entries identified by the Court are: (1) a July 16, 2004 entry ("Filing for CIT password; researching case docket, court rules and forms"); (2) a July 20, 2004 entry ("Printing out case documents from docket database; preparation of draft PO subscriptions"); (3) a July 22, 2004 entry ("Preparation and filing of Motion, Order, PO Subscriptions, and Stipulation

work listed in the two entries cited by the Government, the work listed in the other entries identified

by the Court is also compensable, at the paralegal rate.

Unfortunately, although their respective individual billing rates are specified, the Workers'

Application does not indicate the employment status of the various individuals who performed the

work for which fees are sought.  *See* Naporano Iron and Metal Co., 825 F.2d at 404 (noting that fee

applicant must provide "'contemporaneous records of exact time spent on the case, by whom, *their*

*status* and usual billing rates . . .'") (emphasis added) (quotation omitted).  Thus, based on the

Workers' Application, it is impossible to tell for certain whether the specific work here at issue was

performed by paralegals or by attorneys.  It is similarly impossible to determine with confidence,

from the Workers' Application, the law firm's billing rates for paralegals (as distinguished from its

billing rates for junior attorneys, for example).

Calculating the amount of the award for the paralegal-type work in this case is particularly

difficult in light of the Court of Appeals' recent decision in Richlin Sec. Serv. Co. v. Chertoff, 472

F.3d 1370 (Fed. Cir. 2006).  Prior to Richlin, EAJA awards had included compensation for paralegal

---

at Court of International Trade; service of government and clients; copying and organizing
documents for case file"); (4) a January 18, 2005 entry ("Review CIT website for instructions on
filing documents electronically . . . ; conference . . . regarding attention to CIT filing issues"); (5)
a February 11, 2005 entry ("Prepare service copies and a Certificate of Service for a BMC filing .
. ."); and (6) a February 15, 2005 entry ("Prepare service copies and a Certificate of Service for a
BMC filing . . . ").

One other entry, dated February 11, 2005, records time devoted to a "conference . . .
regarding CM/ECF procedures."  However, that entry cumulates time spent on numerous other –
much more substantive – tasks, most of which are patently attorney-level work.  It is clear from a
review of the complete entry that the "conference . . . regarding CM/ECF procedures" consumed but
a tiny fraction of the total time memorialized in the entry.  Accordingly, the time reflected in that
entry is compensable at lawyers' rates.  No deduction is necessary.

work at market rates (although those rates were not subject to a cost of living adjustment).[86]

However, the Court of Appeals has now squarely held that, under the EAJA, "paralegal services are

not recoverable as fees, but are only recoverable as expenses *at the cost to the attorney*."  Richlin,

472 F.3d at 1381 (emphasis added).  It is thus impossible to calculate the fee award in this case

based on the Workers' Application as it presently stands.  *See generally* Raines v. Shalala, 44 F.3d

1355, 1363 (7th Cir. 1995) (discussing retroactivity in fee award case, in light of Harper v. Virginia

Dep't of Taxation, 509 U.S. 86 (1993)).

     Although neither party brought Richlin to the attention of the Court,[87] the Workers will be

---

[86]*See*, *e.g.*, Levernier, 947 F.2d at 503 (indicating that "the EAJA allows for the recovery of paralegal fees for whom the 'prevailing market rate' is less than $75 [now $125] per hour," but holding that EAJA precludes cost of living adjustment for such fees); Tyco, 28 CIT at 1592, 350 F. Supp. 2d at 1093-94 (awarding "prevailing market rate" for paralegal services).

[87]Neither party has directly raised the issue of the compensability under the EAJA of legal assistant/paralegal-type services, although even Levernier distinguished between the treatment of attorneys and non-attorneys.  *See* Levernier, 947 F.2d at 503 (paralegal rates not subject to cost of living adjustment under EAJA).  In other words, even before Richlin issued, it was essential that a fee application indicate the employment status of each timekeeper working on a case, to allow the court to distinguish between attorney and non-attorney hours in calculating a cost of living adjustment.

    In any event, the differences between the EAJA's treatment of attorneys and non-attorneys were heightened with the Court of Appeals' issuance of Richlin mere weeks after the close of briefing on the fees issue in this matter.  Nevertheless, neither party brought Richlin to the attention of the Court – not after the opinion issued, and certainly not during the pendency of the appeal.  *See generally* Thomas R. Newman & Steven J. Ahmuty, Jr., Disclosing Adverse Authority, N.Y.L.J., Sept. 4, 2002, at 3 (discussing "the lawyers' responsibility to see to it that all relevant authorities are brought to the attention of the court, those supporting the position urged as well as those against it," and noting that – "just as one would advise the court of a recently decided, or found, favorable case," in fulfillment of counsel's duty to zealously represent the interests of his client – so too the ethical obligation of candor toward the court requires that counsel "disclose directly adverse authority not known to and cited by opposing counsel.").  *See also* ABA Model Rules of Prof'l Conduct R. 3.3 (2002), "Candor Toward the Tribunal."

accorded the opportunity to supplement their Application with information on the precise

employment status of each individual whose time is reflected in the Application. *See* Naporano Iron

and Metal Co., 825 F.2d at 404.[88]  In addition, the Workers will be accorded the opportunity to

provide information on the cost to the law firm of any paralegals and other non-attorneys whose time

is reflected in the Application. *See* Richlin, 472 F.3d at 1381.  And the Government, of course, will

have an opportunity to respond.  In the future, such information should be provided in fee

applications as a matter of course, as Naporano and Richlin require.


### h.  Fees for Preparation of Fee Application

The government acknowledges that "attorney fees incurred in the preparation of an

application for fees are compensable under the EAJA."  Schuenemeyer v. United States, 776 F.2d

329, 333 (Fed. Cir. 1985) (citations and footnote omitted); Def.'s Response at 29.  Moreover, the

---

Counsel's duties of disclosure "continue to the conclusion of [a] proceeding" and cover any legal authority "in the controlling jurisdiction" (including not only decisions of relevant appellate courts, but also decisions of the same court, courts of coordinate jurisdiction, and even lower courts). *See*, *e.g.*, ABA Model Rules of Prof'l Conduct R. 3.3(c) (duration of obligation to disclose); Newman & Ahmuty, *supra*, at 4 (definition of "controlling jurisdiction"); Angela Gilmore, Self-Inflicted Wounds: The Duty to Disclose Damaging Legal Authority, 43 Clev. St. L. Rev. 303, 308 (1995) (Rule 3.3 "dictates disclosure of cases decided by the same court or higher courts in the same jurisdiction"). *See generally* Chevron I, 26 CIT at 1280 n.7, 245 F. Supp. at 1324 n.7.

*Cf.* Jewelpak Corp. v. United States, 297 F.3d 1326, 1333 n.6 (Fed. Cir. 2002) (noting that "officers of our court have an unfailing duty to bring to our attention the most relevant precedent that bears on the case at hand – both good and bad – of which they are aware"); Amoco Oil Co. v. United States, 234 F.3d 1374, 1378 (Fed. Cir. 2000) (criticizing counsel's "fail[ure] to cite, much less distinguish, clearly governing case law" as potential violation of Rule 3.3).

[88]Where the employment status of an individual changed during the course of the proceeding (for example, if a summer associate or law clerk who worked on this matter later joined the firm as an associate and continued to work on the matter), that fact (including relevant dates) should be indicated.

Government does not question the 20.75 hours devoted to the fee application here.  Some modest

reduction is nevertheless required, in light of Comm'r, Immigration & Naturalization Service v.

Jean, 496 U.S. 154.

In Comm'r, Immigration & Naturalization Service v. Jean, the Supreme Court held that a fee

applicant may recover fees incurred litigating the fee award without a separate showing that the

Government's opposition to the fee award was not substantially justified.  *See id*. at 159, 161-62

("only one threshold [substantial justification] determination for the entire civil action is to be

made"; although "[a]ny given civil action can have numerous phases," "the EAJA – like other fee-

shifting statutes – favors treating a case as an inclusive whole").  In a footnote, however, the Court

noted that its decision in Hensley v. Eckerhart requires a trial court to "consider the relationship

between the amount of the fee awarded and the results obtained."  *Id*. at 163 n.10 (*citing* Hensley

v. Eckerhart, 461 U.S. 424).  As the Court explained, that principle applies to the fee award phase

of litigation as surely as it does to the "merits" phase:

> [Thus] fees for fee litigation should be excluded to the extent that the applicant
> ultimately fails to prevail in such litigation.  For example, if the Government's
> challenge to a requested rate for paralegal time resulted in the court's recalculating
> and reducing the award for paralegal time from the requested amount, then the
> applicant should not receive fees for the time spent defending the higher rate.

Comm'r, Immigration & Naturalization Service v. Jean, 496 U.S. at 163 n.10.  *Accord* Chiu v.

United States, 948 F.2d at 722 (holding that fees for fee litigation not awarded to extent that fee

applicant does not succeed in fee litigation).

Because Richlin was decided after the parties here completed briefing on the fee issue, the

potential future reduction of the Workers' fee request to reflect an award for the time expended by

paralegals only at their cost to the law firm (rather than at market rates) gives no cause to adjust the

time expended on the fee application. *See* section II.B.1.g, *supra* (discussing Richlin, 472 F.3d

1370). However, because the Workers do not succeed in establishing counsel's entitlement to a

"special factors" enhancement (*see* section II.B.2.a, below), an adjustment is appropriate for time

spent briefing that issue. *See*, *e.g.*, In re Sealed Case 00-5116, 254 F.3d at 237 (declining to award

fees incurred in preparation of briefs "primarily devoted to arguing that [the fee applicants] should

receive higher fees based on their interpretation of the EAJA's 'special factor' provision," where

fee applicants did not prevail on that issue) (citations omitted).

The Itemized Billing Statement submitted by the Workers does not specify which hours

counsel devoted to the "special factors" issue, as distinguished from their work on all other aspects

of the fee application. However, a review of the Workers' Application indicates that the issue

consumed but a fraction of the time spent researching and drafting that document. And, although

the "special factors" issue was one of only two issues addressed in Plaintiffs' Reply, the Workers

seek no fees at all for the time that counsel spent on that document.

Accordingly, the award in this matter will include fees for the attorney and/or paralegal time

devoted to preparation of the Workers' Application, at the appropriate rate(s), with a deduction of

two hours of the time spent on "[l]egal research and drafting [of the] EAJA application" (to account

for time spent on the "special factors" issue on which the Workers do not succeed).

### 2. A Reasonable Hourly Rate of Compensation

The second component of the "lodestar" figure – after "the number of hours reasonably

expended on the litigation" – is "a reasonable hourly rate" of compensation. Hensley v. Eckerhart,

461 U.S. at 433. The EAJA caps attorneys' fees at $125 per hour, "unless the court determines that

an increase in the cost of living or a special factor . . . justifies a higher fee." 28 U.S.C. §

2412(d)(2)(A)(ii). According to the Itemized Billing Statement submitted by the Workers, the

standard hourly billing rates of all their counsel exceed the $125 per hour statutory cap. *See* Pls.'

Exh. 6. Thus, all attorney hours[89] reasonably expended in this matter on the Workers' behalf are

compensable at the rate of at least $125 per hour – and even higher, if justified by "an increase in

the cost of living or a special factor."

The Workers argue that "special factors" are present in this case, justifying an enhancement

of the award of attorneys' fees. *See generally* Pls.' Application at 23-26; Pls.' Reply at 7-8. In the

alternative, the Workers contend that the $125 per hour statutory cap should be subject to a cost of

living adjustment ("COLA"). *See generally* Pls.' Application at 26-27.

For the reasons detailed below, the Workers' request for a "special factors" enhancement is

denied, and their request for a cost of living adjustment is granted.

### a.  The Workers' Request for a "Special Factors" Adjustment

The EAJA permits enhancement of a fee award for "a special factor, such as the limited

availability of qualified attorneys for the proceedings involved." *See* 28 U.S.C. § 2412(d)(2)(A)(ii);

*see generally* Gregory C. Sisk, The Essentials of the Equal Access to Justice Act: Court Awards of

Attorney's Fees for Unreasonable Government Conduct (Part Two), 56 La. L. Rev. 1, 145-76 (1995)

(analyzing "Enhancement of the EAJA Fee Award for 'Special Factors'").

In Pierce v. Underwood, the Supreme Court underscored that the EAJA's "special factors"

---

[89]As discussed above, the time of non-attorneys – including paralegals/legal assistants, law
clerks, and summer associates – is compensable at the actual cost to the firm at the time the work
was done. *See* section II.B.1.g, *supra*.

provision must be interpreted narrowly, "to preserve the intended effectiveness of the [now $125]

cap." *See* Pierce v. Underwood, 487 U.S. at 573. The Court therefore held that the "'special factors'

envisioned by the exception must be such as are not of broad and general application." *Id*. The

Court expressly rejected as "special factors" considerations including the "novelty and difficulty of

the issues," "the undesirability of the case," the "work and ability of counsel," and the "results

obtained," reasoning that they were not "special factors" at all, but – rather – "little more than

routine reasons why market rates are what they are." *Id*.

The Government maintains that "there is no 'special factor' justification for departing from

the statutory limits [on fees]" in the case at bar. *See* Def.'s Response at 24.

### (1) "The Limited Availability of Qualified Attorneys"

The "special factor" most commonly invoked in an attempt to justify enhanced attorneys'

fees is that specified in the EAJA itself – "the limited availability of qualified attorneys for the

proceedings involved." *See* 28 U.S.C. § 2412(d)(2)(A)(ii). According to the Government, however,

there was no "limited availability of qualified attorneys" to handle the case at bar. *See generally*

Def.'s Response at 34-36.

In Pierce v. Underwood, the Supreme Court explained that the special factor of "the limited

availability of qualified attorneys" "must refer to attorneys 'qualified for the proceedings' in some

specialized sense, rather than just in their general legal competence." Pierce v. Underwood, 487

U.S. at 572. The Court construed the language of the statute narrowly, to refer only to situations

where an attorney possesses "some distinctive knowledge or specialized skill needful for the

litigation," and emphasized that "an extraordinary level of the general lawyerly knowledge and

ability useful in all litigation" does not suffice.  *Id.*

Pierce v. Underwood suggested that the requisite "distinctive knowledge or specialized skill" might include "an identifiable practice specialty such as patent law, or knowledge of foreign law or language."  Pierce v. Underwood, 487 U.S. at 572.  But, even then, the $125 statutory cap is to be exceeded only "[w]here such qualifications are *necessary* and can be obtained only at rates in excess of the [$125] cap."  *Id.* (emphasis added).[90]

The Government contends that "'special skills' involving international trade are not required to litigate TAA cases" such as this.  The Government maintains that TAA cases require only knowledge of "general administrative law."  *See* Def.'s Response at 2, 9.

Analysis of the caselaw reveals that Courts of Appeals across the country have taken divergent approaches to the "limited availability of qualified attorneys" as a special factor.  *See generally* Connecticut State Dep't of Social Services v. Thompson, 289 F. Supp. 2d 198, 203 (D. Conn. 2003), *rev'd on grounds that plaintiff not "prevailing party" sub nom.* Santiago v. Leavitt, 153 Fed. Appx. 18 (2d Cir. 2005) (briefly surveying split in the circuits); Sisk, *supra*, at 145-64 (noting that "[t]he courts of appeals are divided," and "surveying and commenting upon the

---

[90]The law on "special factors" in the Fifth Circuit, for example, places great emphasis on one aspect of the purpose of enhancing fees for representation where there is a "limited availability of qualified attorneys" – that is, the expectation "that by increasing the fee, the availability of lawyers [in the particular field at issue] . . . will actually be increased."  *See* Perales v. Casillas, 950 F.2d at 1078 (footnote omitted).  The Fifth Circuit's inquiry thus considers three criteria: "(1) whether the attorneys had a specialized skill that was necessary to the litigation; (2) whether the number of attorneys with such skill was so limited that litigants with potentially valid claims were unable to obtain counsel; and (3) whether an increased fee award would have reduced this shortage."  Estate of Cervin v. Comm'r of Internal Revenue, 200 F.3d 351, 353-54 (5th Cir. 2000).

Other circuits have adopted similar formulations, although – in practice – the emphasis on different criteria varies significantly from one circuit to another.

opposing approaches"). Much of the debate surrounds whether technical specialties within the field of administrative law constitute "distinctive knowledge or specialized skill[s]" within the meaning of Pierce v. Underwood.

At one end of the spectrum is the Ninth Circuit, which has taken perhaps the most liberal view of the provision. *See*, *e.g.*, Love v. Reilly, 924 F.2d 1492, 1496 (9th Cir. 1991) (holding that insecticide litigation expertise, coupled with federal preliminary injunction experience, constituted "special factor"); Nat'l Wildlife Federation v. Federal Energy Regulatory Comm'n, 870 F.2d 542, 547 (9th Cir. 1989) (holding that expertise in environmental law, with specialty in "complex regulatory issues involved in hydropower regulation and public land forestry," constituted "special factor"; key criterion for "special factor" enhancement is attorney's "mastery of a technical subject matter gained by the investment of time and energy").[91]

---

[91]*See also* Internat'l Woodworkers of Americas v. Donovan, 769 F.2d 1388, 1391-92 (9th Cir. 1985) ("combined knowledge of [Redwood Employee Protection Program] law and federal litigation skill and expertise"); Portland Audubon Society, 865 F. Supp. at 1476 (expertise in environmental litigation); Sneede v. Coye, 856 F. Supp. at 535-36 (expertise in Medicaid law); Phayboun v. Sullivan, 1992 WL 247012 at * 19 (E.D. Cal. 1992) (granting "special factor" enhancement for work on fee petition, where "the fee litigation raised extremely complex legal issues"); Volkers v. Sullivan, 785 F. Supp. 871, 873 (D. Mont. 1991) (expertise in social security disability law); Edwards v. Griepentrog, 783 F. Supp. at 530 (expertise in Medicaid law, Supplemental Security Income statutes and regulations, and Veterans Affairs law concerning "unusual medical expense reimbursement payments"); Washington Dep't of Wildlife v. Stubblefield, 739 F. Supp. 1428, 1433 (W.D. Wash. 1989) (public interest environmental litigation); Cervantez v. Sullivan, 739 F. Supp. 517, 524-25 (E.D. Cal. 1990), *rev'd on other grounds*, 963 F.2d 229 (9th Cir. 1992) (expertise in law of social security class actions); Golden Gate Audubon Society v. Army Corps of Eng'rs, 738 F. Supp. 339, 344 (N.D. Cal. 1988) (environmental litigation expertise); Wilson v. Bowen, 691 F. Supp. 1257, 1262 (D. Ariz. 1988) (expertise in social security law); Hoopa Valley Tribe v. Watt, 569 F. Supp. 943, 947 (N.D. Cal. 1983) (expertise in Native American law); In re Tom Carter Enterprises, Inc., 159 B.R. 557, 562 (Bankr. C.D. Cal. 1993) ("specialized knowledge in the area of bankruptcy jurisdiction").

*Cf.* Thangaraja v. Gonzales, 428 F.3d 870, 876 (9th Cir. 2005) (holding that, although "a

In contrast, the D.C. Circuit is among the most rigorous, if not *the* most rigorous, of the

geographic courts of appeals.  *See generally* Truckers United for Safety v. Mead, 329 F.3d 891, 895-

96 (D.C. Cir. 2003).  Like some other courts, the Court of Appeals for the D.C. Circuit has focused

on the fact that the examples of "distinctive knowledge or specialized skill" set forth in Pierce v.

Underwood – "patent law, or knowledge of foreign law or language" – are specialties that require

"technical or other education *outside* the field of American law."  *See* Waterman Steamship Corp.

v. Maritime Subsidy Board, 901 F.2d 1119, 1124 (D.C. Cir. 1990).

The court has noted that, although "lawyers practicing administrative law typically develop

expertise in a particular regulated industry, whether energy, communications, railroads, or firearms,"

those practitioners "usually gain [their] expertise from experience, not from the specialized training

justifying fee enhancement."  Truckers United for Safety, 329 F.3d at 895 (*quoting* F.J. Vollmer Co.,

---

specialty in immigration law could be a special factor," specialized skills were not "needful for the
litigation in question") (quotation omitted); Rueda-Menicucci v. Immigration & Naturalization
Service, 132 F.3d at 496 (same); Pirus v. Bowen, 869 F.2d at 541-42 & n.8 (concluding that
expertise in social security class actions may constitute "special factor"); Animal Lovers Volunteer
Ass'n, Inc. v. Carlucci, 867 F.2d 1224, 1226 (9th Cir. 1989) (indicating that specialization in
environmental litigation may constitute "special factor," though counsel's specialization in the field
was not demonstrated); Ramon-Sepulveda v. Immigration & Naturalization Service, 863 F.2d 1458,
1462-63 (9th Cir. 1988) (assuming, without deciding, that immigration law expertise constitutes
"special factor," but ruling that case did not require "distinctive knowledge" or "specialized skill,"
nor was there shortage of immigration lawyers); Stewart v. Sullivan, 810 F. Supp. 1102, 1108 (D.
Haw. 1993) (denying "special factor" enhancement to attorney with expertise in social security law
in "a relatively straightforward, albeit procedurally complex, disability matter").

*But see* Huffman v. Comm'r of Internal Revenue, 978 F.2d 1139, 1149-50 (9th Cir. 1992)
(holding that general tax expertise does not constitute "special factor" in case under 26 U.S.C. §
7430, a tax law provision that parallels EAJA in key respects; reasoning that, because § 7430 applies
only to tax cases, applications for attorneys' fees thereunder generally will be for lawyers with "tax
expertise" – and if all those with "tax expertise" were entitled to "special factor" enhancement of
statutory rate, the "special factor" exception would swallow the statutory rate rule).

102 F.3d at 598).  Emphasizing that "nothing in the EAJA or its legislative history indicates that the

Congress intended to entitle 'all lawyers practicing administrative law in technical fields' to a fee

enhancement," the D.C. Circuit "refuse[s] to recognize 'expertise acquired through practice' as a

special factor warranting an enhanced fee."[92]  *Id.* (*quoting* F.J. Vollmer Co., 102 F.3d at 598-99);

*accord* Select Milk Producers, 400 F.3d at 950-51 (stating that "an attorney cannot be awarded

enhanced fees under the 'special factor' exception based solely on expertise . . . acquired through

practice in a specific area of administrative law").[93]

The Fifth Circuit, too, has interpreted the "special factors" provision strictly, virtually

excluding legal expertise as a potential special factor.  *See* Estate of Cervin v. Comm'r of Internal

Revenue, 200 F.3d 351, 355 (5th Cir. 2000) (referring to "this circuit's consistently narrow

interpretation of what can constitute a 'specialty and limited availability' of qualified attorneys

under the special factor analysis").

Thus, for example, in Perales v. Casillas, the Court of Appeals for the Fifth Circuit rejected

expertise in immigration law as a "special factor" under the EAJA.  *See* Perales v. Casillas, 950 F.2d

---

[92]The court nevertheless ultimately concluded in Truckers United that there was no need to decide whether "specialized expertise in the safety aspects of the trucking industry" constituted a "special factor," reasoning that – in any event – such expertise had not been "needful for the litigation in question."  *See* Truckers United for Safety, 329 F.3d at 895 (*quoting* Pierce v. Underwood, 487 U.S. at 572).

[93]There is some early caselaw to the contrary.  *See*, *e.g.*, Douglas v. Baker, 809 F. Supp. 131, 135 (D.D.C. 1992) (holding that expertise in immigration law constitutes "special factor"); Nadler v. Immigration & Naturalization Service, 737 F. Supp. 658, 661-62 (D.D.C. 1989) (same). However, those cases do not reflect the current state of the law in the D.C. Circuit.  *See*, *e.g.*, National Ass'n of Manufacturers v. U.S. Dep't of Labor, 962 F. Supp. 191, 199-200 & n.16 (D. D.C. 1997), *aff'd*, 159 F.3d 597 (D.C. Cir. 1998) (holding, *inter alia*, that expertise in immigration law does not constitute "special factor," because "no technical education is necessary to excel"; distinguishing Douglas v. Baker and Nadler).

1066, 1078 (5th Cir. 1992).  The Court of Appeals noted that, although the district court found that "[i]mmigration law is a specialty area requiring an extensive and current knowledge of applicable statutes and regulations," the same could be said of "virtually any area of law, particularly those involving the intricate federal statutory schemes that typically give rise to awards under EAJA." *Id.* at 1078.  Extrapolating from the examples of "special factors" provided in Pierce v. Underwood – specialization in patent law, and knowledge of foreign law or language – the Fifth Circuit reasoned that "the Supreme Court in Underwood intended to distinguish nonlegal or technical abilities possessed by, for example, patent lawyers and experts in foreign law, from other types of substantive specialization currently proliferating within the profession." *Id.*[94]  The court has since ruled even more decisively: "[T]o the extent that Perales . . . left any room for doubt about whether the 'special factor' analysis requires 'nonlegal or technical abilities,' we . . . conclude that it does so require." Estate of Cervin v. Comm'r of Internal Revenue, 200 F.3d at 355 (*citing* Perales, 950 F.2d 1066; Powers v. Comm'r of Internal Revenue Service, 43 F.3d 172).

The First Circuit appears to have staked out middle ground.  Like other courts, the Court of Appeals for the First Circuit has acknowledged that "[m]odern administrative law involves, in practically every area, a tangle of discrete regulations, various precedents, a bureaucratic vocabulary and some background knowledge about the kinds of events commonly involved (which may, for

---

[94]The Court of Appeals noted as well that the district court found no limited availability of qualified attorneys to handle immigration cases, and that plaintiff had been unable to identify anyone with a colorable claim who remained unrepresented.  The Court of Appeals thus sustained the district court's decision not to grant a "special factors" enhancement, based on the district court's determinations as to both "limited availability" *and* specialized skill or expertise.  *See* Perales v. Casillas, 950 F.2d at 1079; *see also* Estate of Cervin v. Comm'r of Internal Revenue, 200 F.3d at 354 (explaining holding of Perales).

example, be scientific, business related, or medical)." <u>Atlantic Fish Spotters Ass'n v. Daley</u>, 205 F.3d 488, 492 (1st Cir. 2000).  The court has further noted: "It is almost always helpful for counsel to have had prior experience in the area, usually the more the better.  But in most cases an otherwise competent lawyer can – albeit at the cost of some extra time – learn enough about the particular controversy to litigate in the area adequately, although perhaps not as well as a long-time specialist." *Id*.

The First Circuit has nevertheless rebuffed attempts by the Government to limit special factors enhancements to only those areas of expertise that "require[] some special discipline over and above the expertise that any experienced counsel might develop in his own specialty." <u>Atlantic Fish Spotters</u>, 205 F.3d at 491 (rejecting government's arguments that "'fisheries law' experience is not the sort of practice specialty that can qualify for an enhanced fee," and government's proposed interpretation that "most highly complicated bodies of technical law could never qualify" as special factor).

The Court of Appeals for the First Circuit has thus emphasized that it "do[es] not read the Supreme Court or most of the circuit cases as adopting a mechanical rule that automatically excludes a specialist from extra compensation merely because no separate credential exists for his field and because no foreign law or language is required." <u>Atlantic Fish Spotters</u>, 205 F.3d at 491.  The First Circuit essentially reframes the issue:

> [T]he statute does not assign extra compensation by "fields" but by asking the practical question whether in the case at hand lawyers qualified to handle the case can be found for $125 or less. . . . [I]f a plaintiff can show that a particular "fisheries law" case (or any other kind of case) requires for competent counsel someone from among a small class of specialists who are available for only $175 per hour, that seems to us enough to meet the language of the statute, its purpose, and the Supreme Court's gloss.

Atlantic Fish Spotters, 205 F.3d at 492.[95]

Any attempt to synthesize the jurisprudence on point compels the conclusion that the courts are truly "all over the map," and that *some* precedent can be mustered to support almost *any* position – particularly if one draws on the early caselaw. Some courts across the country have expressly held, for example, that expertise in relatively common administrative law specialties such as social security disability law and immigration law may justify "special factors" enhancements. *See, e.g.*, Lyden v. Howerton, 731 F. Supp. 1545, 1556 (S.D. Fla. 1990) (immigration law); Penny v. Heckler, 623 F. Supp. 1240, 1243 (E.D.N.Y. 1986) (social security law).[96] Other courts, however, have

---

[95]The Court of Appeals' holding in Atlantic Fish Spotters rested on its conclusion that, whether or not expertise in "fisheries law" might conceivably justify a "special factors" enhancement in *some* case, such expertise was not "essential for competent representation" in the case there under review. *See* Atlantic Fish Spotters , 205 F.3d at 492.

[96]In addition to the cases cited in note 91 above, other cases recognizing areas of legal expertise as justification for "special factors" enhancements include McDonald v. Bowen, 693 F. Supp. 1298, 1306 (D. Mass. 1988), *aff'd in part*, 884 F.2d 1468 (1st Cir. 1989) (law of public assistance benefits); David v. Sullivan, 777 F. Supp. 212, 220-21 (E.D.N.Y. 1991) (expertise in Medicare class actions); Connecticut State Dep't of Social Services, 289 F. Supp. 2d at 204-05 (Medicare benefits law); Bielec v. Bowen, 675 F. Supp. 200, 203-04 (D. N.J. 1987) (expertise in social security disability appeals); Muhur v. Ashcroft, 382 F.3d 653, 656 (7th Cir. 2004) (immigration law, where lawyer brings "relevant expertise to a case, such as knowledge of foreign cultures or of particular esoteric nooks and crannies of immigration law, in which such expertise is needed to give the alien a fair shot at prevailing"); Cheng v. McCredit, 1995 WL 430953 at * 5 (N.D. Ill. 1995) (granting "special factors" enhancement where party "spoke a very rare Chinese dialect," and was only able to communicate with counsel because counsel's wife spoke the dialect); United States v. Knote, 879 F. Supp. 89, 90 (E.D. Mo. 1995) ("specialized environmental litigation skills"); In re Headrick, 285 B.R. 540, 548-49 (Bankr. S.D. Ga. 2001) ("specialized knowledge of Eleventh Amendment sovereign immunity issues"); Douglas v. Baker, 809 F. Supp. at 135 (immigration law); Nadler v. Immigration & Naturalization Service, 737 F. Supp. at 661-62 (immigration law); Gavette v. Office of Personnel Management, 788 F.2d 753, 754 (Fed. Cir. 1986) (Merit Systems Protection Board appeals); Humane Society of U.S. v. Bush, 25 CIT 851, 854, 159 F. Supp. 2d 707, 712 (2001) (trade and environmental law and litigation); Earth Island Institute, 20 CIT at 1240, 942 F. Supp. at 612-13 (expertise in environmental litigation and Endangered Species Act); and Nakamura v. Heinrich, 17 CIT 119, 121 (1993) (knowledge of customs broker statute and

expressly rejected claims for "special factors" enhancements based on the very same areas of expertise – social security disability law, immigration law, and other such administrative law specialties. *See*, *e.g.*, Raines v. Shalala, 44 F.3d at 1361 (social security law).[97]  Still other courts have side-stepped the question of legal expertise entirely, declining "special factors" enhancements on other grounds.[98]

---

regulations).

[97]Other cases rejecting particular specialties or areas of legal expertise as justifications for "special factors" enhancements include Chynoweth v. Sullivan, 920 F.2d 648, 650 (10th Cir. 1990) (social security benefits law); In re Headrick, 285 B.R. at 548 (bankruptcy law); In re Moulton, 195 B.R. 954, 959 (Bankr. M.D. Fla. 1996), *aff'd on other grounds*, 1996 WL 511666 (M.D. Fla. 1996) (bankruptcy law); Powers v. Comm'r of Internal Revenue Service, 43 F.3d at 183-84 (tax law); Select Milk Producers, 400 F.3d at 950-51 ("extremely complex" federal milk marketing regime); In re Sealed Case 00-5116, 254 F.3d at 236 (federal election law litigation); F.J. Vollmer Co., 102 F.3d at 598 (firearms law); Doe # 1 v. Rumsfeld, 501 F. Supp. 2d 186, 191-92 (D.D.C. 2007) ("expertise in the combined areas of military justice, administrative law, and national security"); Scarborough v. Nicholson, 19 Vet. App. at 264 (rejecting specialization in Supreme Court litigation as "special factor"; "enhanced fees based on a 'special factor' are only available when an attorney demonstrates expertise based on training or activity outside the practice of law, and when that expertise was essential to the representation"); Elcyzyn v. Brown, 7 Vet. App. at 182 (veterans' law); and Griffin & Dickson, 21 Cl. Ct. at 9 ("an extraordinary general knowledge of contract law").

*Cf.* Estate of Cervin v. Comm'r of Internal Revenue, 200 F.3d at 354 (holding that "tax attorneys who also have specialized knowledge of Texas community property or insurance law" not eligible for "special factor" enhancement, because not a "specialty" in case under 26 U.S.C. § 7430; "special factor" under § 7430 requires "nonlegal or technical abilities"); Cassuto v. Comm'r of Internal Revenue, 936 F.2d 736, 743 (2d Cir. 1991) (rejecting argument that tax litigation expertise constitutes "special factor," in case under 26 U.S.C. § 7430).

[98]Cases refusing "special factors" enhancements on other grounds include Atlantic Fish Spotters, 205 F.3d at 492 (holding that expertise in fisheries law was not "essential" to case); Securities & Exchange Comm'n v. Morelli, 1995 WL 9387 at * 11 (S.D.N.Y. 1995) (concluding that specialty in securities law did not constitute "special factor," where representation "did not require special skills that a normally competent attorney does not possess"); Hyatt v. Barnhart, 315 F.3d 239, 252-53 (4th Cir. 2002) (holding that, even assuming that combined expertise in class action litigation and social security disability law constituted "special factor," it was not "necessary" in case); Bode v. United States, 919 F.2d 1044, 1050-51 (5th Cir. 1990) (holding that expertise in tax

The issue of the "limited availability of qualified attorneys" as a "special factor" under the EAJA has not been squarely presented to the Court of Appeals for the Federal Circuit in more than a decade – and, even then, the focus was not on interpretation of the reference in Pierce v. Underwood to "distinctive knowledge or specialized skill."  *See generally* Phillips v. General Services Administration, 924 F.2d 1577, 1583-84 (Fed. Cir. 1991).  Phillips involved review of a decision of the Merit Systems Protection Board.  The plaintiff in that case prevailed on the merits, and sought an award of attorneys' fees under EAJA.  The plaintiff argued, *inter alia*, that the fee award should be enhanced for "special factors" – specifically, "the difference in market treatment of contingent fee cases as a class, including particularly employment cases, and . . . the difficulty encountered by individuals in obtaining representation in employment cases when they cannot pay

---

law, in and of itself, did not constitute "special factor" under 26 U.S.C. § 7430, although special legal expertise concerning quarterhorse industry may well have qualified as a "special factor," if limited availability of such expertise had been established); Stockton v. Shalala, 36 F.3d 49, 50 (8th Cir. 1994) (refusing "special factor" enhancement for social security expertise,  in a "very straightforward social security disability case"); Truckers United for Safety, 329 F.3d at 895 (holding that expertise in safety aspects of trucking industry "neither needful nor critical" in case); Action on Smoking & Health, 724 F.2d at 218 (holding that case "did not necessarily require" attorneys with "expertise in the area of smoking regulation"); Cox Constr. Co., 17 Cl. Ct. at 36-37 (holding that expertise in federal procurement law not "required to *competently* litigate" case); Doe v. United States, 16 Cl. Ct. 412, 421 (1989) (holding, *inter alia*, that expertise in immigration law and customs law not necessary in "routine . . . litigation" to recover informer's reward); and Esprit Corp. v. United States, 15 Cl. Ct. 491, 494 (1988) (refusing "special factor" enhancement, where "specialized skills" in "federal procurement law" not required for case).

See also Baker v. Bowen, 839 F.2d 1075, 1084-85 (5th Cir. 1988) (remanding to trial court for determination whether expertise in social security law constitutes "special factor"); Begley v. Sec'y of Health and Human Services, 966 F.2d 196, 200 (6th Cir. 1992) (remanding to trial court for determination whether expertise in Social Security class actions constitutes "special factor"); Pollgreen v. Morris, 911 F.2d 527, 538 & n.17 (11th Cir. 1990) (remanding to trial court for consideration of immigration law expertise, *inter alia*, as "special factor"); Jean v. Nelson, 863 F.2d at 774 (remanding to trial court for determination whether expertise in immigration law and/or fluency in French and Haitian Creole constitute "special factors").

fully for the services." Phillips, 924 F.2d at 1583.

The Court of Appeals made short work of the plaintiff's argument, observing that Pierce v. Underwood specifically held that "the contingent nature of the fee is . . . too generally applicable to be regarded as a 'special' reason for exceeding the statutory cap." Phillips, 924 F.2d at 1584 (*quoting* Pierce v. Underwood, 487 U.S. at 573). The Court of Appeals further noted that Pierce v. Underwood "also rejected as 'special factors' (1) the limited availability of attorneys with an extraordinary level of general lawyerly knowledge and ability useful in all litigation, (2) the novelty and difficulty of the issues, (3) the work and ability of counsel, and (4) the results obtained, because all of these factors are applicable to a broad spectrum of litigation and thus are considered to be covered by the baseline statutory rate of [now $125] per hour, plus a cost of living increase." *Id*. (*citing* Pierce v. Underwood, 487 U.S. at 571-73). The Court of Appeals therefore concluded:

> Even if we accept Phillips' claim that attorneys are often unwilling to work at an hourly rate on cases before the MSPB (caused at least in part by the frequency of nonpayment by clients), it falls short of being a "special factor" covered by the EAJA.

Phillips, 924 F.2d at 1584.

In an earlier case, however, the Court of Appeals directly addressed the issue of legal expertise as a "special factor." In Gavette, the court granted a "special factors" enhancement – albeit with relatively little discussion – based specifically on counsel's "capability and willingness" to handle appeals of adverse decisions by the Merit Systems Protection Board. *See* Gavette v. Office of Personnel Management, 788 F.2d 753, 754 (Fed. Cir. 1986).

And the decisions of courts subject to review by the Court of Appeals for the Federal Circuit have been somewhat mixed. *See*, *e.g.*, Scarborough v. Nicholson, 19 Vet. App. at 264 (holding that

specialization in Supreme Court litigation did not constitute "special factor"); <u>Humane Society of</u>

<u>U.S. v. Bush</u>, 25 CIT 851, 854, 159 F. Supp. 2d 707, 712 (2001) (ruling that expertise in trade and

environmental law and litigation constituted "special factor"); <u>Earth Island Institute</u>, 20 CIT at 1240,

942 F. Supp. at 612-13 (concluding that expertise in environmental litigation and Endangered

Species Act constituted "special factor"); <u>Elcyzyn v. Brown</u>, 7 Vet. App. 170, 182 (1994)

(concluding that veterans' law expertise did not constitute "special factor"); <u>Nakamura v. Heinrich</u>,

17 CIT 119, 121 (1993) (holding that knowledge of customs broker statute and regulations

constituted "special factor"); <u>Griffin & Dickson</u>, 21 Cl. Ct. at 9 (holding that "an extraordinary

general knowledge of contract law" did not constitute "special factor"); <u>Cox Constr. Co.</u>, 17 Cl. Ct.

at 36-37 (holding that expertise in federal procurement law not "required to *competently* litigate"

case); <u>Doe v. United States</u>, 16 Cl. Ct. 412, 421 (1989) (ruling that expertise in federal immigration

law and customs law did not constitute "special factor" in "routine . . . litigation" to recover

informer's reward); <u>Esprit Corp. v. United States</u>, 15 Cl. Ct. 491, 494 (1988) (holding that

"specialized skills" in "federal procurement law" did not constitute "special factor" where not

required for case).

     To support its assertion that a "special factors" enhancement is not appropriate here, the

Government relies on <u>Tyco</u>, the sole decision addressing a claim for a "special factors" enhancement

in a TAA case. *See generally* Def.'s Response at 35; <u>Tyco</u>, 28 CIT at 1578-79, 1582-83, 1589-92,

350 F. Supp. 2d at 1083, 1086, 1092-93.[99] The plaintiffs in <u>Tyco</u> asserted that their lead counsel's

-----

[99]The Government asserts that it is "*well-settled* that . . . where knowledge of general administrative law enables an attorney [to] prosecute a case, courts have denied EAJA fees above the statutory cap." *See* Def.'s Response at 35 (emphasis added) (citations omitted). The Government's strategic use of the phrase "well-settled" could be read to be calculated to convey an

specialized skills in the field of international trade law had been "essential in securing trade

adjustment assistance." Tyco, 28 CIT at 1590, 350 F. Supp. 2d at 1092.[100]  The court nevertheless

denied the special factors enhancement. *Id.*, 28 CIT at 1590-91, 350 F. Supp. 2d at 1092-93.

The Tyco court first stated that, although lead counsel's expertise was "not questioned," his

"specialized skills were not needed *for this litigation*." *Id.*, 28 CIT at 1590, 350 F. Supp. 2d at 1092

(emphasis added).  But the court followed up that first, seemingly case-specific determination with

a much broader statement: "The basic litigation skills needed *for these types of cases* apply 'to a

broad spectrum of litigation and thus are considered to be covered by the baseline statutory rate.'"

*Id.*, 28 CIT at 1591, 350 F. Supp. 2d at 1092-93 (*quoting* Phillips v. General Services

Administration, 924 F.2d at 1584) (emphasis added).[101]

_____

impression of unanimity (or, at least, near-unanimity) – the impression that the law on legal
expertise and "special factors" is a good deal more uniform and consistent than it actually is.  *See*,
*e.g.*, n.91, *supra* (cataloguing sampling of cases from Ninth Circuit cases in which "special factors"
enhancements have been granted).  As discussed above, however, counsel have a duty of candor
toward the court; and misrepresenting the state of the law is potentially sanctionable conduct.  *See
generally* n.87, *supra*.

[100]Notably, the Tyco plaintiffs did not contend that their lead counsel had any special
expertise or skill in trade adjustment assistance law, or any "distinctive knowledge" of the industry
at issue in that action.  *See generally* Pierce v. Underwood, 487 U.S. at 572 (explaining that "special
factor" refers to "some distinctive knowledge or specialized skill needful for the litigation in
question").

[101]The Tyco court noted that, as the Government there emphasized, the Court of International
Trade encourages "any attorney admitted to practice before the court" to volunteer to represent TAA
plaintiffs.  Tyco, 28 CIT at 1582, 1590-91, 350 F. Supp. 2d at 1086, 1092.  But that fact is by no
means dispositive.

Not every attorney who volunteers is necessarily appointed to represent TAA plaintiffs.
Moreover, as other courts have recognized, even if a particular expertise may justify a "special
factors" enhancement in some cases, not every practitioner of that specialty would be entitled to an
enhancement, and even those who may be found to be entitled to an enhancement in one case would

The <u>Tyco</u> court did not elaborate on its assertion that "[t]he basic litigation skills needed for these types of cases apply 'to a broad spectrum of litigation,'" however.  And, although <u>Tyco</u> cited <u>Humane Society</u> and <u>Earth Island Institute</u>, it did not discuss those cases, or other progeny of <u>Pierce v. Underwood</u>.  *See* <u>Tyco</u>, 28 CIT at 1579, 350 F. Supp. 2d at 1083 (*citing* <u>Humane Society of U.S. v. Bush</u>, 25 CIT at 854-55, 159 F. Supp. 2d at 712; <u>Earth Island Institute</u>, 20 CIT at 1239-41, 942 F. Supp. at 612-13).

The Workers here do not seek to distinguish <u>Tyco</u>, and – indeed – have clarified that, contrary to the Government's assumptions, they do not base their request for a "special factors" enhancement on any claim that their counsel possessed "some distinctive knowledge or specialized skill needful for the litigation in question."  *See* Pls.' Reply at 7 (noting that "[p]laintiffs never argued that special factors for attorneys' special skills are applicable to this case"); <u>Pierce v. Underwood</u>,  487 U.S. at 572.  Instead, the Workers invoke another line of cases that treat certain types of delay as "special factors."  *See* Pls.' Reply at 7.

### (2) <u>Delay</u>

According to the Workers, "the Government here engaged in a systematic and improper

---

not necessarily be entitled to an enhancement in every case.  *See*, *e.g.*, <u>Jean v. Nelson</u>, 863 F.2d at 774 n.12 (emphasizing that, although immigration law is a "distinctive knowledge or specialized skill" which may warrant a "special factors" enhancement in appropriate cases, "not every immigration attorney or every immigration lawsuit warrants an upward adjustment of hourly rates," and "suggest[ing] that such is also the case in some patent or foreign law cases"); <u>Thangaraja v. Gonzales</u>, 482 F.3d at 876 (stating that "a specialty immigration law could be a special factor," but "declin[ing] to adopt . . . *per se* rule that 'the practice of immigration law should be classified as a specialty similar to practicing patent law'"); <u>Muhur v. Ashcroft</u>, 382 F.3d at 656 (reading Fifth Circuit law as meaning that "immigration lawyers are not *ipso facto* entitled to fees above the statutory ceiling").

effort to delay unnecessarily the provision of a statutorily adequate comprehensive review of [the

Workers'] case and assurances in their level of benefits."  Pls.' Application at 24.  The Workers

assert that the Government's misconduct entitles them to a "special factors" enhancement of their

fee award, based on two Eleventh Circuit cases – Jean v. Nelson and Pollgreen – which appear to

authorize an enhancement where "the government's litigation delay was the result of bad faith or

the length of the delay was excessive."  *See* Pollgreen v. Morris, 911 F.2d 527, 538 (11th Cir. 1990).

*See generally id.* at 536-38; Jean v. Nelson, 863 F.3d 759, 776 (11th Cir. 1988), *aff'd on other*

*grounds sub nom.* Comm'r, Immigration & Naturalization Service v. Jean, 496 U.S. 154; *see also*

Pls.' Application at 23-26; Pls.' Reply at 7-8.  The Government contends that Jean v. Nelson and

Pollgreen are not good law, and that the facts of this case would not support an enhanced award

under the two cases in any event.  *See* Def.'s Response at 2, 24, 34-39.

Jean v. Nelson concerned a challenge by Haitian refugees to the Immigration and

Naturalization Service's policies of holding mass exclusion hearings for Haitian refugees and

detaining them during the pendency of their asylum applications with no possibility of parole.

Following contentious litigation, the refugees prevailed on the merits of their claims and were

eventually awarded attorneys' fees and costs under the EAJA.  On appeal, the U.S. Court of Appeals

for the Eleventh Circuit ruled that the district court erred in granting a "blanket enhancement" of the

fees awarded to each attorney.  However, the majority opinion advised that, on remand, the district

court should feel "free to approach this question [of "special factors" enhancements] anew, and

consider potential special factors that would be consistent with [Pierce v. Underwood] and the

[appellate court's opinion] . . . , including *whether the government's unusually litigious position in*

*this case might constitute a special factor*."  Jean v. Nelson, 863 F.2d at 776 (emphasis added)

(footnote omitted).

In a footnote, the majority in Jean v. Nelson gave a nod to the dissent's concern that –

because a finding on the nature of the government's conduct is "a condition precedent to every

EAJA award" – "allowing a premium based on the government's 'contentions and litigating

postures' will lead courts to double-count the substantial justification factor." Jean v. Nelson, 863

F.2d at 776 n.13 (discussing Jean v. Nelson, 863 F.2d at 782 (dissent)).  But the majority reasoned

that "[t]he EAJA does not . . . protect a litigant against potential government harassment." Jean v.

Nelson, 863 F.2d at 776 n.13.  The majority postulated "a situation where a position that is not

'substantially justified' is exacerbated by improper purposes in defending the lawsuit":

> For instance, if the government were aware that the cost of doing business of certain
> of the plaintiffs' attorneys exceeded the EAJA cap of $75.00 per hour, the
> government might adopt an aggressive, litigious strategy in order to deter the
> plaintiffs' attorneys by actually forcing these attorneys to operate at a loss.  We do
> not suggest that this situation occurred, but it is illustrative of how an improper
> purpose can be a factor that is additional to a "frivolous" position.  Thus, *if the
> government in this case advanced litigation for any improper purpose such as
> harassment, unnecessary delay or increase in the plaintiffs' expense, then consistent
> with Pierce, its action warrants the imposition of a special factor*.

Jean v. Nelson, 863 F.2d at 776 n.13 (emphasis added).

Pollgreen v. Morris followed two years later, in protracted litigation arising out of the Mariel

boat lift in which Key West fishermen transported to Florida refugees from Cuba who were seeking

political asylum in the United States.  The Immigration and Naturalization Service seized the fishing

boats and issued a Notice of Intention to Fine to each of the fishermen.  When the fishermen sought

relief in the federal courts, the district court issued a preliminary injunction permitting the boats to

be used for fishing operations, finding, *inter alia*, that the fishermen would likely prevail on a

defense of duress in their administrative hearings before the agency.  The Immigration and

Naturalization Service refused to recognize the defense, however, and imposed fines on the

fishermen totaling nearly five million dollars.  *See generally* <u>Pollgreen v. Morris</u>, 911 F.2d at 530.

The fishermen returned to federal court, challenging the imposition of the fines and seeking

to permanently enjoin the seizure of their vessels.  The district court granted summary judgment and

issued a permanent injunction, concluding that the fishermen had established the defense of duress

and that the Immigration and Naturalization Service's failure to recognize that defense was arbitrary,

capricious, and an abuse of discretion.  The Court of Appeals for the Eleventh Circuit upheld the

district court's determination that the duress defense was applicable, but directed the district court

to remand the cases to the agency for "rehearing, reconsideration, and redetermination" in light of

the defense.  The Immigration and Naturalization Service later vacated its prior decisions and ruled

that no fines would be imposed.  *See generally* <u>Pollgreen v. Morris</u>, 911 F.2d at 530-31.

The district court awarded attorneys' fees under the EAJA, enhancing the award for "special

factors."  Among other things, the district court noted "the exceptional and unusual circumstances

of [the] case includ[ing] the extreme delay by the government in proceeding with and finally

disposing of this suit."  *See generally* <u>Pollgreen v. Morris</u>, 911 F.2d at 537.  On appeal, the Eleventh

Circuit noted that it was not clear "whether the district court's description of the government's

'extreme delay' in proceeding with the case . . . was meant to suggest that the reason for the delay

was improper or that the delay resulted because the underlying position litigated was unjustified."

*Id*.  The Court of Appeals clarified the holding of <u>Jean v. Nelson</u>:

> *The government's delay in litigating a case is a permissible special factor only when*
> *the motivation for the delay was improper or the length of the delay itself was*
> *inappropriate*. *Cf*. <u>Wilkett v. I.C.C.</u>, 844 F.2d 867, 876-77 (D.C. Cir. 1988) (unusual
> delay in awarding fees, not attributable to plaintiff, may constitute special factor
> warranting rate increase).  A delay that occurred because the government litigated

a position that lacked substantial justification is not a permissible special factor because any litigation eligible for EAJA fees, by definition, involves the government's pursuit of an unjustified position. *If the government's litigation delay was the result of bad faith or the length of the delay was excessive*, *regardless of the merits of the position litigated*, *then such delay could constitute a special factor.*

Pollgreen v. Morris, 911 F.2d at 537-38 (emphases added). In Pollgreen – as in Jean v. Nelson – the issue of a "special factors" enhancement for delay in litigation was remanded to the district court.

Although there are no published opinions on remand by the district courts in Pollgreen and Jean v. Nelson, the Workers here apparently assume that both courts awarded special factors enhancements based on delay. Specifically, the Workers state that "the Circuit [Court] remanded the recalculation to [the] district courts, who did not publish their opinions, so there is no reported guidance as to what level of [enhancement] . . . is suitable." *See* Pls.' Application at 25.

Contrary to the Workers' assertions, however, the remands in Pollgreen and Jean v. Nelson were not merely for the purpose of "recalculat[ing]" the EAJA awards. Rather, the district courts were to consider whether, under the specific circumstances of each of those cases, "special factors" enhancements for delay were appropriate. *See* Jean v. Nelson, 863 F.2d at 776 (instructing district court to consider on remand "whether the government's unusually litigious position in this case might constitute a special factor") (footnote omitted); Pollgreen, 911 F.2d at 538 (remanding "for additional consideration and, if necessary, recalculation"). It is thus unclear from the published record whether, in fact, a "special factors" enhancement for delay was granted in either case.

It is, however, clear beyond cavil that the potential "special factor" alluded to in Jean v. Nelson and Pollgreen has been successfully invoked only once in the courts of the Eleventh Circuit

in the more than 15 years since those opinions were handed down.[102]  And research has disclosed

---

[102]In In re Moulton, the bankruptcy judge cited Jean v. Nelson for the proposition that "the Government's unusually litigious position might constitute a special factor," and noted that, in the case there *sub judice*, "the continuing litigation and defense by the Government of [the] totally indefensible conduct of the IRS may properly be considered as [a] 'special factor,' sufficient to warrant an enhancement" in addition to the cost of living adjustment granted by the court.  *See* In re Moulton, 195 B.R. at 958-59 (Bankr. M.D. Fla.), *aff'd*, 1996 WL 511666 (M.D. Fla. 1996).  With little further analysis, the bankruptcy judge concluded that "based on the utterly inexcusable and egregious conduct of the IRS, there [was] a cognizable 'special factor'" in that case.  *See* 195 B.R. at 959.

In an unpublished order, the district court considered the Government's objection that the case was distinguishable from Jean v. Nelson, because the court there had "found counsel's legal position to be unusually litigious" (a finding that the bankruptcy judge did not make in the case at bar).  The district court rejected the Government's distinction and affirmed the ruling of the bankruptcy judge, stating that "neither Jean nor the EAJA preclude the Court from finding a special factor other than unusual litigiousness."  United States v. Moulton, 1996 WL 511666 at * 1.  The district court continued:

> Although the Bankruptcy Court cited Jean to support its position, it based its decision on the actions of the IRS, not government counsel.  Given the IRS['s] repeated, and unjustified harassment, the Bankruptcy Court properly found that the IRS's failure to abide by the injunction, even if inadvertent, was sufficiently egregious to constitute a "special factor" as contemplated under the EAJA.

1996 WL 511666 at * 1.

In Lyden v. Howerton – another case, like Pollgreen, arising out of the Mariel boat lift – the court "[found] a number of 'special factors' which warrant[ed] exceeding the statutory base" (then $75 per hour).  *See* Lyden v. Howerton, 731 F. Supp. at 1556.  Emphasizing the increase in the cost of living since the case was filed six years earlier, and relying on Wilkett v. Interstate Commerce Comm'n, 844 F.2d at 876-77 (discussed in note 103 below), the court stated that "an unusual delay in the award of fees has . . .been considered a 'special factor.'"  In addition to the "delay in the award of fees" and the increase in the cost of living, the district court also alluded to the limited availability of qualified immigration counsel, and the large number of beneficiaries in addition to the named plaintiffs.  Lyden v. Howerton, 731 F. Supp. at 1556.

In a somewhat cryptic footnote, the district court appeared to point the finger at the Government:

> The exceptional and unusual circumstances of this case include[] *the extreme delay*

no cases in other circuits where enhanced fees have been awarded on the strength of <u>Jean v. Nelson</u>

or <u>Pollgreen</u> for excessive delay or delay attributable to bad faith on the part of the Government.[103]

_____

> *by the government in proceeding with and finally disposing of this suit*. This delay affords the court the opportunity to substantially increase the amount of the fee award. This may be accomplished either by increasing the EAJA fee by the cost of living . . . , or by adjusting the "lodestar" upwards to take into account the time value of the money and the effects of inflation. . . . This authority provides an independent basis to support the increase in the EAJA fee provided herein.

<u>Lyden v. Howerton</u>, 731 F. Supp. at 1556 n.7 (emphasis added) (citations omitted). Although the language of the footnote could be read as suggestive of <u>Jean v. Nelson</u> or <u>Pollgreen</u>, the district court did not cite either of those cases as support for its argument. Indeed, the only reference to either case in <u>Lyden v. Howerton</u> is a citation to <u>Jean v. Nelson</u> as support for the proposition that "special expertise in immigration law might qualify as a 'special factor' under the EAJA." *See* <u>Lyden v. Howerton</u>, 731 F. Supp. at 1556. Instead, as support for the point made in the quoted footnote, the <u>Lyden</u> court relied on <u>Norman v. Housing Authority of City of Montgomery</u>, 836 F.2d at 1302. However, as the Court of Appeals for the 11th Circuit has recently emphasized, <u>Norman</u> involved *state* defendants, not a *federal* defendant. "Thus, an award of 'compensation for delay' is equivalent to an award of interest" against the federal government, and is not permitted under traditional principles of sovereign immunity. *See generally* <u>United States v. Aisenberg</u>, 358 F.3d 1327, 1345-46 & n.27 (11th Cir. 2004).

    In several other cases, courts in the Eleventh Circuit have expressly acknowledged <u>Jean v. Nelson</u> and <u>Pollgreen</u>, but have declined to apply them under the specific circumstances of the cases there at bar. *See*, *e.g.*, <u>United States v. Aisenberg</u>, 358 F.3d at 1344 & n.25 (*quoting* <u>Jean v. Nelson</u> and <u>Pollgreen</u>, but denying "special factor" enhancement, concluding that government's actions were "not the result of an 'improper purpose'"); <u>United States v. Adkinson</u>, 256 F. Supp. 2d 1297, 1313-14 (N.D. Fla. 2003), *aff'd*, 360 F.3d 1257, 1258-59 (11th Cir. 2004) (acknowledging <u>Pollgreen</u> but refusing "special factor" enhancement for "excessive delay," in section of opinion captioned "Bad Faith & Extreme Delay in Making the Award," reasoning that "the extreme delay due to the prolonged litigation of this case because the government prosecuted the defendants in bad faith does not, by itself, justify the imposition of a bad faith delay special factor"; noting that "[c]omplex bank fraud and tax conspiracy cases . . . take a long time to litigate"); <u>In re Headrick</u>, 285 B.R. at 547 (acknowledging <u>Pollgreen</u>, but denying "special factor" enhancement for "delay in litigation caused by [losing party's] challenging . . . Court's jurisdiction"; fact that party was "denied relief at every appeal" merely "establishes 'pursuit of an unjustified position' and [is] not evidence of bad faith or excessive litigiousness").

    [103]As discussed below, caselaw in the Fifth Circuit and the D.C. Circuit has authorized enhancement of EAJA awards in certain situations involving extreme delay in the award or payment

---

of fees. *See*, *e.g.*, <u>Oklahoma Aerotronics, Inc. v. United States</u>, 943 F.2d 1344, 1350 (D.C. Cir. 1991); <u>Wilkett v. Interstate Commerce Comm'n</u>, 844 F.2d at 876-77; <u>Hirschey v. Federal Energy Regulatory Comm'n</u>, 777 F.2d 1, 2, 4-5 (D.C. Cir. 1985); <u>Action on Smoking & Health</u>, 724 F.2d at 218-20; <u>Perales v. Casillas</u>, 950 F.2d at 1077; <u>Baker v. Bowen</u>, 839 F.2d at 1079 n.1, 1083.

However, those Fifth Circuit and D.C. Circuit cases do not even cite – much less rely on – <u>Jean v. Nelson</u> or <u>Pollgreen</u>, and they reflect very different policy considerations. In the Fifth Circuit and D.C. Circuit lines of cases – unlike <u>Jean v. Nelson</u> and <u>Pollgreen</u> – the enhancement is intended to be essentially compensatory, not punitive. *See*, *e.g.*, <u>Wilkett v. Interstate Commerce Comm'n</u>, 844 F.2d at 876-77 (noting that "[i]n the past, [the court has] increased the adjusted cap to compensate parties for the cost of foregone investment attributable to delayed payment of the award, on the assumption that delay may be counted as a 'special factor' justifying a higher award"). Thus, the focus is on the *delay in the receipt of fees*, rather than on any *delay in the litigation itself*, much less the *cause* of any delay. In other words, under the Fifth Circuit and D.C. Circuit lines of cases, the *reason* for the passage of an extraordinary amount of time before the award and payment of fees is of no relevance.

Indeed, in three of the D.C. Circuit cases, the delay was attributable to the court itself. *See* <u>Oklahoma Aerotronics</u>, 943 F.2d at 1346, 1350 (awarding "special factors" enhancement in light of eight-year delay in court action on fee application); <u>Wilkett v. Interstate Commerce Comm'n</u>, 844 F.2d at 869, 876-77 (granting "special factors" enhancement where fee application "languished unnoticed in the Clerk's Office for almost four years"; noting that enhancement "is amply justified by the exceptional delay, through no fault of [the fee applicant], in [the court's] consideration of his application"); <u>Hirschey</u>, 777 F.2d at 2, 4-5 (granting "special factors" enhancement where "[d]ue to a paperwork error in the Court Clerk's office, consideration of the petitioner's EAJA claim was greatly delayed"; rejecting argument that bad faith conduct by the Government may constitute a "special factor" under the EAJA).

Further, although the Court of Appeals for the Fifth Circuit paid lip service to a "special factors" enhancement for delay in the award or payment of fees in <u>Baker v. Bowen</u> and <u>Perales</u>, it did not actually sanction such an enhancement in either case. *See* <u>Perales v. Casillas</u>, 950 F.2d at 1077 (indicating that, although "some forms of delay [in payment of an award] may justify enhancing the statutory base rate under the EAJA," "the delay in this case . . . [was not] truly exceptional"; in instant case, "[a]ny delay in payment experienced . . . has been caused merely by the complexity of the litigation and defendant's appeals"); <u>Baker v. Bowen</u>, 839 F.2d at 1079 n.1, 1083 (*dicta*) (noting that "special factors" such as "delay in payment" of fee award "will arise only rarely and will be unique to the fact situation of a particular case"). And the court has recently given signs of retreating. *See* <u>Estate of Cervin v. Comm'r of Internal Revenue</u>, 200 F.3d at 356 n.3 (emphasizing that <u>Baker v. Bowen</u>'s statement concerning delay was mere "*dictum*," and indicating that the case merely "involved a decision by the *district court* that . . . a special factor existed, and this court was unwilling to call such determination an abuse of discretion").

In the meantime, however, the rationale of the two cases has been subject to serious criticism, on

several different grounds. *See generally* Def.'s Brief at 36-38; Sisk, *supra*, at 171-75 (discussing

"Exceptional Delay as a 'Special Factor'").

In Dixon v. Comm'r of Internal Revenue, for example, the taxpayers invoked Pollgreen,

arguing that delay constituted a "special factor" justifying enhanced attorneys' fees under 26 U.S.C.

§ 7430, a tax statute which closely parallels the EAJA. *See* Dixon v. Comm'r of Internal Revenue,

2006 WL 1275497 at * 14 (U.S. Tax Ct. 2006). The court rejected the taxpayers' claim.

Surveying the split in the Circuits, Dixon noted that "[t]he Courts of Appeals for the Fifth

and Eleventh Circuits have sided with the D.C. Circuit on the delay issue" – that is, those courts

have concluded that treating delay (at least, delay in the award and/or payment of fees) as a "special

factor" under the EAJA is not inconsistent with the Supreme Court's holding in Library of Congress

v. Shaw. *See* Dixon, 2006 WL 1275497 at * 14 (citations omitted) (*citing* Library of Congress v.

Shaw, 478 U.S. 310, 314 (1986) (rejecting enhancement of lodestar to compensate for delay in

receipt of fee award in Title VII case, reasoning that enhancement would constitute award of pre-

judgment interest from which Government is traditionally immune)).

But the court in Dixon sided with the Courts of Appeals for the Seventh Circuit and the

---

Moreover, in Estate of Cervin, the Court of Appeals for the Fifth Circuit was confronted with a claim for a "special factors" enhancement based on the Internal Revenue Service's "'untenable' litigation positions," which assertedly "complicated and prolonged" the underlying litigation. Estate of Cervin, 200 F.3d at 355-56. The fee applicant in that case invoked both Jean v. Nelson and Pollgreen. *Id*. at 356. The Court of Appeals recognized the proposed theory of recovery as different from Baker v. Bowen and Perales – that is, as a request that the court adopt "a new 'special factor,' not previously recognized by [the] court, that would allow for an increase in fees where the government's behavior was particularly egregious" – and squarely rejected the proposed theory as "punitive." *Id*. at 355-57.

Federal Circuit instead.  *See* Dixon, 2006 WL 1275497 at * 14.  As Dixon noted, the Court of

Appeals for the Seventh Circuit in Marcus v. Shalala characterized the caselaw in the D.C. Circuit

and the Fifth Circuit as "an end run around the no-interest rule in Shaw," concluding that the

"special factors" provision of the EAJA "is not the kind of express, unambiguous statutory language

sufficient to waive sovereign immunity."  Marcus v. Shalala, 17 F.3d at 1039 (citations omitted)

(*quoted in* Dixon, 2006 WL 1275497 at * 14).[104]  Dixon also took note of the decision in Chiu v.

United States, 948 F.2d at 721, in which the Court of Appeals for the Federal Circuit "stated in

*dictum* that the argument for delay as a special factor would not pass muster under Shaw."  *See*

Dixon, 2006 WL 1275497 at * 14.[105]

     Indeed, the Court of Appeals for the Eleventh Circuit – which penned Jean v. Nelson and

---

[104]At issue in Marcus v. Shalala was the district court's calculation of the fee award including "a cost of living adjustment indexed at current rates, without regard to when the fees were incurred. . . . Thus, the same hourly rate was applied to all hours expended even though the work was performed over a number of years.  The [district] court reasoned that such an adjustment was warranted because the delay involved in the case was 'truly exceptional' and was, therefore, a special factor."  Marcus v. Shalala, 17 F.3d at 1038.

     The Government objected, arguing that the district court's methodology "was tantamount to an award of prejudgment interest which is precluded under Library of Congress v. Shaw, 478 U.S. 310, 314 (1986)."  Marcus v. Shalala, 17 F.3d at 1038.  The Court of Appeals for the Seventh Circuit sustained the Government's objection, and added: "Even if delay could constitute a special factor, the delay in this case was not exceptional given the complexity of the issues.  The district court made no finding and plaintiffs do not argue that the [agency] engaged in obstructive litigation tactics or otherwise protracted the proceedings.  In fact, the district court concluded just the opposite and noted that the matter was litigated with 'professional distinction.'" *Id*. at 1039-40.

[105]As Dixon observed, both Marcus v. Shalala and Chiu further opined that awarding enhanced fees for delay contravenes Pierce v. Underwood's holding that "special factors" cannot be of "broad and general application."  *See* Dixon, 2006 WL 1275497 at * 14 n.37 (*citing* Marcus v. Shalala, 17 F.3d at 1039 (*quoting* Pierce v. Underwood, 487 U.S. at 573); Chiu v. United States, 948 F.2d at 721 (*quoting* Pierce v. Underwood, 487 U.S. at 573)).

Pollgreen – recently addressed this same issue.  In United States v. Aisenberg, the appellate court

reversed the district court's grant of a "special factors" enhancement for delay in payment.  *See*

United States v. Aisenberg, 358 F.3d at 1345-46.   The court explained that "an award of

'compensation for delay' is equivalent to an award of interest," which "cannot be recovered in a suit

against the Government in the absence of an express waiver of sovereign immunity from an award

of interest."  *Id.* at 1345.  And, as the court acknowledged, the EAJA includes no such waiver.  *Id.*

at 1345-46.

        Much as Dixon, Marcus v. Shalala, and Chiu (as well as United States v.Aisenberg) cast

doubt on the consistency of Jean v. Nelson and Pollgreen with the general bar precluding awards

of interest against the Government, so too Estate of Cervin, Cassuto, and Dixon suggest that Jean

v. Nelson and Pollgreen run afoul of the parallel prohibition against punitive damages.  *See*

*generally* Estate of Cervin v. Comm'r of Internal Revenue, 200 F.3d at 355-58; Cassuto v. Comm'r

of Internal Revenue, 936 F.2d at 743-44; Dixon, 2006 WL 1275497 at * 13 (*citing* Jean v. Nelson

and Pollgreen).

        In Estate of Cervin, for example, the taxpayers invoked Jean v. Nelson, asserting that the

Internal Revenue Service's "untenable" litigation positions in that case unreasonably complicated

and prolonged the litigation, entitling the taxpayers to a "special factors" enhancement of their fee

award under 26 U.S.C. § 7430.  *See generally* Estate of Cervin, 200 F.3d at 355-56.

        The Court of Appeals for the Fifth Circuit rejected the taxpayers' argument, emphasizing the

lack of any apparent reason why an agency's "'indefensible' litigation positions would increase the

*hourly rate*, as opposed to a mere increase in *the number of hours* required to litigate the case."

Estate of Cervin, 200 F.3d at 357 (footnote omitted).   The court explained that, "[w]hile the

calculation of damages would be compensatory in nature, the enhancement of fees above the

statutory rate [could] be justified only under punitive principles." *Id.* at 357-58. The court therefore

concluded that, under the circumstances, "imposition of a special factor . . . essentially would

amount to an impermissible award of punitive damages, contrary to . . . principles of sovereign

immunity." *Id.* at 357. *Accord* <u>Cassuto</u>, 936 F.2d at 743-44; <u>Dixon</u>, 2006 WL 1275497 at * 13.

In addition to the concerns about the proscriptions against awards of interest and punitive

awards against the Government (outlined above), a third line of authority has echoed the reservation

that was voiced by the dissent in <u>Jean v. Nelson</u> – the concern that awarding a "special factors"

enhancement based on the Government's conduct, as <u>Jean v. Nelson</u> and <u>Pollgreen</u> contemplate,

would essentially conflate two distinct inquiries. Thus, for example, the U.S. Court of Appeals for

the D.C. Circuit  has held:

> The special factor inquiry [under the EAJA] is separate from the inquiry into whether
> the United States' position was justified. [The plaintiffs'] proposed reading conflates
> the two by asking for higher fees in light of the [agency's] actions and how those
> actions impacted them. . . . [But] Congress has not devised a system to penalize the
> United States for the degree of its unjustified position or how that unjustified
> position has impacted a prevailing party. Rather, its waiver of sovereign immunity
> assumes that the United States has taken an unreasonable position.

<u>In re Sealed Case 00-5116</u>, 254 F.3d at 237. The court underscored its point:  "To say that the

[agency's] position was not substantially justified is an understatement.  It was not justified at all.

. . . Nevertheless, this simply reflects the threshold inquiry required for [the plaintiffs] to receive any

fee award, not a reason to increase that award beyond the otherwise applicable $125 rate." *Id.*; *see*

*also* <u>Estate of Cervin</u>, 200 F.3d at 357 (same); <u>Cassuto</u>, 936 F.2d at 743-44  (same); <u>Jean v. Nelson</u>,

863 F.2d at 782 (dissent) (same).

In an effort to downplay the criticisms of <u>Jean v. Nelson</u> and <u>Pollgreen</u>, the Workers argue

that "[o]nly one Circuit and the Tax Court have declined to apply the rule" established in the two

cases.  *See* Pls.' Reply at 7 (apparently referring to the Fifth Circuit).  As discussed above, however,

the rationale of Jean v. Nelson and Pollgreen is further undermined by various other lines of

authority that do not cite either of the two cases.  The Workers ignore those authorities.  Moreover,

the Workers' focus on the assertedly low number of courts that have expressly *rejected* Jean v.

Nelson or Pollgreen diverts attention from what is perhaps the most telling point – the fact that, with

one limited exception (a 1995 case, in the federal trial courts in Florida), the rationale of the two

cases has not been *adopted* by other courts, or even advanced by litigants elsewhere in the country.

        In short, for all the reasons detailed above, the vitality of the rationale of Jean v. Nelson and

Pollgreen – as a matter of law – is in grave doubt.  But, even assuming that the rationale is legally

sound, the facts of this case do not warrant the "special factors" enhancement that the Workers seek.

        As discussed above, the Workers maintain that they are entitled to a "special factors"

enhancement of their fee award "[i]f the government's litigation delay was the result of bad faith *or*

the delay was excessive."  *See* Pls.' Reply at 8 (*quoting* Pollgreen, 911 F.2d at 537-38 (emphasis

added)).  The record here establishes neither.

        The Government is presumed to have acted in good faith.  *See*, *e.g.*, Clemmons v. West, 206

F.3d 1401, 1403-04 (Fed. Cir. 2000) (*citing* Sanders v. U.S. Postal Serv., 801 F.2d 1328, 1331 (Fed.

Cir. 1986)).  To overcome that presumption, the proof must be "almost irrefragable." Clemmons v.

West, 206 F.3d at 1403-04; *see also* Galen Medical Assoc., Inc. v. United States, 369 F.3d 1324,

1330 (Fed. Cir. 2004).  Where bad faith is alleged, the requisite "irrefragable proof" essentially

amounts to "evidence of some specific intent to injure the plaintiff."  *Id.* (quotation omitted); *see*

*also* Spezzaferro v. Federal Aviation Admin., 807 F.2d 169, 173 (Fed. Cir. 1986) (noting that

"[u]nsubstantiated suspicions and allegations are not enough").

In the case at bar, the Workers do not even allege bad faith, much less point to evidence to attempt to prove it. Thus, for example, the Workers do not allege that the Government "had a specific intent to injure" the Workers – either at the agency level or in litigation.[106] Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1241 (Fed. Cir. 2002) (quotation omitted). Nor do the Workers claim that the Government was "actuated by animus toward" them, or that the Government's actions were "designedly oppressive or "motivated alone by malice," or were "part of a proven 'conspiracy'" to deny them TAA benefits. Id. at 1239-41 (quotations omitted).[107]

---

[106]Jean v. Nelson speaks only in terms of the government's "unusually unwavering and litigious position *throughout the litigation*," and the potential for the government's use of "*litigation* for any improper purpose such as harassment, unnecessary delay or increase in the plaintiffs' expense." *See* Jean v. Nelson, 863 F.2d at 776 & n.13 (emphases added). Similarly, by its terms, Pollgreen refers only to "the government's *litigation* delay," and "[t]he government's delay in *litigating* a case." *See* Pollgreen, 911 F.2d at 537-38 (emphases added). It is thus dubious whether – as the Workers apparently assume – Jean v. Nelson and Pollgreen extend beyond the Government's conduct of this litigation, to the proceedings before the Labor Department that gave rise to the litigation. *See* United States v. Moulton, 1996 WL 511666 at * 1 (implicitly suggesting that, because bankruptcy judge based "special factors" enhancement on conduct of agency (rather than government counsel), the enhancement was not based on Jean v. Nelson).

The Court of Appeals' recent opinion in Centex also casts a pall over the Workers' claim, to the extent that it is based on the Labor Department's initial investigations. *See* Centex Corp. v. United States, 486 F.3d 1369 (Fed. Cir. 2007). Interpreting a different provision of the EAJA (specifically, 28 U.S.C. § 2412(b), which codifies the so-called "bad faith/common fund" exception to the American Rule on attorneys' fees), the Court of Appeals held that a court may not shift fees based solely on the government's bad faith "primary conduct" – that is, the conduct that forms the basis for the substantive claim for relief. *Id*. at 1372, 1375.

[107]The record compiled in the course of the Labor Department's initial investigation and the record of its investigation following the Workers' request for reconsideration are particularly troubling. Those proceedings reflected a flagrant, wholesale violation of the agency's duty to "marshal all relevant facts," as well as its duty to "conduct [its] investigation with the utmost regard for the interest of the petitioning workers." *See* 29 C.F.R. § 90.12; Internat'l Molders and Allied Workers' Union v. Marshall, 643 F.2d at 32. But, while the Labor Department is patently guilty of

Apparently conceding that they cannot prove bad faith, the Workers emphasize that "[t]he Pollgreen standard does not require an *intentional* delay of the awarding of benefits, but rather will be satisfied if the delays are excessive or unusual, whether or not [they] are intentional." Pls.' Reply at 8. But the case for excessive delay is only marginally stronger than the (non-existent) case for bad faith.

The Workers here simply cannot argue that "the length of delay was excessive" within the meaning of Pollgreen and Jean v. Nelson. As the Government pointedly observes, the Labor Department rendered both its initial determination on the Workers' TAA petition and its determination denying the Workers' request for consideration within the applicable statutory and regulatory periods. *See* Def.'s Response at 38. Thus, to the extent that Pollgreen and Jean v. Nelson would permit consideration of the Labor Department's *pre-litigation* conduct, the Workers cannot be heard to complain. *See* n.106, *supra* (distinguishing between Government's conduct of litigation and agency's pre-litigation conduct).

Moreover, while it is true that more than six months elapsed between the filing of the Workers' complaint and their certification by the Labor Department, the time consumed by the processes of litigation is not – in and of itself – considered "unnecessary" or "excessive" delay as those terms are used in Pollgreen and Jean v. Nelson. *See* Pollgreen, 911 F.2d at 538 (noting that "[a] delay that occurred because the government litigated a position that lacked substantial justification is not a permissible special factor because any litigation eligible for EAJA fees, by definition, involves the government's pursuit of an unjustified position.").

---

incompetence, indifference, or gross neglect (or some combination of the three), the record of this action is largely barren of any concrete, non-circumstantial evidence of bad faith.

Further, as the Government has underscored, it sought a remand of this action to the agency "within 24 days of the filing of the complaint." *See* Def.'s Response at 38. Thus, the only remaining "delay" that the Workers could conceivably lay at the Government's door is the 60-day extension of time that the Government sought for the filing of the Labor Department's remand results. But the Workers consented to that extension of time (albeit only after extracting certain assurances from the Government – assurances which were given, but which later spawned a dispute). *See* sections I & II.B.1.b, *supra* (discussing Government's assurances to Workers concerning effects of delayed certification on availability of TAA benefits).

In sum, the Workers here have failed to establish their right to a "special factors" enhancement of their fee award, both as a matter of law and based on the facts of the case. Accordingly, the Workers' award must be capped at the statutory rate of $125 per hour, except to the extent that the Workers are entitled to a cost of living adjustment to that rate.

### b. The Workers' Request for a Cost of Living Adjustment

As an alternative to the requested "special factor" enhancement, the Workers seek a cost of living adjustment ("COLA") to the EAJA's $125 per hour statutory cap on attorneys' fees. *See generally* Pls.' Application at 26-27, Exh. 7; 28 U.S.C. § 2412(d)(2)(A)(ii) (capping awards of attorneys' fees at $125 per hour "unless the court determines that an increase in the cost of living . . . justifies a higher fee"). The Government opposes the Workers' request, asserting that a cost of living adjustment is "[not] warranted in this case" – although the Government never actually explains why such an adjustment is "[not] warranted." *See* Def.'s Response at 33-34. The Government relies primarily on the Court of Appeals' opinion in <u>Phillips v. General Services</u>

Administration, 924 F.2d 1577 (Fed. Cir. 1991).  *See* Def.'s Response at 39-40.  But the

Government's citation to Phillips is misleading.[108]

The linchpin of the Government's argument is a quotation from Phillips, stating that "'the

'special factor' formulation [in the EAJA statute] suggests Congress thought that [the statutory rate]

was generally quite enough public reimbursement for lawyers' fees, *whatever the local or national*

*market might be*.'"  Phillips, 924 F.2d at 1584 (*quoting* Pierce v. Underwood, 487 U.S. at 572)

(*quoted in* Def.'s Response at 39) (emphasis added by Defendant).  Taking that excerpt out of

context, the Government employs italics to suggest that the holding of Phillips was anti-COLA.  But

the propriety of a cost of living adjustment was not at issue in Phillips.  Instead, in the excerpt on

which the Government relies, the Court of Appeals was emphasizing the limited circumstances in

---

[108]The Government also appears to suggest that a cost of living adjustment should be denied
in this case because the EAJA "does not 'absolutely require' it."  *See* Def.'s Response at 39-40
(*quoting* Baker v. Bowen, 839 F.2d at 1084).  Like the Government's distortion of Phillips, this
argument too borders on the sanctionable.  *See* USCIT Rule 11.

The EAJA does not mandate a cost of living adjustment because there may be specific
factual circumstances where an adjustment is not warranted – such as, for example, where little time
has elapsed since Congress fixed the presumptive hourly rate specified in the statute, or where a fee
applicant has failed to proffer evidence to support a cost of living adjustment.  *See*, *e.g.*, American
Wrecking Corp. v. Sec'y of Labor, 364 F.3d 321, 329 (D.C. Cir. 2004) (finding no need for cost of
living adjustment where $125 statutory rate was established in 1996, and legal services at issue were
rendered in late 1996 and early 1997); May v. Sullivan, 936 F.2d 176, 177-78 (4th Cir. 1991)
(affirming denial of cost of living adjustment where fee applicant "presented . . . nothing except an
increase in the Consumer Price Index," and even failed to assert that such an adjustment was
needed).

In light of the Congressional intent behind the cost of living provision (*i.e.*, a recognition of
the importance of preventing the erosion over time of the statutory rate established by Congress),
if the Government wishes to oppose a cost of living adjustment in the event that a fee award is
granted, the Government must articulate some specific, good faith reason why a cost of living
adjustment is not appropriate under the facts of that case.  It is not enough for the Government to
say simply that such an adjustment is not required.

which *special factors adjustments* are appropriate.

The Government's intimations notwithstanding, there is absolutely nothing in <u>Phillips</u> that questions the appropriateness of adjusting the EAJA statutory rate to reflect increases in the cost of living. Indeed, in dismissing the plaintiff's claim for a special factors adjustment in that case, <u>Phillips</u> emphasized that the Supreme Court's opinion in <u>Pierce v. Underwood</u> rejected a range of potential "special factors" precisely because they were "considered to be covered by the baseline statutory rate of [then] $75 per hour, *plus a cost of living increase*." <u>Phillips</u>, 924 F.2d at 1584 (*citing* <u>Pierce v. Underwood</u>, 487 U.S. at 571-73) (emphasis added). Moreover, although no special factors adjustment was granted, the Court of Appeals expressly held that the plaintiff in <u>Phillips</u> was entitled to attorneys' fees in a sum calculated by using "the statutory rate increased to reflect *the cost of living increase* from the effective date of the passage of the EAJA to the date the services were performed." <u>Phillips</u>, 924 F.2d at 1583 (emphasis added); *see also id*. at 1584 (requesting submissions from parties addressing "the appropriate rate for the cost of living adjustment").

Various Courts of Appeals have held in the past that a cost of living adjustment "is not automatic." <u>Oliveira v. United States</u>, 827 F.2d 735, 742 (Fed. Cir. 1987) (concluding that Claims Court's refusal "to adjust, for inflation, the statutory hourly rate" did not constitute abuse of discretion); <u>May v. Sullivan</u>, 936 F.2d 176, 177-78 (4th Cir. 1991) (holding that district court did not abuse discretion in refusing cost of living adjustment, "when presented with nothing except an increase in the Consumer Price Index," and where "even 'need for a cost of living increase' was not asserted"); <u>Baker v. Bowen</u>, 839 F.2d 1075, 1084 (5th Cir. 1988) (noting that "while the statute clearly allows an adjustment for changes in the cost of living, it does not absolutely *require* it").

However, as the courts now widely acknowledge, "[t]he express authorization for raising the

[$125] cap based on increases in the cost of living 'reflected congressional awareness that, with inflation, the fee limiting provision could defeat the purpose of the statute,'" which is to ensure that citizens have access to counsel to challenge unreasonable government action. Payne v. Sullivan, 977 F.2d 900, 902-03 (4th Cir. 1992) (*quoting* Action on Smoking & Health, 724 F.2d at 217 (footnote omitted)). Thus, absent a cost of living adjustment, an award of attorneys' fees under the EAJA may not fully reflect Congress' judgment as to the appropriate maximum statutory rate of compensation:

> [In 1996], Congress believed [$125] was a sufficient rate for awards under the Act. By permitting cost-of-living increases, Congress intended to provide attorneys at most with an hourly rate in present-day dollars commensurate with [$125] in [1996].

Baker v. Bowen, 839 F.2d at 1084. "Granting . . . courts the discretion to award cost-of-living increases . . . 'effectuates Congress' intent that attorney fees be fixed at [$125] per hour in [1996] dollars regardless of prevailing market rates, yet ensures that the maximum rate will continue to provide adequate compensation notwithstanding inflation.'" Payne v. Sullivan, 977 F.2d at 903 (*quoting* Sullivan v. Sullivan, 958 F.2d 574, 578 (4th Cir. 1992)).

Accordingly, the great weight of authority today recognizes that "[i]t 'would undermine the purpose of EAJA to remove the financial disincentive to challenge wrongful government action' if . . . courts could simply 'withhold an inflation adjustment without reason.'" Payne v. Sullivan, 977 F.2d at 903 (*quoting* Animal Lovers Volunteer Ass'n, Inc. v. Carlucci, 867 F.2d 1224, 1227 (9th Cir. 1986)). In light of "the nexus between permitting the cost-of-living adjustment and effectuating the [EAJA's] purpose," except in unusual circumstances, "any time 'there is a significant difference in the cost of living since [the year in which Congress fixed the statutory rate] . . . , then an increase should be granted.'" Payne v. Sullivan, 977 F.2d at 903 (*quoting* Baker v. Bowen, 839 F.2d at

1084).

Indeed, certain circuits have long "regard[ed] the cost of living adjustment as 'essentially perfunctory or even mandatory.'" Payne v. Sullivan, 977 F.2d at 903 n.2 (*quoting* Begley v. Sec'y of Health and Human Services, 966 F.2d 196, 199 (6th Cir. 1992) (*citing* Coup v. Heckler, 834 F.2d 313, 320 (3d Cir. 1987))); Meyer v. Sullivan, 958 F.2d 1029, 1035 n.9 (11th Cir. 1992) (stating that "[t]he Supreme Court has implied that . . . a cost-of-living adjustment under the EAJA is next to automatic"); Role Models America, 353 F.3d at 969 (noting that research by D.C. Circuit "found no case where [the court] denied [a cost of living adjustment]"); Bowen, 839 F.2d at 1084).[109]

Further, if a court refuses to grant a cost of living adjustment, it is required to specify the reasons for the denial. *See*, *e.g.*, Payne v. Sullivan, 977 F.2d at 903-04 (remanding case to trial court, emphasizing that decision on request for cost of living adjustment "should be accompanied by sufficient explanation to enable [the appellate court] to review whether it was properly considered"); Begley v. Sec'y of Health and Human Services, 966 F.2d at 200 (instructing that decision on request for cost of living adjustment "should be made on the record and on the basis of specific factual findings and conclusions of law").

The Government in this case cites nothing to suggest that the practice in the Federal Circuit is any different. *See* Nakamura v. Heinrich, 17 CIT at 121-23 (observing that "[i]t has been held that to withhold an inflation adjustment without reason would undermine the purpose of the EAJA to remove the financial disincentive to challenge wrongful government action") (citation omitted). In

---

[109]*See also* Sisk, *supra*, at 128, 145 (noting that "courts routinely approve cost-of-living adjustments," and that, in contrast to a "special factors" enhancement, "a cost-of-living escalation may properly be regarded as routine").

EAJA cases, cost of living adjustments are routinely granted as a matter of course. *See*, *e.g.*, Doty, 71 F.3d at 387 (noting that "[a] cost of living adjustment is measured from . . . the date of enactment of the EAJA, to the time the services were rendered") (citation omitted); Chiu v. United States, 948 F.2d at 722 (explaining that "the COLA to the EAJA fee rate is required to be calculated from [the date the statutory rate was fixed] to the date services are performed"); Levernier, 947 F.2d at 503 (emphasizing that "[c]learly, the court may adjust the statutory cap governing the rate of attorneys fees upward to account for an increase in the cost of living") (citation omitted).[110]

Under the circumstances, the Workers' counsel are entitled to a cost of living adjustment to the EAJA statutory fee cap of $125 per hour. The Workers assert that the cost of living adjustment should be calculated using Consumer Price Index data compiled by the Labor Department's Bureau of Labor Statistics. *See* Pls.' Application at 26 (*citing* Allegheny Bradford Corp. v. United States, 28 CIT 2107, 2114-15, 350 F. Supp. 2d 1332, 1339 (2004)). According to the Workers, the Consumer Price Index – All Urban Consumers ("CPI-U") data for March 1996 serve as the baseline for calculations. *See id.*[111] Because the Workers' counsel live and work in the Washington, D.C. area, the Workers state that cost of living adjustments in this case should be calculated using CPI-U data for the Washington-Baltimore metropolitan area (DC - MD - VA - WV). *See* Pls.' Application at 26 & Exh. 7.

The Workers note that the CPI-U data for the Washington-Baltimore area that is closest in

---

[110]*See generally* Sisk, *supra*, at 128-32 (captioned "Adjustment of the . . . [Statutory] Rate Cap for Cost-of-Living Increases Should Be Routinely Granted").

[111]The statutory cap of $125 per hour became effective in March 1996. *See* Atlantic Fish Spotters, 205 F.3d at 490 n.1 (citation omitted).

time to March 1996 is the data for November 1996, when the CPI-U was 100. By March 2004, it

had risen to 118.1 (an 18.1% increase). By March 2005, it had risen to 122.7 (a 22.7% increase).

And by March 2006, it had risen to 126.8 (a 26.8% increase). *See* Pls.' Application at 26 & Exh.

7.

Although the Government opposes the award of a cost of living adjustment in principle, it

does not quarrel with the data that the Workers use or their calculation of the adjustment. *See* Def.'s

Response at 39-40. Accordingly, adjusted to reflect increases in the cost of living, the applicable

EAJA statutory cap is $147.63 per hour for attorney hours expended in 2004, $153.38 per hour for

hours expended in 2005, and $158.50 for hours expended in 2006. *See generally* Pls.' Application

at 26.[112]

---

[112]*Compare*, *e.g.*, <u>Tyco</u>, 28 CIT at 1591-92, 350 F. Supp. 2d at 1093 (calculating cost of living adjustment in TAA case for counsel located in Washington, D.C., using CPI-U for "Northeast Urban Area"; capping award at $151.09/hour for hours expended in 2002, $155.35/hour for hours expended in 2003, and $158.70/hour for hours expended in 2004); <u>Griffin & Dickson</u>, 21 Cl. Ct. at 10 (stating that court may calculate cost of living adjustment "based either on national or local Consumer Price Index (CPI) figures"); <u>Cox Constr. Co.</u>, 17 Cl. Ct. at 37 (rejecting "use of national CPI figures" in favor of "those for San Diego," even though court "has national jurisdiction and its bar is a national bar").

*See also*, *e.g.*, <u>Miller v. Hotel & Restaurant Employees & Bartenders Union</u>, 107 F.R.D. at 243 (calculating cost of living adjustment using CPI-U for "U.S. city average"); <u>United States v. Adkinson</u>, 256 F. Supp. 2d at 1312 (stating that "[m]ost courts . . . have approved the use of the Consumer Price Index for All Urban Consumers as the appropriate index for EAJA cost of living adjustments"); <u>Stewart v. Sullivan</u>, 810 F. Supp. at 1107 (holding that cost of living adjustment must be calculated using "*national* CPI-U" rather than data for "a particular region or city"); <u>Elcyzyn v. Brown</u>, 7 Vet. App. at 179-81 (noting that "the majority view of the geographical courts of appeal is that the appropriate cost of living index is the United States Department of Labor's Consumer Price Index for All Urban Consumers (CPI-U or CPI-ALL)"); <u>Dewalt v. Sullivan</u>, 963 F.2d 27, 28 (3d Cir. 1992) (holding that cost of living adjustment should be calculated using "CPI-ALL index for Southern New Jersey," rather than CPI sub-category for "personal expenses" including legal services); <u>Sullivan v. Sullivan</u>, 958 F.2d 574 (4th Cir. 1992) (surveying split in circuits, and rejecting calculation of cost of living adjustment using "personal expenses" subcategory of CPI rather than

3. <u>Expenses</u>

In addition to an award of attorneys' fees, the Workers also seek a total of $277.65 for expenses. *See* Pls.' Application at 27; Pls.' Exhs. 5-6, 8; Application for Fees and Other Expenses Pursuant to the Equal Access to Justice Act. In support of their request, the Workers have supplied the requisite "itemized statement," including "a breakdown of expenses such as the amounts spent copying documents, telephone bills, mail costs and any other expenditures related to the case." *See* <u>Naporano Iron and Metal Co.</u>, 825 F.2d at 404 (observing that, "[i]n the absence of . . . an itemized statement, the court is unable to determine whether the . . . [claimed] expenses[] are reasonable") (citation omitted); 28 U.S.C. § 2412(d)(1)(B) (requiring submission of "itemized statement").

The documentation provided by the Workers supports their request for $7.80 for reproduction costs, $257.43 for long distance telephone charges, and $12.42 for courier costs – sums which seem eminently reasonable under the circumstances. *See* Pls.' Application at 27; Pls.' Exhs. 5-6, 8; Application for Fees and Other Expenses Pursuant to the Equal Access to Justice Act. Moreover, except to the extent that it maintains that no award of fees and expenses is appropriate (because, it contends, the position of the United States was "substantially justified"), the Government does not oppose the Workers' request.

---

broader CPI-U); *see generally* Sisk, *supra*, at 133-41 & n.864 (captioned "The Consumer Price Index as the Measure of Increases in Cost of Living" and "Measuring Increases in the Cost of Living on a National or Local Scale").

*Cf.* <u>Chiu v. United States</u>, 948 F.2d at 722 n.10 (suggesting that simpler method of calculation is to adopt "a single mid-point inflation adjustment factor applicable to services performed before and after that mid-point," but cautioning that court must "exclude inflation occurring after all services have been performed and reasonably weigh the quantum of hours and inflation factors which are otherwise applicable").

Accordingly, the Workers' request for an award of $277.65 for expenses shall be granted.

## III.  Conclusion

The Court of Appeals has spoken eloquently to the importance of the EAJA in veterans' benefits cases, beginning with the proposition that "'[t]he essential objective of the EAJA [is] to ensure that persons will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved in the vindication of their rights.'"  Kelly v. Nicholson, 463 F.3d at 1353 (*quoting* Johnson v. Gonzales, 416 F.3d 205, 208 (3d Cir. 2005) (quotation omitted)).  The Court of Appeals has emphasized that "[r]emoving such deterrents is imperative in the veterans benefits context, which is intended to be uniquely pro-claimant, . . . and in which veterans generally are not represented by counsel [at the administrative level]."  Kelly v. Nicholson, 463 F.3d at 1353 (citations omitted).  Thus, the Court of Appeals has concluded, "EAJA is a vital complement to this system designed to aid veterans, because it helps to ensure that they will seek an appeal when the VA has failed in its duty to aid them or has otherwise erroneously denied them the benefits that they have earned."  *Id.*

There are powerful parallels between the statutory scheme governing veterans' benefits and that governing trade adjustment assistance for workers whose jobs have been sacrificed to international trade, for the greater good of the nation.  *See generally* section II.A.1, *supra*; BMC, 30 CIT at ____, 454 F. Supp. 2d at 1355-58 (comparing TAA and veterans' benefits schemes).  And the significance of the EAJA is no less compelling in TAA cases.  Indeed, in at least one respect, the EAJA may be even more vital in the TAA context.  TAA cases are much like class actions.  They directly and immediately affect not only the rights of the individual representative plaintiff workers,

but also those of an entire class of former employees. *See* section II.B.1.d, *supra*.

That judicial review and representation by counsel can make a profound difference in the outcome of TAA cases is clear. *See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1352-53 (noting that, in four-year period analyzed, agency ultimately certified the workers in all but four of the 45 TAA cases litigated to resolution on the merits). Nevertheless, the overwhelming majority of workers whose TAA petitions are denied never seek judicial review of the Labor Department's determinations, for reasons unrelated to the merits of the petitions. It is thus also clear that the full potential of the EAJA in TAA cases has yet to be realized. *See id*., 30 CIT at ____, 454 F. Supp. 2d at 1353-54 (noting that denials appealed to court are "just the tip of the iceberg," explaining that it is "reasonable to assume that the TAA petitions which are *denied but not appealed* to the court are – on the whole – no less meritorious than the denied petition which *are* challenged [in court]," and concluding that the figures indicate that "the Labor Department's failure to properly investigate [TAA] petitions is routinely depriving thousand of U.S. workers of the TAA benefits to which they are legally entitled").

In short, what the Court of Appeals has said of the EAJA in veterans' benefits cases applies with equal force in the context of trade adjustment assistance: "EAJA is a vital complement to . . . [the TAA program] designed to aid . . . [displaced workers], because it helps to ensure that they will seek an appeal when the [Labor Department] . . . has failed in its duty to aid them or has otherwise erroneously denied them the benefits that they have earned." *See* Kelly v. Nicholson, 463 F.3d at 1353.

The plaintiff Workers and the other former employees of BMC have their *pro bono* counsel to thank for securing for them the trade adjustment assistance benefits that the Labor Department

had previously twice denied them.  For all the reasons discussed above, the Workers are also entitled

to an award of attorneys' fees and expenses under the EAJA, in a sum to be calculated in accordance

with the principles set forth herein.

A separate order will enter accordingly.

_____
/s/

Delissa A. Ridgway
Judge

Dated:  October 15, 2007
         New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____    By: _____
                                                    Deputy Clerk